**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| PETRO-HUNT, L.L.C., Plaintiff, | ) | No. 00–512 L |
| v. | ) | Honorable Francis M. Allegra |
| UNITED STATES OF AMERICA, Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

RONALD J. TENPAS
Acting Assistant Attorney General
Environmental & Natural Resources Division

JAMES D. GETTE
Trial Attorney
Environment and Natural Resources Division
United States Department of Justice
Benjamin Franklin Station, P.O. Box 663
Washington, DC 20044
Telephone: (202) 305-1461
Facsimile: (202) 305-0506
James. Gette@usdoj.gov

Of counsel:
Timothy H. Baker
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street, N.W., Mail Stop 4230
Washington, D.C. 20240

Of counsel:
Jay McWhirter
Office of the General Counsel
Department of Agriculture
1718 Peachtree St., NW, Suite 576
Atlanta, Georgia 30309-2437

Dated this 2nd day of September, 2008

**DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Pursuant to Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) and 12(h)(3), and 12(b)(6), Defendant, the United States of America, hereby moves to dismiss Plaintiff's Complaint on several grounds. In the alternative, to the extent that the Court finds it necessary to go beyond the confines of the pleadings, the United States moves for summary judgment pursuant to RCFC 56.

First, Defendant seeks dismissal of the contract claims contained in Plaintiff's First Amended Complaint ("Amd. Cmplt.") (Counts IV, V, VI, and VII) pursuant to RCFC 12(b)(1). This Court lacks jurisdiction to hear the contract claims[1] because those claims are barred by the Tucker Act's six-year statute of limitations. 28 U.S.C. § 2501.[2] Plaintiff admits that it was known as early as 1991, well over six years before any complaint was filed in this case, that Defendant had taken actions which allegedly violated the deeds that form the basis of Plaintiff's contract claims.

Second, Defendant seeks dismissal of this case pursuant to RCFC 56 on the ground that Plaintiff's contract claims are barred by the doctrine of laches. Plaintiff's failure to notify Defendant or the Court of its contract claims for more than eight years, despite ongoing litigation between the parties throughout that entire period of time, is manifestly unreasonable and has

---

[1]As set forth below, the United States is also moving to dismiss the majority of Plaintiff's takings claims because they are barred by the Tucker Act's six-year statute of limitations.

[2]In John R. Sand & Gravel Co. V. Untied States, ___U.S. ___, 128 S.Ct. 750, 753-54 (2008), the United States Supreme Court recently reaffirmed that Section 2501 is jurisdictional in nature. Thus, this section of the instant motion is properly considered a motion to dismiss under RCFC 12(b)(1).

prejudiced Defendant. Therefore, Plaintiff's claims should be barred.

Third, the contract claims in the First Amended Complaint (Counts IV, V, VI, and VII) should be dismissed pursuant to RCFC 12(b)(6) because Plaintiff lacks standing to pursue those claims. Plaintiff would only possess standing to pursue these contract claims if it was a party to the contract or in privity with one of the contracting parties. Here, however, the alleged contract for sale of property in the Kisatchie National Forest was between certain lumber companies and the United States. Plaintiff was not a party to the contract. Moreover, Plaintiff is not a successor-in-interest to the lumber companies. Rather, Plaintiff admits that it is the successor-in-interest to Good Pine Oil Company, which was never a party to the sales of land to the United States and has never entered into any contract with the United States related to the property at issue here. Thus, given that Plaintiff is not a party to any contract with Defendant and is not the successor-in-interest to any contracting party, Plaintiff lacks standing to pursue contract claims against the United States.

Fourth, Plaintiff's claim for reformation of the alleged contract (Count VII) must be dismissed pursuant to RCFC 12(b)(1) because this Court lacks jurisdiction to hear claims for non-monetary relief.

Fifth, in this case, Plaintiff claims that the United States has permanently and/or temporarily taken ninety-six mineral servitudes from it (Counts I, II, and III). With respect to ninety of those servitudes, however, the United States District Court for the Western District of Louisiana has already ruled that those servitudes are owned by the United States. As such, any claim by Plaintiff regarding the ownership of these ninety servitudes is barred by the doctrine of collateral estoppel. Ultimately, because Plaintiff has no ownership interest in the 90 servitudes,

the servitudes could not have been taken from it. Therefore, Defendant moves to dismiss these claims pursuant to RCFC 12(b)(6) or, in the alternative, RCFC 56.

Sixth, with respect to the remaining six servitudes, Plaintiff's claims are premised upon the argument that the United States took the property by issuing leases to third parties to conduct mining operations in violation of Plaintiff's mineral servitudes. Of the 15 leases issued by the United States on the six mineral servitudes, however, 10 of the leases were issued more than six years before Plaintiff filed the initial complaint in this case. As such these claims are barred by the Tucker Act's six-year statute of limitations (28 U.S.C. § 2501) and should be dismissed pursuant to RCFC 12(b)(1).

Seventh, also with respect to the remaining six servitudes, Plaintiff cannot allege a permanent taking (Count I) because any leases of mineral rights on these six servitudes have now either been terminated or cancelled by the Bureau of Land Management, or have expired. In any event, the leases have come to an end. As such, there can be no permanent taking and this claim should be dismissed pursuant to RCFC 56.

Eighth, similarly with respect to the remaining six servitudes, Plaintiff has failed to state a claim for a taking on servitudes one, three, and four. The unrefuted evidence is that no leases were ever issued on these three servitudes. Therefore, Plaintiff's claims with respect to these three servitudes should be dismissed pursuant to RCFC 56.

Ninth, also with respect to the remaining six servitudes in which the district court held that Plaintiff possesses a mineral interest, Plaintiff does not possess a compensable interest in precluding the United States from issuing the leases at issue here. Under Louisiana law, as a protective measure, a party may issue leases on mineral servitudes, which are later determined to

be owned by someone else. Conversely, the true owner has no right under state law to prohibit such leases, which, as a matter of law, do not interfere with the true owners use and enjoyment of the property. As such, these claims should be dismissed pursuant to RCFC 12(b)(6) or, in the alternative RCFC 56.

A memorandum in support of this motion follows.

**TABLE OF CONTENTS**

PROCEDURAL AND FACTUAL BACKGROUND . . . . . 1

SCOPE AND STANDARD OF REVIEW . . . . . 5

A. Lack of Jurisdiction – RCFC 12(b)(1) . . . . . 5

B. Failure to State a Claim – RCFC 12(b)(6) . . . . . 7

C. Summary Judgment – RCFC 56 . . . . . 7

ARGUMENT . . . . . 8

I. The Court Lacks Jurisdiction to Hear Plaintiff's Contract Claims, Which Were Filed More Than Six Years After They Accrued . . . . . 8

A. Plaintiff's Claims Are Subject to the Tucker Act's Six-Year Statute of Limitations . . . . . 8

B. Plaintiff Bears the Burden of Establishing the Court's Jurisdiction . . . . 10

C. Plaintiff Failed to Timely File Its Contract Claims in this Case . . . . . 11

II. Plaintiff's Contract Claims are Barred by the Doctrine of Latches . . . . . 13

III. Plaintiff's Breach of Contract Claims Must Be Dismissed Because Plaintiff is Not a Party to the Contract, nor is Plaintiff a Successor-in-Interest to a Contracting Party . . . . . 15

IV. The Court Lacks Jurisdiction Over Claims for Equitable Relief . . . . . 17

V. Plaintiff Has No Legally Compensable Property Interest in the Prescribed Mineral Servitudes . . . . . 19

A. Plaintiff Must Demonstrate that It Possesses a Compensable Property Interest . . . . . 20

B. Plaintiff is Collaterally Estopped from Arguing that it Holds A Compensable Property Interest in the Prescribed Servitudes . . . . . 21

VI. This Court Lacks Jurisdiction to Hear Any of Plaintiff's Taking Claims Based Upon Leases Issued Before August 24, 1994 . . . . . 23

VII. Plaintiff Fails to State a Claim for a Permanent Taking of the Non-Prescribed Servitudes . . . . . . . . . . 25

VIII. Plaintiff Fails to State a Claim for a Taking on Servitudes One, Three, and Four . . . . . . . . . . 27

IX. Plaintiff Lacks a Compensable Property Interest . . . . . . . . . . 27

A. Background Principles of State Law Define the Contours of Plaintiff's Property Interest . . . . . . . . . . 28

1. As a Threshold Matter, Plaintiff Must Demonstrate the Existence of a Protected Property Right Before a Taking Can Be Considered . . . . . . . . . . 28

2. Plaintiff Bears the Burden of Demonstrating That a Property Interest Exists . . . . . . . . . . 30

3. State Law Routinely Defines the Scope of a Plaintiff's Property Interest . . . . . . . . . . 31

B. Louisiana Law Does Not Allow a Mineral Servitude Owner to Restrict the Issuance of Protective Leases on Its Servitude . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . 35

## TABLE OF AUTHORITIES

### FEDERAL CASES

A.C. Aukerman Co. v. R.L. Chaides Const. Co.,
960 F.2d 1020 (Fed. Cir. 1992) . . . . . . . . . . 13, 14

Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,
988 F.2d 1157 (Fed. Cir. 1993) . . . . . . . . . . 7

Air Pegasus of D.C., Inc. v. United States,
424 F.3d 1206 (Fed. Cir. 2005) . . . . . . . . . . 29, 30

Alder Terrace, Inc. v. United States,
161 F.3d 1372 (Fed. Cir. 1998) . . . . . . . . . . 6

Alliance of Descendants of Texas Land Grants v. United States,
27 Fed. Cl. 837 (1993), aff'd, 37 F. 3d 1478 (Fed. Cir. 1994) . . . . . . . . . . 24

Alliance of Descendants of Texas Land Grants v. United States,
37 F.3d 1478 (Fed Cir. 1994) . . . . . . . . . . 11

Allustiarte v. United States,
256 F.3d 1349 (Fed. Cir. 2001) . . . . . . . . . . 22

Am. Pelagic Fishing Co. v. United States,
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . . . . . 21, 28-31

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 7

Ariadne Financial Servs. Pty. Ltd. v. United States,
133 F.3d 874 (Fed. Cir.) cert. denied, 525 U.S. 823 (1998) . . . . . . . . . . 9

Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . 8

Bd. of Regents of State Colls. v. Roth,
408 U.S. 564, 577 (1972) . . . . . . . . . . 20, 31

Bender v. Williamsport Area School Dist.,
475 U.S. 534 (1986) . . . . . . . . . . 11

Block v. North Dakota,

461 U.S. 273 (1983) . . . . . . . . . . 9

Bobula v. United States Dep't of Justice,
970 F.2d 854 (Fed. Cir. 1992) . . . . . . . . . . 19

Boise Cascade Corp. v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . 26

Bond v. United States,
47 Fed. Cl. 641 (2000) . . . . . . . . . . 6

Borough of Alpine v. United States,
923 F.2d 170 (Fed. Cir. 1991) . . . . . . . . . . 10

Bowen v. United States,
292 F.3d 1383 (Fed. Cir. 2002) . . . . . . . . . . 11

Briscoe v. LaHue,
663 F.2d 713 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983) . . . . . . . . . . 6

Brown v. United States,
105 F.3d 621 (Fed. Cir. 1997) . . . . . . . . . . 18

C.W. Over & Sons, Inc. v. United States,
44 Fed. Cl. 18 (1999) . . . . . . . . . . 8

Catellus Dev. Corp. v. United States,
31 Fed. Cl. 399 (1994) . . . . . . . . . . 9, 10

Cedars-Sinai Med. Ctr. v. Watkins,
11 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . 6

Celotex v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 8

Cent. Pines Land Co. v. United States,
274 F.3d 881 (5th Cir. 2001) . . . . . . . . . . 2, 3, 35

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . 20

Chandler v. United States,
47 Fed. Cl. 106 (2000) . . . . . . . . . . 11

Cloutier v. United States,
19 Cl. Ct. 326 (1990), aff'd mem., 937 F.2d 622 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . 8

Colvin Cattle Co. v. United States,
468 F.3d 803 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Conti v. United States,
291 F.3d 1334 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28, 29, 31

Cook v. United States,
32 Fed. Cl. 783 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

De Graffenried v. United States,
20 Cl. Ct. 458 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Doe v. United States,
372 F.3d 1308 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

D'Andrea v. United States,
27 Fed. Cl. 612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Entines v. United States,
39 Fed. Cl. 673 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Eurell v. United States,
215 Ct. Cl. 273, 566 F.2d 1146 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fallini v. United States,
56 F.3d 1378 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996) . . . . . . . . . . . . . . . . . 11

Fanning, Phillips, Molnar v. West,
160 F.3d 717 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ferreiro v. United States,
350 F.3d 1318 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Figueroa v. United States,
57 Fed. Cl. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

First Hartford Corp. Pension Plan & Trust v. United States,

194 F.3d 1279 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Franconia Assocs. v. United States,
240 F.3d 1358 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Griswold v. United States,
61 Fed. Cl. 458 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hart v. United States,
910 F.2d 815 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hartle v. United States,
22 Cl. Ct. 843 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hendler v. United States,
952 F. 2d. 1364 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
26

Ho v. United States,
49 Fed. Cl. 96 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Hunt v. United States,
52 Fed. Cl. 810 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

John R. Sand & Gravel Co. v. United States,
___U.S. ___, 128 S.Ct. 750, 753-54 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 10

Jones v. United States,
801 F.2d 1334 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

King Bridge Co. v. Otoe County,
120 U.S. 225 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Kinne v. United States,
21 Cl.Ct. 104 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Kroeger v. U.S. Postal Serv.,

865 F.2d 235 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lakewood Assocs. v. United States,
45 Fed. Cl. 320 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Loretto v. Teleprompter Manhattan CATV Corp.,
458 U.S. 419 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Lucas v. S.C. Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 30, 32

M&J Coal Co. v. United States,
47 F.3d 1148 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28-31

Maniere v. United States,
31 Fed. Cl. 410 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Maritrans v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 29, 30

Mason v. United States,
27 Fed. Cl. 832 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

McDonald v. United States,
37 Fed. Cl. 110 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

McNutt v. Gen. Motors Acceptance Corp. of Ind.,
298 U.S. 178 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 11

Members of Peanut Quota Holders Ass'n, Inc., v. United States,
421 F.3d 1323 (Fed.Cir. 2005), cert. denied, 548 U.S. 904 (2006) . . . . . . . . . . . . . . . . . 28

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Montana v. United States,
440 U.S. 147 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Mother's Rest., Inc. v. Mama's Pizza, Inc.,
723 F.2d 1566 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Murray v. United States,
817 F. 2d. 1850 (Fed. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18

Penn Central Transp. Co. v. City of New York,
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Petro-Hunt v. United States,
179 F. Supp. 2d 669 (W.D. La. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

Petro-Hunt v. United States,
2007 WL 715270, *1 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 20, 21

Petro-Hunt v. United States,
365 F.3d 385 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Pixton v. B & B Plastics, Inc.,
291 F.3d 1324 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Pratt & Whitney Canada Inc. v. United States,
12 Cl. Ct. 221 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Raitport v. United States,
33 Fed. Cl. 155 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Renne v. Geary,
501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Reynolds v. Army & Air Force Exchange Serv.,
846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10

Sheuer v. Rhodes,
416 U.S. 232 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sierra Club v. Cedar Point Oil Co.,
73 F.3d 546 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Simmons v. United States,
53 Fed. Cl. 131 (2002), aff'd, No. 02-5163,
2003 WL 23415938 (Fed. Cir. Jan. 10, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Soriano v. United States,
352 U.S. 270 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

State of Alaska v. United States,
32 Fed. Cl. 689 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Stearns Co., Ltd. v. United States,
396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Stephenson v. United States,
58 Fed. Cl. 186 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Tabb Lakes v. United States,
26 Cl. Ct. 1334 (1992), aff'd, 10 F. 3d. 796 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 8

Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Thomas vs. Gen. Servs. Admin,
794 F. 2d. 66 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
22

Thomson v. Gaskill,
315 U.S. 442 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Toxgon Corp. v. BNFL, Inc.,
312 F.3d 1379 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Truckee - Carson Irr. Dist v. United States,
14 Cl. Ct. 361 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 17

United States v. Causby,
328 U.S. 256 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Diebold, Inc.,
369 U.S. 654 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

United States v. Gen. Motors Corp.,
323 U.S. 373 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

United States v. King,
395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

United States v. Little Lake Misere,
412 U.S. 580 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

United States v. Mitchell,
463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

United States v. Nebo Oil Co.,
190 F.2d 1003 (5th Cir. 1951) . . . . . . . . . . 2

United States v. Pewee Coal Co.,
341 U.S. 114 (1951) . . . . . . . . . . 26

United States v. Sherwood,
312 U.S. 584 (1941) . . . . . . . . . . 17

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . 9

Wyatt v. United States,
271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 535 U.S. 1077 (2002) . . . . . . . . . . 20

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . . . . . . 25

**STATE CASES**

American Lung Ass'n v. State of La.,
645 S.2d 1219, 1222 (La. Ct. App. 1994) . . . . . . . . . . 33

Gailey v. McFarlin,
193 So. 570 (La. 1940) . . . . . . . . . . 34

**FEDERAL STATUTES**

28 U.S.C. § 1491(a)(2) . . . . . . . . . . 18

28 U.S.C. § 2501 . . . . . . . . . . 9, 36

**STATE STATUTES**

La. Civ. Code Art. 789 (1870) . . . . . . . . . . 1

La. Rev. Stat. § 31:121 (West 2000) . . . . . . . . . . 27, 32

La. Rev. Stat. § 31:149 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

La. Rev. Stat. § 31:27 (West 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FEDERAL RULES**

18 Am. Jur. 2d Corporations § 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 24

Federal Practice and Procedure § 1357 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

RCFC 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 25, 36

RCFC 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 36

RCFC 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Rule 12(h)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**PROCEDURAL AND FACTUAL BACKGROUND**

In the early 1930s, Bodcaw Lumber Company of Louisiana ("Bodcaw Lumber") and Grant Timber & Manufacturing Company of Louisiana, Inc. ("Grant Timber") owned approximately 180,000 acres of land in Grant, Winn, and Natchitoches parishes in Louisiana. Amd. Cmplt. (Dkt. 51) ¶¶ 10, 13.[3] From 1932-1934 Bodcaw Lumber and Grant Timber transferred the mineral interests underlying the 180,000 acres to a third party, Good Pine Oil, to do oil and gas exploration. Id. ¶¶ 13-16. The mineral interests transferred to Good Pine Oil constituted 96 mineral servitudes. Id. ¶ 19.

Then from 1934-1937, Bodcaw Lumber and Grant Timber separately sold the surface rights to the 180,000 acres of land to the United States. Id. ¶¶ 37-38. At the time of the initial sale of the surface rights to the United States, the land was burdened by the 96 mineral servitudes. Id. ¶ 39. At the time of the sale of the land to the United States, Louisiana's law of prescription provided that any mineral servitude, on which there was no production activity for a period of ten years, prescribed to the owner of the surface estate. La. Civ. Code Art. 789 (1870); La. Rev. Stat. § 31:27 (West 2008). Subsequently, Act 315 of 1940 was passed by the Louisiana Legislature, which amended the prescription law and made it inapplicable to lands owned by the

[3]For purposes of the instant motion only, Defendant assumes the truth of the allegations in the Amended Complaint that are material to the adjudication of the instant motion. The majority of the facts relevant to the instant motion are also set forth in the 2004 decision by the Fifth Circuit in Plaintiff's quiet title action. See Petro-Hunt v. United States, 365 F.3d 385 (5th Cir. 2004) ("Petro-Hunt II"); see also Petro-Hunt v. United States, 179 F. Supp. 2d 669 (W.D. La. 2001) ("Petro-Hunt I").

United States. See Petro-Hunt II, 365 F.3d at 390; 1940 La. Act 315; La. Rev. Stat. § 31:149 (1974). In 1948 the United States brought an action for declaratory relief against Nebo Oil, the successor to Good Pine Oil, arguing that, with respect to 1 of the 96 servitudes, the mineral interests had prescribed to the United States as surface owner as the result of ten years of non-use. (This servitude is referred to herein as the "Nebo Oil Servitude"). The Fifth Circuit ultimately ruled that Act 315 of 1940 was retroactive and therefore prevented the Nebo Oil Servitude from prescribing to the United States. Petro-Hunt II, 365 F.3d at 391, citing United States v. Nebo Oil Co., 190 F.2d 1003, 1010 (5th Cir. 1951).

In 1973, the Supreme Court issued a ruling that was contrary to the conclusion reached by the Fifth Circuit in Nebo Oil. In United States v. Little Lake Misere, the Supreme Court held that, as a choice-of-law principle, Act 315 of 1940 could not be applied to property acquired by the United States prior to its enactment because it was "'plainly hostile to the interests of the United States' and could not be 'borrowed' as the rule of decision." Petro-Hunt II, 365 F.3d at 392, citing United States v. Little Lake Misere, 412 U.S. 580, 596 (1973).[4]

As a result of this subsequent Supreme Court precedent, which called into question the vitality of the Nebo Oil decision, the United States reassessed its ownership position vis-a-vis the remaining 95 mineral servitudes and determined that it did, in fact, own the mineral servitudes as the result of the Louisiana prescription law that existed at the time of the land purchases. Petro-Hunt II, 365 F.3d at 393-94; see also Petro-Hunt I, 179 F. Supp. 2d at 675. As a result,

---

[4]The Little Lake Misere decision was later applied by the Fifth Circuit to a case posing almost identical facts to the Nebo Oil case to support the Fifth Circuit's similar holding that Act 315 of 1940 could not be applied to property acquired by the United States prior to its enactment. Petro-Hunt II, 365 F.3d at 393, citing Cent. Pines Land Co. v. United States, 274 F.3d 881 (5th Cir. 2001).

beginning in the late 1980s, the United States began offering leases on the United States' land on which the servitudes had been located. Id.; see also Amd. Cmplt. (Dkt. 51) ¶ 60. Petro-Hunt disputed several of these leases. Petro-Hunt I, 179 F. Supp. 2d at 675; Amd. Cmplt. (Dkt. 51) ¶ 61.

In response, Petro-Hunt and its partners (Hunt Petroleum Corp. and Kingfisher Resources, Inc.) filed a quiet title action in the United States District Court for the Western District of Louisiana seeking to be declared the owners of the 96 mineral servitudes. Petro-Hunt II, 365 F.3d at 394; Petro-Hunt I, 179 F. Supp. 2d at 675; Amd. Cmplt. (Dkt. 51) ¶ 66. Initially, the District Court reasoned that the doctrine of res judicata applied and that the decision in Nebo Oil was determinative of the case. Petro-Hunt I, 179 F. Supp. 2d 669. The Court, therefore, initially held that Petro-Hunt and its partners still owned all 96 servitudes. Id. 179 F. Supp. 2d at 682. This decision was set aside by the Fifth Circuit based upon the Supreme Court's ruling in Little Lake Misere, 412 U.S. 580, and the Fifth Circuit's decision in Cent. Pines Land, 274 F.3d 881. Petro-Hunt II, 365 F.3d at 393.

On remand, the District Court held that Plaintiff was the owner of the Nebo Oil Servitude. The District Court also held, based upon a stipulation of the parties, that 90 of the remaining 95 servitudes had prescribed and were therefore owned by the United States. See Petro-Hunt v. United States, 2007 WL 715270, at *1 (5th Cir. 2007) ("Petro-Hunt III"). (These 90 servitudes are referred to herein as the "Prescribed Servitudes"). The remaining 5 servitudes – which were numbered one through five in the district court's judgment on remand – were held to have not prescribed and to be owned by Plaintiff and its partners. See Petro-Hunt v. United States, Civ. No. 00-303 (W.D. La., Dec. 7, 2005), Judgment (Dkt. 228) (attached hereto as

Exhibit A). (These five servitudes and the Nebo Oil servitude are referred to herein as the "Non-Prescribed Servitudes").[5]

During the late 1980s and during the 1990s the United States issued a single lease on the Nebo Oil Servitude; 11 leases on servitude number two; and 2 leases on servitude number five. Declaration of Delia K. Jaquette ("Jacquette Dec."), ¶ 3 (attached hereto as Exhibit B). As set forth in the following chart, 10 of the 15 leases were issued prior to August 24, 1994, which places them more than six years before the initiation of the instant lawsuit. Moreover, also as demonstrated in the chart, all 15 leases have now either been cancelled or terminated by the Bureau of Land Management, or have expired as a result of the stated term coming to an end.

| **Servitude** | **Lease No.** | **Issuance Date** | **Lease Disposition** | **End Date** | **Source of Information** |
|---|---|---|---|---|---|
| Nebo | 046324 | January 27, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.a.i. |
| 2 | 043575 | June 5, 1991 | Expired | June 30, 2001 | Jacquette Dec. Ex. B, ¶ 3.c.i. |
| 2 | 046310 | January 26, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.c.viii. |
| 2 | 046312 | January 26, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.c.ii. |
| 2 | 046313 | January 27, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.c.iii |
| 2 | 046314 | January 27, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.c.iv. |

[5]Plaintiff incorrectly states that the United States was declared the owner of 91 of the servitudes (Amd. Cmplt. ¶ 69), presumably because it overlooked the Nebo Oil servitude, which was determined to still be owned by Plaintiff and its partners in addition to servitudes one through five.

| | | | | | |
|---|---|---|---|---|---|
| 2 | 046315 | January 27, 1994 | Cancelled | January 11, 2002 | Jacquette Dec. Ex. B, ¶ 3.c.v. |
| 2 | 046318 | January 27, 1994 | Expired | January 31, 2004 | Jacquette Dec. Ex. B, ¶ 3.c.vi. |
| 2 | 046323 | January 26, 1994 | Terminated | February 1, 2000 | Jacquette Dec. Ex. B, ¶ 3.c.xi. |
| 2 | 047595 | January 25, 1996 | Cancelled | January 11, 2002 | Jacquette Dec. Ex. B, ¶ 3.c.vii. |
| 2 | 047978 | August 9, 1996 | Terminated | August 1, 2005 | Jacquette Dec. Ex. B, ¶ 3.c.ix. |
| 2 | 047979 | July 17, 1996 | Terminated | August 1, 2003 | Jacquette Dec. Ex. B, ¶ 3.c.x. |
| 5 | 037729 | June 1, 1988 | Expired | January 1, 2001 | Jacquette Dec. Ex. B, ¶ 3.f.i. |
| 5 | 047279 | July 5, 1995 | Expired | July 31, 2005 | Jacquette Dec. Ex. B, ¶ 3.f.ii. |
| 5 | 047280 | July 17, 1995 | Cancelled<br>Expired | January 11, 2002<br>July 31, 2005 | Jacquette Dec. Ex. B, ¶ 3.f.iii. |
| *Highlighted entries represent leases issued more than six years before the filing of this lawsuit. | | | | | |

**SCOPE AND STANDARD OF REVIEW**

**A. Lack of Jurisdiction – RCFC 12(b)(1)**

In this case, Plaintiff asserts takings claims and contract claims, including a request for reformation of an alleged contract. The determination of whether this Court has subject matter jurisdiction to hear these claims is a question of law. See Toxgon Corp. v. BNFL, Inc., 312 F.3d 1379, 1381 (Fed. Cir. 2002). When considering a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of establishing subject matter

jurisdiction, which must be done by a preponderance of the evidence. Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936)); Entines v. United States, 39 Fed. Cl. 673, 678 (1997) ("Plaintiff bears the burden of establishing all jurisdictional requirements . . . and must do so by a preponderance of the evidence.")). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." Bond v. United States, 47 Fed. Cl. 641, 647 (2000) (quoting Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981), aff'd, 460 U.S. 325 (1983)). Subject matter jurisdiction may be challenged at any time by the parties or by the court sua sponte. Fanning, Phillips, Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998).

In ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true the complaint's undisputed factual allegations and construe the facts in the light most favorable to the plaintiffs. Figueroa v. United States, 57 Fed. Cl. 488, 492 (2003) (citing Sheuer v. Rhodes, 416 U.S. 232, 236 (1974)); Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002). However, if a motion to dismiss challenges the truth of jurisdictional facts alleged in the complaint, the allegations in the complaint are not controlling, and the court may consider relevant evidence in order to resolve the factual dispute. Ferreiro v. United States, 350 F.3d 1318, 1324 (Fed. Cir. 2003) ("A trial court may weigh relevant evidence when it considers a motion to dismiss that challenges the truth of jurisdictional facts alleged in a complaint."); Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1584 (Fed. Cir. 1993); Reynolds v. Army & Air Force Exchange Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Where, as here, the Court lacks jurisdiction over the subject matter of the complaint, the correct remedy is dismissal of the action. "[U]nder [Court of Federal Claims] Rule 12(h)(3), this court is mandated to. . .

dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. . . .'" Truckee-Carson Irr. Dist. v. United States, 14 Cl. Ct. 361, 368 (1988) (alteration in original).

**B. Failure to State a Claim – RCFC 12(b)(6)**

The Court has authority to dismiss a complaint for failure to state a claim pursuant to RCFC 12(b)(6). Kinne v. United States, 21 Cl.Ct. 104, 107 (1990). The rules allow the dismissal when the causes of action asserted in the complaint are "fatally flawed in their legal premises and destined to fail. . . spar[ing] litigants the burdens of unnecessary pretrial and trial activity." Maniere v. United States, 31 Fed. Cl. 410, 419 (1994) (quoting Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc., 988 F.2d 1157, 1160 (Fed. Cir. 1993). Dismissal for failure to state a claim is proper when it is established that a plaintiff cannot prove any set of facts consistent with the plaintiff's allegations that would entitle the plaintiff to the relief sought. See Sierra Club v. Cedar Point Oil Co., 73 F.3d 546, 559 (5th Cir. 1996). In approving a motion to dismiss pursuant to 12(b)(6), "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." 5A Chalres A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357, p. 299 (1990).

**C. Summary Judgment – RCFC 56**

Summary judgment is proper where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Admittedly, the facts, "must be viewed in the light most favorable to the party

opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1961) (per curiam). However, "a mere 'metaphysical doubt' will not prevent the granting of a summary judgment motion." Cloutier v. United States, 19 Cl. Ct. 326, 328 (1990), aff'd mem., 937 F.2d 622 (Fed. Cir. 1991). The evidence presented "must be more than merely colorable." C.W. Over & Sons, Inc. v. United States, 44 Fed. Cl. 18, 22 (1999) (citing Celotex v. Catrett, 477 U.S. 317, 323 (1986)); Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) ("If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted.").

Moreover, summary judgment "must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and in which that party will bear the burden of proof at trial. A complete failure of proof concerning an essential element of the non-movant's case entitles the movant to judgment as a matter of law." Cloutier, 19 Cl. Ct. at 328 (citing Celotex, 477 U.S. at 323-24). In this regard, summary judgment "is properly regarded not as a disfavored procedural shortcut but, rather, as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action. . . .'" Tabb Lakes v. United States, 26 Cl. Ct. 1334, 1344 (1992) (quoting Celotex, 477 U.S. at 327), aff'd, 10 F.3d 796 (Fed. Cir. 1993).

## ARGUMENT

### I. The Court Lacks Jurisdiction to Hear Plaintiff's Contract Claims, Which Were Filed More Than Six Years After They Accrued

#### A. Plaintiff's Claims Are Subject to the Tucker Act's Six-Year Statute of Limitations

The United States may not be sued unless Congress has waived sovereign immunity,

United States v. Mitchell, 463 U.S. 206, 212 (1983), and a waiver of sovereign immunity is subject to any conditions imposed by Congress, Soriano v. United States, 352 U.S. 270, 276 (1957). Specifically, when a waiver of sovereign immunity contains a statute of limitations, the "limitations provision constitutes a condition on the waiver of sovereign immunity." Block v. North Dakota, 461 U.S. 273, 287 (1983). The statute therefore, "define[s] th[e] court's jurisdiction to entertain the suit." United States v. Testan, 424 U.S. 392, 399 (1976).

Thus, in order for a claim to fall within the jurisdiction of the Court of Federal Claims, a plaintiff is required to file its claim within the applicable statute of limitations. Cook v. United States, 32 Fed. Cl. 783, 785 (1995); D'Andrea v. United States, 27 Fed. Cl. 612, 614, aff'd, 6 F.3d 786 (Fed. Cir. 1993). The statute of limitations applicable to Plaintiff's takings claims is set forth in 28 U.S.C. § 2501 and provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." The six-year limitation is "an 'express limitation on the Tucker Act's waiver of sovereign immunity.'" Franconia Assocs. v. United States, 240 F.3d 1358, 1362 (Fed. Cir. 2001) (quoting Hart v. United States, 910 F.2d 815, 817 (Fed. Cir. 1998)).

In Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988), the Federal Circuit observed that the six-year limitations period for actions against the United States "is a jurisdictional requirement attached by Congress" that must be strictly construed. "[F]ailure to comply with the statute of limitations places the claim beyond the court's power to hear and decide." Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 404 (1994) (citing Soriano v. United States, 352 U.S. 270, 273 (1957)); see also Ariadne Financial Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir.) cert. denied, 525 U.S. 823 (1998)

(citing Borough of Alpine v. United States, 923 F.2d 170, 171 n.1 (Fed. Cir. 1991)). "Because the limitations period is an express condition of the Government's consent to be sued, the court lacks the power to toll the running of the statute of limitations on equitable grounds." Simmons v. United States, 53 Fed. Cl. 131, 133 (2002), aff'd, No. 02-5163, 2003 WL 23415938 (Fed. Cir. Jan. 10, 2003) (unpublished per curiam). Indeed, the United States Supreme Court recently confirmed that 28 U.S.C. § 2501 is an absolute jurisdictional statute of limitations that bars claims not brought within the prescribed six year period. John R. Sand & Gravel Co. v. United States, ___U.S. ___, 128 S.Ct. 750, 753-54 (2008).

### B. Plaintiff Bears the Burden of Establishing the Court's Jurisdiction

It is well-established that the party asserting jurisdiction bears the burden of demonstrating that the Court possesses jurisdiction to hear its claims. Thomson v. Gaskill, 315 U.S. 442, 446 (1942); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The Supreme Court has addressed the burden of establishing jurisdiction in federal courts by stating that the statutory authority vested in the court to enforce its jurisdictional limitations,

> precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof.

McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936), quoted in Catellus Dev. Corp., 31 Fed. Cl. at 404-05. "[B]ecause the statute of limitations is jurisdictional, a plaintiff bears the burden of proving that its action was timely filed." McDonald v. United States, 37 Fed. Cl. 110, 113 (1997) (citing Mason v. United States, 27 Fed. Cl. 832, 836 (1993)). As the Supreme Court has repeatedly held, "[w]e presume that federal courts lack jurisdiction 'unless

the contrary appears affirmatively from the record.'" Renne v. Geary, 501 U.S. 312, 316 (1991) (quoting Bender v. Williamsport Area School Dist., 475 U.S. 534, 546 (1986), and King Bridge Co. v. Otoe County, 120 U.S. 225, 226 (1887); see also McNutt, 298 U.S. at 189.

"[A] claim against the United States first accrues on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Bowen v. United States, 292 F.3d 1383, 1385–86 (Fed. Cir. 2002) (quoting Chandler v. United States, 47 Fed. Cl. 106, 113 (2000)); see also Kemp, 65 Fed.Cl. at 825 (quoting Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d 1478, 1481-82 (Fed Cir. 1994)). In determining when a claim has accrued, the court applies an objective standard. Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996).

**C. Plaintiff Failed to Timely File Its Contract Claims in this Case**

Plaintiff first filed contract claims in this case on June 25, 2008. Amd. Cmplt. (Dkt. 51) (counts IV, V, VI, and VII). As such, to be timely, Plaintiff's claims must have accrued no earlier than six years prior to that date, or June 25, 2002.

In its first amended complaint, Plaintiff alleges that certain deeds – through which the United States bought property from several lumber companies – constituted contracts, which Defendant has now allegedly breached. Amd. Cmplt. (Dkt. 51) ¶¶ 37-41 and Counts IV, V, VI and VII. Plaintiff premises the alleged breaches of these contracts on leases which the United States issued to third parties, which allowed the third parties to conduct mining operations on the property at issue in this case. Amd. Cmplt. (Dkt. 51) ¶¶ 60-65. By its own admission, however, Plaintiff was well aware that the United States was issuing leases to third parties to mine this property beginning in 1991. Plaintiff's Initial Complaint ("Cmplt.") (Dkt. 1) ¶ 9; Amd. Cmplt.

(Dkt. 51) ¶ 60. Plaintiff, in fact, disputed the leases beginning in 1991 by writing letters to the United States Department of Agriculture. Cmplt. (Dkt. 1) ¶ 10; Amd. Cmplt. (Dkt. 51) ¶ 61. Given that all of the facts necessary to institute a breach of contract claim had accrued by 1991, Plaintiff was required to initiate those claims by the close of 1997 at the latest. Because Plaintiff's contract claims were not filed until June 25, 2008 – more than ten years after the Tucker Act's six-year statute of limitations had run – this Court lacks jurisdiction to hear those claims, which must be dismissed.[6]

Even if Plaintiff somehow asserts that the leasing of the mineral rights does not represent the claim accrual for purposes of Plaintiff's contract claims, Plaintiff's contract claims could not have been timely filed in this case. Certainly by the time that Plaintiff filed a quiet title action against the United States regarding the ownership of all 96 of the servitudes at issue in this case, any acts which could possibly represent the claim accrual date for Plaintiff's contract claims would have occurred. As such, Plaintiff was aware of any breach of contract claim, at the latest, by February 18, 2000 – the date Plaintiff brought an action against the United States in the Western District of Louisiana claiming that leases issued by the Bureau of Land Management had interfered with Plaintiff's property interests in certain mineral servitudes allegedly owned by Plaintiff. Amd. Compl. (Dkt. 51) ¶¶ 60, 66. Since Plaintiff did not assert its contract claims until June 25, 2008 – more than six years since the filing of the quiet title action in the district court – these claims were not timely filed.

A claim which is time barred under the statute of limitations must be dismissed since this

[6]Even if the contract claims alleged by Plaintiff date back to the initial filing of the Complaint, an assertion with which Defendant strongly disagrees, Plaintiff's contract claims were still not filed within the jurisdictional time limit.

Court lacks subject matter jurisdiction to hear such a claim. See Jones v. United States, 801 F.2d 1334, 1335 (Fed. Cir. 1986). In the instant case, under any possible scenario, Plaintiff's contract claims were not timely filed. Those claims, therefore, must be dismissed as beyond this Court's jurisdiction.

## II. Plaintiff's Contract Claims are Barred by the Doctrine of Latches

Even assuming, arguendo, that the Tucker Act's statute of limitations does not bar plaintiffs' claims, this Court should grant Defendant summary judgment based on the doctrine of laches. Laches is "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar [to suit]." Raitport v. United States, 33 Fed. Cl. 155, 159 (1995), quoting A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1028-29 (Fed. Cir. 1992) (en banc). Plaintiff's inexplicable decision to sit on its claims for, at a minimum, more than eight years has prejudiced Defendant; therefore, Plaintiff should be barred from recovery.

The application of laches is within the sound discretion of the trial court. Raitport v. United States, 33 Fed. Cl. at 159; A.C. Aukerman v. R.L. Chaides, 960 F.2d at 1032. Though not based on rigid rules, a rebuttable presumption of laches arises upon proof that a plaintiff, without good excuse, delayed filing suit. Raitport, 33 Fed. Cl. at 160; De Graffenried v. United States, 20 Cl. Ct. 458, 487 (1990); see also Pratt & Whitney Canada Inc. v. United States, 12 Cl. Ct. 221, 222 (1987).

To overcome the presumption of laches, Plaintiff must produce evidence that the eight-year delay here was reasonable, or that Defendant was not prejudiced by the delay. Raitport, 33 Fed. Cl. at 161; A.C. Aukerman v. R.L. Chaides, 960 F.2d at 1032, 1038. Further, "the greater

the lapse of time, the less need there is to show specific prejudice." Eurell v. United States, 215 Ct. Cl. 273, 566 F.2d 1146, 1150 (1977). While the burden of proving the affirmative defense of laches ultimately rests with defendant, Plaintiff must present sufficient evidence that there is a genuine issue of fact to overcome the presumption of laches. Raitport, 33 Fed. Cl. at 161. This, Plaintiff cannot do.

Here, Plaintiff recognizes that it, or its predecessor in interest, first became aware of ownership disputes related to the mineral servitudes at issue in this case in 1948 when the United States first filed an action for declaratory judgment in the United States District Court for the Western District of Louisiana. Amd. Cmplt. (Dkt. 51) ¶¶ 53, 108 ("The United States later claimed ownership of certain of Plaintiff's Mineral Estate[s] in 1948. . . ."). Plaintiff was again put on notice regarding the dispute over the mineral servitudes at issue here in 1991, when, over Plaintiff's objections, the Bureau of Land Management issued leases on the servitudes. See supra. p. 12. Moreover, Plaintiff was well aware of the dispute over the ownership of these mineral servitudes in February 2000 when it instituted its first of two lawsuits against the United States. See supra. pp. 12-13.

Despite being well aware of the disputed ownership of these mineral servitudes and the relationship that the dispute had to any property transfers related to the property, Plaintiff made no effort to apprise the United States or any court of the United States that it intended to pursue allegations of breach of contract. Instead, when it filed the instant lawsuit, Plaintiff filed it purely as a saving action that would allow for the adjudication of money damages related to the takings claims that might arise out of the quiet title action being adjudicated in the district court. That is why Plaintiff immediately moved to stay the litigation in this Court pending the outcome

of the quiet title action in the district court. See Cmplt. (Dkt. 1) ¶¶ 11 & 13 ("The present proceeding is brought, in part, in the alternative, and the interests of justice and judicial economy require that it be stayed pending resolution of plaintiff's Louisiana Quiet Title Act Suit."); Plaintiff's Motion to Stay (Dkt. 5). If Plaintiff had filed its contract claims when it originally brought the instant lawsuit in 2000, Defendant would not have consented to a stay of the contract claims, which were not at issue in and not dependent upon an adjudication of the quiet title action brought by Plaintiff in the district court.

In sum, even putting aside the statute of limitations, Plaintiffs' claims should be barred by the doctrine of laches. The Defendant has clearly been prejudiced as a result of the extraordinary delay in being apprised of Plaintiff's alleged contract claims; witness memories will have faded, knowledgeable employees may have retired or moved, and if an adverse judgment is ultimately rendered, damages may have increase or accumulated as a result of Plaintiff's dilatory behavior. Considering the prejudice caused by Plaintiff's failure to apprise the United States of its contract claims for almost eight years after the filing of the complaint in this case, the doctrine of laches should be applied and Plaintiff's contract claims should be dismissed.

**III. Plaintiff's Breach of Contract Claims Must Be Dismissed Because Plaintiff is Not a Party to the Contract, nor is Plaintiff a Successor-in-Interest to a Contracting Party**

The Tucker Act authorizes suit against the United States only where privity of contract exists between the party bringing suit and the United States. Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984) ("The government consents to be sued only by those with whom it has privity of contract . . . ."). Thus, only where a contract claim is founded upon an express or implied contract between the plaintiff and the United States does the plaintiff have standing to sue. Plaintiff simply is not in privity with the United States.

Plaintiff alleges that two lumber companies, Bodcaw Lumber and Grant Timber, executed several deeds by which the surface interests in the properties at issue in this case were transferred from the lumber companies to the United States. Amd. Cmplt. (Dkt. 51) ¶ 37. Plaintiff further alleges that these deeds represent contracts and that Bodcaw Lumber and Grant Timber were induced into entering into the "contracts" by certain representations by the United States regarding whether the mineral interests on the property could or would prescribe to the United States if not actively mined. Amd. Cmplt. (Dkt. 51) ¶¶ 34-36.

Strikingly absent from these allegations is any assertion that Plaintiff or its predecessor in interest, Good Pine Oil,[7] were parties to these contracts. Plaintiff, as a corporate successor, can only assert those rights held by the predecessor corporation, Good Pine Oil. Since Good Pine Oil was not a party to the deeds – identified by Plaintiff as the contracts that form the bases for its claims – Plaintiff cannot attempt to reach back and challenge those contracts.[8] While the successors of Bodcaw Lumber and Grant Timber might arguably have a right to assert claims based upon the deeds between the United States and the lumber companies – Plaintiff, which is not in the line of corporate succession of Bodcaw Lumber or Grant Timber, does not. Since neither Plaintiff, nor its successor, were parties to the alleged contracts, the United States is not

[7]Plaintiff admits that it is a successor-in-interest to Good Pine Oil, not the lumber companies that allegedly contracted with the United States. Amd. Compl. ¶¶ 51, 52 & 60.

[8]Plaintiff, in passing, makes a vague and unsupported assertion that Good Pine Oil is the "alter ego" of Bodcaw Lumber and Grant Timber. Amd. Compl. (Dkt. #51) ¶ 94. Plaintiff, however, confuses the relevance and application of the alter ego concept. Generally, alter ego status is requested by an adverse party attempting to pierce the corporate veil. 18 Am. Jur. 2d Corporations § 51. It is not a device employed by corporate successors to reform legal agreements or rewrite history. As such, Plaintiff cannot assert rights or claims that may have been available to Bodcaw Lumber and Grant Timber when Plaintiff is not in the corporate lines of succession of those companies.

in privity with Plaintiff and has not consented to waive sovereign immunity for a breach of contract claim.

## IV. The Court Lacks Jurisdiction Over Claims for Equitable Relief

The Court lacks jurisdiction over Plaintiff's claim for reformation because it falls outside the purview of this Court's limited jurisdiction. Where, as here, the Court lacks jurisdiction over the subject matter of a claim, the correct remedy is dismissal of the claim. See Truckee-Carson Irrigation Dist. v. United States, 14 Cl. Ct. 361, 368 (1988) ("[U]nder [Court of Federal Claims] Rule 12(h)(3), this court is mandated to. . . dismiss the action '[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. . . .'") (alteration in original). Accordingly, the Court should dismiss Plaintiff's claim for reformation pursuant to RCFC 12(b)(1).

As sovereign, the United States may not be sued unless it consents to such suit. United States v. Sherwood, 312 U.S. 584, 586 (1941), Stephenson v. United States, 58 Fed. Cl. 186, 187 (2003). As such, the Court of Federal Claims' jurisdiction is wholly dependent on a waiver of sovereign immunity and that waiver "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). Plaintiffs have failed to prove – indeed, they have failed to even suggest – the existence of a statutory provision that provides the "unequivocally expressed" waiver of sovereign immunity necessary for this Court to entertain claims for reformation. Undoubtedly, Plaintiff's failure is driven by the fact that no such statutory authority exists. In fact, courts have emphatically held that the statute cited by Plaintiff in its First Amended Complaint – the Tucker Act – does not confer jurisdiction on this Court to entertain claims for equitable relief, such as reformation.

"Courts have consistently held that the jurisdiction of the Court of Federal Claims is limited to cases in which the Constitution or a federal statute requires payment of money damages as compensation for their violation." Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997) (citing United States v. Mitchell, 463 U.S. 206, 218 (1983) and Murray v. United States, 817 F.2d 1580, 1582-83 (Fed. Cir. 1987)). Moreover, this limitation has specifically been applied to the Tucker Act, which does not confer jurisdiction on this Court to hear "every claim involving or invoking the Constitution, a federal statute, or a regulation. Rather, the Court of Federal Claims may only hear claims seeking primarily monetary relief against the United States government based upon 'money-mandating' provisions of the Constitution, acts of Congress, or executive regulations, to which the plaintiff alleges a specific entitlement." Stephenson, 58 Fed. Cl. at 192 (internal quotations and citation omitted) (emphasis in original). While the Tucker Act grants jurisdiction to the Court of Federal Claims to hear claims for monetary damages, it "does not provide independent jurisdiction over [ ] claims for equitable relief." King, 395 U.S. at 2-3; see also Brown, 105 F.3d at 623.

This Court does have jurisdiction to consider claims for reformation in very limited circumstances, where the claims are incident to a claim for money damages. Hartle v. United States, 22 Cl. Ct. 843, 846, n. 5 (1991). The question is "whether the request for relief is, on its face or in substance, a request for money damages as opposed to equitable relief." Doe v. United States, 372 F.3d 1308, 1313-14 (Fed. Cir. 2004). If the latter, this Court lacks jurisdiction. Under 28 U.S.C. § 1491(a)(2), the Court does have limited equitable powers, but only if they are necessary for complete relief and if they are "incidental of and collateral to" money judgments. See Bobula v. United States Dep't of Justice, 970 F.2d 854, 859 (Fed. Cir. 1992). In other

words, this Court cannot grant nonmonetary equitable relief such as an injunction, a declaratory judgment or specific performance. First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1294 (Fed. Cir. 1999); Griswold v. United States, 61 Fed. Cl. 458, 466-67 (2004). In this case, Plaintiff has clearly not asserted that the claim for reformation is incidental to the claim for money damages. Indeed, Plaintiff's complaint clearly pleads for the equitable relief "[i]n the alternative. . ." to money damages. Amd. Compl. ¶ 114. As such, Plaintiff's claim for reformation here is akin to specific performance, in that Plaintiff is requesting that the United States convert title to the property to Plaintiff incident to the contract.

Moreover, reformation is only available in cases involving a mistake of fact or in which the contract contains provisions that are contrary to law. Ho v. United States, 49 Fed. Cl. 96, 100 (2001). As in Ho, Plaintiff here has not pled mistake of fact or a term that is contrary to law. As such, reformation cannot be considered by the Court.

In short, the Court of Federal Claims does not have the authority to grant relief absent an express statutory grant. Because Congress has provided no such statutory grant for equitable relief in breach of contract cases, this Court lacks jurisdiction to consider Plaintiff's claim for reformation and that claim must be dismissed.

## V. Plaintiff Has No Legally Compensable Property Interest in the Prescribed Mineral Servitudes

Plaintiff's takings claims are equally deficient and should be dismissed. With respect to the Prescribed Servitudes, Plaintiff cannot demonstrate that it possessed a legally compensable property interest. Indeed, the United States District Court for the Western District of Louisiana has already considered the issue of ownership of these mineral servitudes and has ruled that the Prescribed Servitudes are owned by the United States, not Plaintiff. See Petro-Hunt III, 2007

WL 715270 at *1. As such, Plaintiff is collaterally estopped from arguing that it owns the Prescribed Servitudes. Given that Plaintiff is foreclosed from arguing that it owns the Prescribed Servitudes, it cannot possess a compensable property interest in them and its claims for permanent (Count I) and temporary (Count II) takings of the Prescribed Servitudes must be dismissed for failure to state a claim upon which relief may be granted RCFC 12(b)(6).

### A. Plaintiff Must Demonstrate that It Possesses a Compensable Property Interest

As a matter of law, in every Fifth Amendment takings case, the issue of whether the plaintiff possesses a compensable property interest is a threshold element of plaintiff's claim. See Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted); Chancellor Manor v. United States, 331 F.3d 891, 901 (Fed. Cir. 2003).[9] In determining the nature and scope of a plaintiff's alleged property interest, the Federal Circuit, following Supreme Court precedent, has repeatedly emphasized that,

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. Lucas [v. South Carolina Coastal Council], 505 U.S. [1003, 1030 (1992)].

Maritrans, 342 F.3d at 1352; see also Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002).

---

[9] The question of whether plaintiff has a compensable property interest presents "a question of law based on factual underpinnings." Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 535 U.S. 1077 (2002).

Therefore, the Court must determine whether plaintiff's claimed property right is a legally compensable property interest based on "background principles" derived from state, federal, or common law. Stated another way, the Court must determine whether plaintiff's claimed property right is "a stick in the bundle of property rights" possessed by the plaintiff. Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1376 (Fed. Cir. 2004); M&J Coal Co. v. United States, 47 F.3d 1148,1153 (Fed. Cir. 1995).

If a plaintiff cannot establish a "legally cognizable property interest, the court's task is at an end." Am. Pelagic, 379 F.3d at 1372 (citation omitted); Conti, 291 F.3d at 1339 ("[I]f a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central [Transp. Co. v. City of New York, 438 U.S. 104 (1978)]").

**B. Plaintiff is Collaterally Estopped from Arguing that it Holds A Compensable Property Interest in the Prescribed Servitudes**

Because ownership of the Prescribed Servitudes has already been adjudicated in favor of the United States by the United States District Court for the Western District of Louisiana, Plaintiff is unable to show that it possesses a protected property interest. Petro-Hunt III, 2007 WL 715270 at *1. Moreover, Plaintiff cannot re-litigate this issue before the Court of Federal Claims. Nor may Plaintiff ask the Court of Federal Claims to reverse the decision of the United States District Court. The Court of Federal Claims may not scrutinize the decisions of another tribunal. See e.g., Allustiarte v. United States, 256 F.3d 1349, 1351-52 (Fed. Cir. 2001).

It is a bed-rock principle that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a

different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979) (citations omitted). Collateral estoppel, also referred to as issue preclusion, "operate[s] to prevent the relitigation of a claim or issue that has already had its day in court." Lakewood Assocs. v. United States, 45 Fed. Cl. 320, 335 (1999). Simply put, "[t]o preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana, 440 U.S. at 153-54.

As the Federal Circuit has recognized, collateral estoppel is applicable if:

> (i) the issue previously adjudicated is identical with that now presented, (ii) that issue was "actually litigated" in the prior case, (iii) the previous determination of that issue was necessary to the end-decision then made, and (iv) the party precluded was fully represented in the prior action.

Kroeger v. U.S. Postal Serv., 865 F.2d 235, 239 (Fed. Cir. 1988) (quoting Thomas v. Gen. Servs. Admin., 794 F.2d 661, 664 (Fed. Cir. 1986)); accord Mother's Rest., Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1569 (Fed. Cir. 1983). In the instant case, these four requirements have been met.

First, the initial question that this Court must answer, with respect to a takings claim, is whether the plaintiff has a compensable interest in the property at issue. When Plaintiff chose to file a quiet title action in the United States District Court for the Western District of Louisiana, this is exactly the issue that was presented to that court. Ultimately, after two appeals, the District Court concluded that the rightful owner of the Prescribed Servitudes was the United States and not Plaintiff. Petro-Hunt v. United States, Civ. No. 00-303 (W.D. La., Dec. 7, 2005),

Judgment (Dkt. 228) (attached hereto as Exhibit A).

Second, there can be no question that this issue was actually litigated before the District Court. Plaintiff's quiet title action specifically sought a determination by the Court of the rightful owner of all 96 servitudes, including the Prescribed Servitudes.

Third, a determination of the ownership of the Prescribed Servitudes was not only necessary as part of the Plaintiff's quiet title action in the District Court, it was the sole issue posed to the District Court.

Finally, Plaintiff was represented in the District Court by the same counsel that represents it in this case. As such, Plaintiff's interests in the prior case were fully represented and protected. See Hunt v. United States, 52 Fed. Cl. 810, 814-15 (2002) (finding that collateral estoppel applies even where parties appeared pro se in the prior action).

Because the Western District of Louisiana already considered and resolved the issue of whether Plaintiff has a compensable property interest with respect to the Prescribed Servitudes, Plaintiff is estopped from re-litigating this issue before the Court of Federal Claims, and Defendant's motion to dismiss for failure to state a claim should be granted.

## VI. This Court Lacks Jurisdiction to Hear Any of Plaintiff's Taking Claims Based Upon Leases Issued Before August 24, 1994

Plaintiff's takings claims, like its contract claims, are premised upon the issuance of mining leases on the servitudes it allegedly owns. As previously stated, the district court has already ruled that 90 of the servitudes, the Prescribed Servitudes, are owned by the United States and not Plaintiff. As such, no takings claims apply. With respect to the remaining six servitudes, any takings claims that are premised upon leases that were issued more than six years before the filing of Plaintiff's initial complaint in this case (August 24, 2000) are barred by the

Tucker Act's statute of limitations.[10] See Discussion of Tucker Act's Statute of Limitations, supra. pp. 8-11.

For purposes of a Fifth Amendment taking claim, "[i]t is axiomatic that a cause of action . . . accrues at the time the taking occurs." Alliance of Descendants of Texas Land Grants v. United States, 27 Fed. Cl. 837, 843 (1993), aff'd, 37 F.3d 1478 (Fed. Cir. 1994). In order to ascertain the point in time when an alleged taking occurred, the court must identify the governmental action that allegedly effected the taking and the time when it occurred. State of Alaska v. United States, 32 Fed. Cl. 689, 698 (1995). While it is not entirely clear from Plaintiff's complaint exactly what property interest was allegedly taken, it is clear that Plaintiff alleges that the leases issued by the Bureau of Land Management constitute the acts that effectuated the alleged taking. Amd. Cmplt. (Dkt. 51) ¶¶ 65, 81, 89.

It is equally clear that with respect to the Non-Prescribed Servitudes there are only 15 leases that were issued by the United States. See Jaquette Dec. , Ex. B ¶ 3. It is also clear that 10 of those leases were issued more than six years before Plaintiff first filed this case. Id., see also chart supra. pp. 4-5.

Since all governmental acts giving rise to Plaintiff's takings claims had accrued as of the issuance of the leases, any claims based upon leases that were issued before August 24, 1994 (six years preceding the filing of the original complaint in this case) are barred by the statute of limitations. This Court, therefore, lacks jurisdiction to hear these claims and must dismiss them pursuant to RCFC 12(b)(1).

---

[10]In the event that this Court does not apply the doctrine of collateral estoppel to preclude Plaintiff from re-litigating the ownership of the 90 Prescribed Servitudes, this statute of limitations argument would apply equally to any leases made on the Prescribed Servitudes, which were issued more than six years before the original complaint was filed in this case.

## VII. Plaintiff Fails to State a Claim for a Permanent Taking of the Non-Prescribed Servitudes

Plaintiff has asserted a claim for a permanent taking of its interest in the Non-Prescribed Servitudes (Count I). Even assuming, arguendo, that Defendant's leasing of the mineral interests in these six servitudes constituted a taking in violation of the Fifth Amendment, Plaintiff has failed to allege that the United States has continued to lease these mineral interests. As indicated in the chart above (supra. pp. 4-5), all of the 14 leases issued on the Non-Prescribed Servitudes have now either been terminated or cancelled by the Bureau of Land Management, or they have expired because their terms have come to an end. In any event, none of the leases remains in place today, with the last having been terminated more than three years ago on August 1, 2005. Id.

A physical taking occurs when the government has physically occupied the property. Yee v. City of Escondido, 503 U.S. 519, 527 (1992) ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land.") (underline added, italics in original); accord Stearns Co., Ltd. v. United States, 396 F.3d 1354, 1357 (Fed. Cir. 2005); Forest Properties, Inc. v. United States, 177 F.3d 1360, 1364 (Fed. Cir. 1999); see also Tuthill Ranch, 381 F.3d at 1136 ("the sole question governing physical takings is whether or not the government has physically occupied the plaintiff's property") (emphasis added).

Recent cases from the Supreme Court and the Federal Circuit have confirmed that the *sine qua non* of a physical taking is the actual occupation of the property. In Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302 (2002), the Court listed the

following examples of government actions characterized as physical occupations or invasions of private property that would be considered *per se* takings:

- the government occupies a warehouse for its own purposes (United States v. Gen. Motors Corp., 323 U.S. 373 (1945));
- the government appropriates part of a rooftop to provide cable TV access for apartment tenants (Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (2002));
- planes owned by the government physically invade private airspace (United States v. Causby, 328 U.S. 256 (1946)); and
- the government takes actual possession and control of a coal mine (United States v. Pewee Coal Co., 341 U.S. 114 (1951)).

Id. at 322-25.

A physical invasion short of an occupation, on the other hand, does not constitute a per se taking and, therefore, must be analyzed not under the Loretto rule, but under the Penn Central test. "A physical occupation, as defined by the Court, is a permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property." Boise Cascade Corp. v. United States, 296 F.3d 1339, 1353 (Fed. Cir. 2002) (emphasis added); see also Hendler v. United States, 952 F.2d 1364, 1376-1377 (Fed. Cir. 1991) (a government occupation is "permanent" when it is a "substantial physical occupancy" of private property, while "temporary" refers to occupation that is "transient and relatively inconsequential"). "The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude." Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982).

Here, the leases issued by the United States cannot form the basis for a claim of a permanent invasion. First, as set forth above, all of the leases on the Non-Prescribed Servitudes

have now come to an end. Second, they were not exclusive. As set forth more fully below, under Louisiana law, a mineral lease can never be exclusive because other parties always retain the right to issue protective leases for the same mineral interests. La. Rev. Stat. § 31:121 (West 2000); see also supra at 27-35.

Given that the United States has demonstrated that no governmental acts continue today that could be considered a taking of the Non-Prescribed Servitudes and given that Plaintiff, at all times, retained the right to use the Non-Prescribe Servitudes, any taking could at most be temporary in nature. As such, Plaintiff's claim that a permanent taking of these servitudes has occurred (Count I) must be dismissed pursuant to RCFC 56.

**VIII. Plaintiff Fails to State a Claim for a Taking on Servitudes One, Three, and Four**

With respect to the takings claimed by Plaintiff related to the Non-Prescribed Servitudes, Plaintiff cannot state a claim for a taking on servitudes one, three, and four. As indicated in the chart above (supra. pp. 4-5), the only evidence is that the United States has never issued any leases on these servitudes. As such there has been no governmental act that could constitute a taking and plaintiff's claims must be dismissed.

**IX. Plaintiff Lacks a Compensable Property Interest**

The Plaintiff alleges that the United States engaged in both permanent and temporary takings of its mineral servitudes by wrongfully issuing leases to third parties and receiving payments. Amd. Cmplt. (Dkt. 51) ¶¶ 65, 81, 89, 109. After addressing introductory issues such as whether the Court has jurisdiction over the suit, the first question the Court must address in its analysis of Fifth Amendment takings claims is whether the plaintiff has a compensable property interest. If there is no compensable property interest there can be no taking.

### A. Background Principles of State Law Define the Contours of Plaintiff's Property Interest

#### 1. As a Threshold Matter, Plaintiff Must Demonstrate the Existence of a Protected Property Right Before a Taking Can Be Considered

The Federal Circuit has established a two part test to evaluate whether governmental action amounts to a taking of private property for Fifth Amendment purposes. Conti v. United States, 291 F.3d 1334, 1339 (Fed. Cir. 2002); M&J Coal Co. v. United States, 47 F.3d 1148, 1154 (Fed. Cir. 1995). The need for this two part test stems from the realization that the Court must first determine whether the property owner has the right to put the property to the owner's proposed use. There are limitations to use inherent in all property, which preclude an owner from deriving specific benefits from their property. See Members of Peanut Quota Holders Ass'n, Inc., v. United States, 421 F.3d 1323, 1334-35 (Fed. Cir. 2005), cert. denied, 548 U.S. 904 (2006) (holding that the government's unilateral right to revoke peanut quotas established by federal statute is inherent in the property owner's rights); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1374-77 (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005) (fishing boat owner and operator has no protected property interest in fishery permits granted by the government); Colvin Cattle Co. v. United States, 468 F.3d 803, 808 (Fed. Cir. 2006) (reduction in value of property resulting from cancellation of grazing lease on adjacent federal lands does not represent a cognizable property interest). Thus, before turning to the question of whether the government's actions have effectuated a taking, "[f]irst, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment. [Then], [s]econd, once a court has determined that a property interest exists, it must determine whether a taking occurred." Conti, 291 F.3d at 1339; see also M&J Coal, 47 F.3d at 1154. As noted by the

Federal Circuit in Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005), "we do not reach this second step without first identifying a cognizable property interest."

Therefore, in every Fifth Amendment takings case, the issue of whether the Plaintiff possesses a protected property interest is a threshold element of the Plaintiff's claim. See Air Pegasus, 424 F.3d at 1212 ("First, as a threshold matter, the court must determine whether the claimant has established a property interest for the purposes of the Fifth Amendment.") (quoting Am. Pelagic, 379 F.3d at 1372; Maritrans v. United States, 342 F.3d 1344, 1351 (Fed. Cir. 2003) ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted). If a plaintiff cannot establish a cognizable property interest, plaintiff's takings claim fails. See Am. Pelagic, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end"); Conti, 291 F.3d at 1339 ("However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central").

According to this legal framework, the Court's inquiry into whether Plaintiff possessed a protected property interest at the time of the alleged taking must begin with identifying the property right alleged to have been taken and examining any limitations that are placed on the use of the property by state background principles. See Air Pegasus, 424 F.3d at 1217 (limiting review to the right alleged by plaintiff). In this manner, the court determines whether plaintiff's claimed property right is "a stick in the bundle of property rights" possessed by the plaintiff. Am. Pelagic, 379 F.3d at 1376; M&J Coal Co., 47 F.3d at 1154, citing Lucas v. S.C. Coastal

Council, 505 U.S. 1003, 1027 (1992) (noting that the threshold inquiry before the court must be to "inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with, i.e., whether the land use interest was a 'stick in the bundle of property rights' acquired by the owner").

The question here is whether Plaintiff, as the owner of the Non-Prescribed Servitudes had the right to preclude the United States from issuing leases on those servitudes under state law. As will be demonstrated below, under Louisiana law, the owner of a mineral servitude does not have the right to preclude a non-owner from issuing a mineral lease on a servitude. This seemingly odd result (at least to non-Louisiana practitioners), in reality, provides for much more efficient access to minerals for lessors than in other states where disputes over mineral ownership can bring the leasing process to a halt.

### 2. Plaintiff Bears the Burden of Demonstrating That a Property Interest Exists

The Federal Circuit has repeatedly said that the burden of proving the existence of a compensable property interest rests with the claimant. See Am. Pelagic, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end")(emphasis added); Maritrans, 342 F.3d at 1351 ("First, a court must evaluate whether the claimant has established a 'property interest' for purposes of the Fifth Amendment.") (citation omitted)(emphasis added); Conti, 291 F.3d at 1339 ("However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in Penn Central.")(emphasis added).

In the instant case, Plaintiff has failed to demonstrate that it possesses the right under

Louisiana law to preclude the United States from issuing protective leases on its servitudes. Indeed, the law of Louisiana is to the contrary.

### 3. State Law Routinely Defines the Scope of a Plaintiff's Property Interest

In determining whether a plaintiff possesses a property right that is protected by the Fifth Amendment, courts begin with the maxim that

> [t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking. Lucas[, 505 U.S. at] 1030 [(1992)]. These existing rules often involve and define "the citizen's relation to the physical thing, as the right to possess, use and dispose of it." United States v. Gen. Motors, 323 U.S. 373, 378, 65 S. Ct. 357, 89 L.Ed. 311 (1945).

Conti, 291 F.3d at 1340. Stated another way, the threshold inquiry into whether a plaintiff possesses a protected or cognizable property interest requires the court to determine whether the particular property interest that a plaintiff contends has been taken is "a stick in the bundle of property rights" possessed by the plaintiff. Am. Pelagic, 379 F.3d at 1376; M&J Coal, 47 F.3d at 1154 (noting that the court must first determine whether the use proscribed by the governmental action was part of the owner's title to begin with) (citing Lucas, 505 U.S. at 1027).

As the Supreme Court has said, "independent source[s] such as state law" define "the range of interests that qualify for protection as 'property' under the Fifth . . . Amendment[]." Lucas, 505 U.S. at 1030 (citations omitted). As such, before imposing liability on the government for a taking, the Court has recognized the need to determine what pre-existing

limitations inhere in a plaintiff's property interest: "It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time. . . ." Id. at 1027.[11] In Louisiana, owners of mineral interests may not preclude others from issuing protective leases on their mineral servitudes; this constitutes a limitation on use inherent in the property.

### B. Louisiana Law Does Not Allow a Mineral Servitude Owner to Restrict the Issuance of Protective Leases on Its Servitude

The question that this Court must ask is the following: under Louisiana law, does Plaintiff, incident to its ownership of the Non-Prescribed Servitudes, have the right to preclude non-owners from issuing leases on the servitude? That is, is the right to preclude protective mineral leases a right enjoyed by Plaintiff under Louisiana law? The answer to this question is no; Plaintiff has no such right.

Under the Louisiana Mineral Code, more than one individual may issue leases for exploration of mineral servitudes. La. Rev. Stat. § 31:121 (West 2000). "The provision was incorporated into the Mineral Code to enable a mineral lessee to protect its right to explore for and produce minerals." American Lung Ass'n v. State of La., 645 S.2d 1219, 1222 (La. Ct. App. 1994). In other words, the state established a process that would avoid delay in accessing valuable minerals while ownership disputes were adjudicated by the Courts. As the Louisiana Court of Appeals has said, through this provision, "the Mineral Code is impliedly authorizing the

[11]In Lucas, the plaintiff challenged application of South Carolina's Beachfront Management Act, which prevented the erection of a house on coastal property. The Court held that a regulation which deprives an owner of all "economically beneficial use" of his or her property is, "categorically," a taking that requires compensation. Justice Scalia noted, however, that no compensation would be due if the limitation on property use was one which "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas, 505 U.S. at 1029 (citations omitted).

lease of mineral rights actually owned by another person." Id. Moreover, "if such implied authority is given by the Mineral Code, it cannot be said that the non-owner lessor who enters into such a protective lease pursuant to this authority is, at the same time, guilty of a violation of the rights of the true owner of the minerals." Id. 1222-23. Stated conversely, the true owner has no right to preclude the issuance of a lease made to protect a third party's interest. In the instant case, the Bureau of Land Management had determined that the United States was the rightful owner of the Non-Prescribed Servitudes. Thus, even though this conclusion was ultimately found to be in error, the United States had every right to issue leases to protect the interest it believed it possessed and Plaintiff, as the true owner, had no right under state law to preclude such a lease.

This conclusion is supported by the fact that, under Louisiana law, the leasing of mineral interests, even when done in error, does not constitute "possession" of the mineral servitude. As such, and given the protective lease provision in the Mineral Code, the mere issuance of a lease, by a non-owner, does not interfere with the true owner's use or enjoyment of the property.

"The mere execution of a mineral lease is not possession . . . ." Id. 1223. Moreover, as the Supreme Court of Louisiana has said, such leases do not interfere with the true owner's ability to use the property. In Gayoso v. Ark. Natural Gas, Giddens was the owner in fee of certain property, including the mineral interests. 145 So. 677, 678 (La. 1933). In 1919 Giddens sold the surface interests in the land to Ashley, but reserved the mineral interests. Id. Shortly thereafter, Giddens sold the mineral interests to the plaintiff. Id. In 1928, before the ten year law of prescription became effective, Ashley, who at the time owned only the surface estate, leased the mineral interests to defendant. Id. Two years later, after the prescription period had

run, defendant commenced mineral production on the property. Id. The plaintiff sued arguing that the mineral interests had not yet prescribed because "the granting of this lease [to defendant before the servitude had prescribed] operated as an obstacle to prevent plaintiff from enjoying its exclusive right to explore the land for minerals." Id. at 679.

The Louisiana Supreme Court, in adjudicating the case, recognized that "[a]t the time Ashley . . . granted the lease [to defendant], he had not the mineral rights to the land to lease." Id. In short, Ashley was in exactly the same position as the United States here – he had mistakenly leased mineral rights which he did not own. Nonetheless, the court perceived no problem and no interference for the plaintiff who was the rightful owner of the mineral interests at the time the lease was issued in error. The court reasoned that:

> In these circumstances, there was no reason why [plaintiff] should not have attempted to explore the land. The granting of the lease did not constitute a placing of an obstacle in the way. Had an effort been made by [plaintiff] to exploit the land, and had that effort been met with resistance . . . then it might be said that the resistance constituted an obstacle, placed in the way of using the servitude, with the resultant effect of suspending prescription, until removed. As no such effort was made, prescription was not suspended.

Id. at 680. Accord Gailey v. McFarlin, 193 So. 570, 578-79 (La. 1940). In short, given the protective lease provision of the Louisiana Mineral Code, leases of mineral interests, even when issued in error, do not create an obstacle to the rightful owners use or enjoyment. This is particularly true where, as here, a plaintiff has not even asserted that it attempted to access its mineral interests.

This conclusion was adopted by the United States District Court for the Western District of Louisiana in Cent. Pines Land Co. v. United States, a case remarkably similar to the case at

bar. No. 2:96-2000 (W.D. La. 2000) slip op. (Dkt. 181) (a copy is attached as Exhibit C), aff'd, 274 F.3d 881, 895 (5th Cir. 2001). Like the instant case, Cent. Pines Land Co. involved federal mineral leases in Louisiana on lands burdened by private mineral servitudes and addressed the issue of whether the issuance of a lease created an "obstacle" to the use and enjoyment of the property by the rightful owner of the mineral servitudes. The Court reasoned that:

> The plaintiffs point out the government leased the minerals to other companies beginning in 1992 . . . . The surface owner's leasing of the minerals underlying his land to someone other than the servitude owner does not in and of itself create an obstacle. See Gayoso, 145 So. at 679-80; Gailey, 193 So. at 578-79 (prior recorded mineral lease on land upon which mineral servitude is subsequently created does not constitute an obstacle).

Id. at 33. Since the issuance of leases by a mistaken lessor does not create an obstacle to the true owner's full use and enjoyment of its mineral rights, the Louisiana legislature has effectively determined that there is no good reason to allow the true owner to preclude such protective leases. Thus, in the instant case, Plaintiff has no right under Louisiana law to preclude the United States from issuing the leases it made and, thus, nothing could have been "taken" from Plaintiff.

## CONCLUSION

For all of the reasons set forth above Plaintiff's Complaint should be dismissed in its entirety:

- Counts IV, V, VI, and VII should be dismissed pursuant to RCFC 12(b)(1) because the court lacks jurisdiction over these claims which are barred by the Tucker Act's statute of limitations at 28 U.S.C. § 2501.
- Counts IV, V, VI, and VII should also be dismissed pursuant to RCFC

12(b)(6), or alternatively pursuant to RCFC 56 based upon the doctrine of laches.

- Counts IV, VI, and VII should also be dismissed pursuant to RCFC 12(b)(6), or alternatively pursuant to RCFC 56, because Plaintiff is not a party to the contract, nor is Plaintiff a successor-in-interest to a contracting party. As such, Plaintiff lacks standing to bring a contract claim.
- Count VII should be dismissed pursuant to RCFC 12(b)(1) because this Court lacks jurisdiction to render the equitable remedy of reformation where, as here, the requested relieve is not incident to a determination of money damages.
- Counts I, II, and III should be dismissed pursuant to RCFC 12(b)(1) with respect to takings claims based upon leases issued before August 24, 1994, because these claims are time barred.
- Count I (permanent taking) should be dismissed with respect to the 90 Prescribed Servitudes, pursuant to RCFC 12(b)(6) for failure to state a claim, because Plaintiff is collaterally estopped from claiming that it has a compensable property interest in the Prescribed Servitudes. Count I should also be dismissed with respect to the 6 Non-Prescribed Servitudes, pursuant to RCFC 12(b)(6), or alternatively pursuant to RCFC 56, because there can be no permanent taking where, as here, any actions of the United States have ceased.

- Count II (temporary taking) should be dismissed with respect to the 90 Prescribed Servitudes pursuant to RCFC 12(b)(6) for failure to state a claim, because Plaintiff is collaterally estopped from claiming that it has a compensable property interest in the Prescribed Servitudes. Counts II and III (temporary taking) should be dismissed with respect to the Non-Prescribed Servitudes pursuant to Rule 12(b)(6), or alternatively RCFC 56, because Plaintiff lacks a compensable property interest.
- Finally, Plaintiff's takings claims related to Servitudes one, three, and four must be dismissed pursuant to RCFC 56 because no leases have ever been issued by Defendant on these servitudes.

Thus, Defendant respectfully requests that its motion to dismiss or, in the alternative, for summary judgment be granted and that Plaintiff's Complaint be dismissed in its entirety with prejudice.

September 2, 2008

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment & Natural Resources Division

*/s/ James D. Gette*

JAMES D. GETTE
Natural Resources Section
Environment & Natural Resources Division
Department of Justice
P.O. Box 663
Washington, DC 20044-0663
Tel: 202-305-1461
Fax: 202-305-0267
Email: james.gette@usdoj.gov

Of counsel:
Timothy H. Baker
Office of the Solicitor
Division of Mineral Resources
Department of the Interior
1849 C Street, N.W., Mail Stop 4230
Washington, D.C. 20240

Of counsel:
Jay McWhirter
Office of the General Counsel
Department of Agriculture
1718 Peachtree St., NW, Suite 576
Atlanta, Georgia 30309-2437

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 1 of 34

RECEIVED
DEC 0 7 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **PETRO-HUNT, L.L.C.; HUNT PETROLEUM CORPORATION AND KINGFISHER RESOURCES, INC.** | * | **CIVIL ACTION** |
| | * | **NO. CV00-0303 "S"** |
| **VERSUS** | * | **JUDGE WALTER** |
| **UNITED STATES OF AMERICA AND ASPECT RESOURCES, LLC,; BAYOU PETROLEUM COMPANY; CATAWBA ENERGY, INC.; FIRST TEXAS HYDROCARBONS, INC.; OSCAR C. FORLAND; GULF COAST OIL & GAS CO.; JUSTISS OIL COMPANY, INC.; MATRIX ENERGY, INC.;MB EXPLORATION LLC; NORTHSTAR ENERGY, LLC; PALMER PETROLEUM, INC; RICE & ASSOCIATES, LLC; SNYDER OIL CORPORATION; HOWELL R. SPEAR; JOHN P. STRANG; TEXACO EXPLORATION AND PRODUCTION, INC.; TMR EXPLORATION, INC.; UMC PETROLEUM CORPORATION; AND WHELESS TDL EXPLORATION CO., LLC** | * | **MAGISTRATE JUDGE HAYES** |

******************************************

## JUDGMENT

Before the court is plaintiffs' **PETRO-HUNT, L.L.C., HUNT PETROLEUM CORPORATION** and **KINGFISHER RESOURCES, INC.**, Alternative Motion for Summary Judgment pertaining to mineral servitudes which are held by drilling or production, and which have not prescribed, pursuant to Louisiana mineral law. After considering the motion and supporting memoranda and affidavits and noting that the government has not

opposed the motion, the Court finds plaintiffs' Motion to be well founded and it is hereby GRANTED;

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment be and is hereby entered in favor of plaintiffs, Petro-Hunt, L.L.C., Hunt Petroleum Corporation and Kingfisher Resources, Inc., and against defendants, United States of America; Aspect Resources, L.L.C.; Justiss Oil Company; MB Exploration, L.L.C.; Palmer Petroleum, Inc.; Snyder Oil Corporation, a/k/a Santa Fe Snyder a/ka Devon SFS; John P. Strang; UMC Petroleum Corp. and its successor Ocean Energy Resources; Wheless TDL Exploration Co., Ltd.; Bayou Petroleum Company; First Texas Hydrocarbons, Inc.; Oscar C. Forland; Northstar Energy, L.L.C.; Howell R. Spear; Gulf Coast Oil & Gas Co.; J. Bradley Jeffreys and Energy Arrow Exploration, L.L.C., declaring that the five mineral servitudes described in Exhibit "A," are owned by plaintiffs and, at this time, remain in full force and effect and have not prescribed because of interruption of prescription by drilling or production of minerals, pursuant to the Louisiana rules of prescription of mineral servitudes; consequently this court finds that plaintiffs are the owners in indivision of the five mineral servitudes described on Exhibit "A," as follows:

| | |
|---|---|
| **PETRO-HUNT, L.L.C.:** | **64.28572%** |
| **HUNT PETROLEUM CORPORATION:** | **16.80672%** |
| **KINGFISHER RESOURCES, INC.:** | **18.90756%** |

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all mineral leases

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 3 of 34

issued by the United States of America on the five mineral servitudes described in Exhibit "A" are hereby cancelled and set aside as null and void and the **UNITED STATES OF AMERICA** shall cause the cancellation of all Oil, Gas or Mineral Leases which it has granted to any third party, that intrude onto the mineral servitudes described in Exhibit "A," and that such cancellation shall be filed in the records of the appropriate Parish of the situs of such lands and that a recorded copy of such cancellation shall be provided to plaintiffs.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiffs hereby reserve the right to pursue any and all claims for damages, caused by or as a result of the issuance of all intrusive leases and any other claims they have against the United States of America in the U.S. Court of Federal Claims.

Ordered this 7 day of December 2005.

Donald E. Walter

**UNITED STATES DISTRICT JUDGE**

**Approved as to Form and Content:**

**DONALD W. WASHINGTON**
**United States Attorney**
**KAREN J. KING (#23508)**
**Assistant United States Attorney**
**United States Courthouse**
**800 Lafayette Street, Suite 2200**
**Lafayette, Louisiana 70501-6832**
**Telephone: (337) 262-6618**

**Attorneys for the United States**

**and**

**J. RALPH WHITE (#13425)**
**STELLA SHACKELFORD (#27876)**
**FREELAND & FREELAND, LAWYERS**
**P.O. BOX 269**
**1013 JACKSON AVENUE**
**OXFORD, MS 38655**
**Telephone: (662) 234-3414**

**W. MICHAEL ADAMS (#2338)**
**BLANCHARD, WALKER, O'QUIN & ROBERTS**
**(A Professional Law Corporation)**
**400 Texas Street, Suite 1400**
**P.O. Drawer 1126**
**Shreveport, LA 71163-1126**
**Telephone: (318) 221-6858**

**Attorneys for Petro-Hunt, L.L.C.**

**and**

**JOHN M. McCOLLAM (#7117)**
**MATTHEW J. RANDAZZO, III (#14340)**
**AIMEE WILLIAMS HEBERT (#25935)**
**GORDON, ARATA, McCOLLAM,**
**DUPLANTIS & EAGAN, L.L.P.**
**210 St. Charles Avenue, Suite 4000**
**New Orleans, Louisiana 70115**
**Telephone: (504) 582-1111**

**Attorneys for Hunt Petroleum Corporation and Kingfisher Resources**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I have on this 30th day of November, 2005, served a copy proposed Judgment on all counsel of record by depositing a copy of same in the United States mail, properly addressed, and first-class postage prepaid.

/s/ W. Michael Adams

## EXHIBIT "A" ATTACHED HERETO AND MADE PART HEREOF

## SERVITUDE 1

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 7 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | E2E2, W2NENW, NWNW, NESW, SWSW, W2SESW, NWSE, | 360.61 |
| 2 | N2N2, S2NW, SW, S2SE | 475.03 |
| 10 | N2SWNE, SESWNE, SENE, E2SWSE, E2SE | 169.23 |
| 11 | All | 638.76 |
| 12 | E/2NE/4, SW/4NE/4, W/2 NW/4, SE/4 NW/4, SW/4, W/2 SE/4 | 485.79 |
| 13 | E/2 NE/4, SW/4 NW/4, W/2 SW/4, NE/4 SE/4 | 282.19 |
| 14 | W2E2, SENE, NW, N2SW less and except approx. 7 acres being that part of the NWSW lying South of right-of-way for L & A Railroad; SESW less and except approx. 3 acres being that part of SESW lying South of right-of-way for L & A Railroad.; NESE | 518.99 |
| 15 | E2NE less and except approx. 5 acres being that part of the SENE lying South of right-of-way for L & A Railroad, NESE less and except approx. 35.76 acres being that part of the NESE lying South of right-of-way for L & A Railroad. | 73.68 |
| 23 | N2NE, E2NW less and except approx. 67.22 acres being that part of the E2NW lying South of right-of-way for L & A Railroad. | 92.61 |

## SERVITUDE 1

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 6 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 6 | 16 acres in a square in the NW corner of the NWNE, 2 acres in the SE corner of the SWNE, W2, E2NWSE, SWNWSE, SWSE | 431.48 |
| 7 | NE/4, W/2, NE/4 SE/4 | 559.94 |
| 8 | NW, N2SW | 239.78 |
| 18 | NE less 30 acres on the South side, N2NW, SENW less 2 acres in a square in the Northwest corner, and less 3 acres described as beginning at a point 295 feet South of the Northwest corner of said forty acres, run thence East 210 yards, thence South 70 yards, thence West 210 yards, thence north 70 yards to the point of beginning; NWSW, NESW less 4 acres in a square in the Southeast corner | 224.87 |

**TOTAL ACREAGE FOR SERVITUDE 1: 4,552.96**

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | NWSW | 39.14 |
| 2 | E2E2, SWNE, NW, S2S2SW, S2NWSE, SWSE | 453.33 |
| 3 | All | 629.68 |
| 4 | All | 630.80 |
| 5 | E2, E2W2, NWNW | 516.91 |
| 6 | E2NE | 81.00 |
| 7 | NESW, That part of the S2SW lying East of Saline Bayou, SWSE/4 | 153.70 |
| 8 | E2NE, NW NE, SWSE | 159.17 |
| 9 | All | 638.20 |
| 10 | N2, SW, N2SE, SWSE | 601.73 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 11 | S2NE less 2 acres in a square in the NE corner, E2W2, W2NW, NWSW, E2SWSW, NWNESE, S2NESE, W2SESE, SESESE, W2SE less 2.005 acres described as follows: Commencing at the concrete monument located at the NW corner of the NESESE of Section 11, T13N, R5W; thence proceed S 84° 13' W, a distance of 1,269.8 feet, to a 2" aluminum pipe with a cap stamped with La. Reg. No. 4447 set at the north right-of-way of La. Hwy. 126, also being the Point of Beginning;<br><br>Thence N 89° 29' W along said right-of-way, a distance of 300.00 feet, to a ½" diameter iron rod in the centerline of the Parish road;<br><br>Thence N 01° 22' W along said centerline, a distance of 122.93 feet, to a ½" diameter iron rod;<br><br>Thence N 10° 44' W along said centerline, a distance of 177.07 feet, to a ½" diameter iron rod;<br><br>Thence S 89° 40' E a distance of 300.00 feet, to a 2" aluminum pipe with a cap stamped with La. Reg. No. 4447;<br><br>Thence S 06° 52' E a distance of 300.00 feet, to the Point of Beginning. | 517.51 |
| 12 | SESW, SWSE | 79.68 |
| 13 | W2NE, SENE, E2NW, SW, NESE, N2SESE, W2SE less and except 24.82 acres in the NWSE, being the same 24.82 acres acquired by the U.S. in Civil Action 2732, dated January 28, 1937. | 472.63 |
| 14 | S2NE, E2NW, SWNW, E2SW, NWSW, SE, | 480.27 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 11 of 34

**SERVITUDE 2**

**KISATCHIE NATIONAL FOREST LANDS
SUBJECT TO PETRO HUNT MINERAL SERVITUDES
WHICH ARE HELD BY DRILLING
AS OF JUNE 1, 2005**

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 15 | S2NE, W2NW, S2 | 480.33 |
| 16 | E2, NW, N2SW, E2SESW | 577.72 |
| 17 | NE, W2NW less 1 acre in SW corner of the NENW, SW, N2NESE, NWSE, SWSE less 5 acres in a square in the SW corner | 491.74 |
| 18 | W2NE, NESE, That part of the NWNW, NENW, SENW, W2SE, SESE lying East of Saline Bayou | 299.32 |
| 19 | That part of the E2NE lying East of Saline Bayou | 15.00 |
| 20 | W2NW, NESE less and except a strip on the West side, being 120 yards wide and containing 10.90 acres, SWSE less 8.00 acres in a square in the NE corner, SESE | 148.78 |
| 21 | E2, E2NW, E2SWNW, E2W2SWNW, SW | 589.59 |
| 22 | NENE less 3 acres in a square in the Southeast corner, W2NE, SENE, W2, SE | 634.78 |
| 23 | E2, E2NW, SWNW, SW | 599.82 |
| 24 | S2NE, E2NW, NWNW, S2 | 519.16 |
| 25 | W2NE less 15 acres off the West side described as follows: BEGINNING at the Southwest corner of NWNE, run thence due East 10 chains, thence North 15 chains, thence West 10 chains, thence South 15 chains, to the point of beginning., E2NW | 135.00 |
| 26 | All | 640.00 |

Case 1:00-cv-00512-EMA Document 53-2 Filed 09/02/2008 Page 12 of 34

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 27 | NENE, W2NE, N2SENE, NENW, W2NW, 5 acres in a square in the Southeast corner of the SWSW, S2SESW, NENESE, S2NESE, W2NWSE, S2SE | 403.31 |
| 28 | NE, E2NW, NWNW, N2NESW, NWSW less 10 acres in a square in the Northwest corner, W2SWSW, SWSE, N2SESE | 410.05 |
| 29 | NENE, W2NE, That part of the W2 lying East of Saline Bayou containing 212.02 acres. SE, | 492.47 |
| 32 | That part of section lying East of Saline Bayou | 421.50 |
| 33 | S2NENE, NWNE, N2SWNE, SWSWNE, SENE, E2NW, SWNW, SW, N2SE, SESE less 5.5 acres in the Southeast corner, described as follows: BEGIN at the Southeast corner of the section, and run thence West along the South line of section 40 rods, thence at right angles easterly 40 rods, to the East line of the section, thence southerly along the East line of the section to the place of beginning. | 484.50 |
| 34 | E2, NENW, NWNW less 2.0 acres described as follows: BEGIN at the Northwest corner of the section, run thence South 70 yards, thence East 140 yards, thence North 70 yards to the North boundary of the section, thence West 140 yards to the point of beginning., S2NW, SW | 637.76 |
| 35 | ALL | 639.12 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 13 of 34

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

### TOWNSHIP 13 NORTH, RANGE 5 WEST, Louisiana PM (continued)

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 36 | S2NE, W2NWNE, E2NW, NWNW less 2 acres in the Northwest corner more particularly described as follows: BEGINNING at the Northwest corner of section and run thence due East 209 feet; thence South 418 feet; thence West 209 feet; thence North 418 feet to point of beginning, SWNW, SESW, SE | 457.91 |

### TOWNSHIP 12 NORTH, RANGE 5 WEST

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | All | 638.12 |
| 2 | All | 614.40 |
| 3 | E2, E2NW, S2SW | 472.93 |
| 4 | SE, W2 | 468.13 |
| 5 | That part of the E2 of the Section lying East of Saline Bayou | 224.00 |
| 10 | N2, SESE | 361.80 |
| 11 | All | 619.76 |
| 12 | All | 641.80 |
| 13 | All | 641.96 |
| 14 | E2, NW, N2SW, N2SWSW, SESW | 604.55 |

## SERVITUDE 2

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 15 | E2NE, SWNE less and except the North 24 acres, S2SW less and except the North 28 acres (N.457.04'), SE | 309.57 |
| 16 | That part of the Section lying East of Saline Bayou | 365.00 |
| 22 | W2NENE, NWNE, NENW, W2W2, SENW less and except 5 acres in a square in the Southeast corner, NESW less and except 3 acres in a square Northeast corner and less and except 2 acres described as follows: BEGINNING at the Southwest corner of the forty, run thence North along the West line of the forty 110 yards, thence East 154 yards to the point of beginning, thence North 140 yards, thence East 70 yards, thence South 140 yards, thence West 70 yards to point of beginning. | 330.79 |
| 23 | E2, E2NW4, SWNW, SW | 586.76 |
| 24 | All | 639.44 |
| 25 | All | 635.65 |
| 26 | NENE, N2SENE, W2E2, W2 | 529.16 |
| 27 | E2, NW, E2SW | 560.14 |
| 28 | That part of the S2SW lying East of Saline Bayou, SWSE | 115.35 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 13 of 34

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 29 | E2SE | 79.15 |
| 33 | That part of Section lying East of Saline Bayou | 400.00 |
| 34 | W2NE, W2SENE, That part of the NENW described as follows: BEGINNING at the Northwest corner of the section and run thence North 88° 16' East 1,298 feet to point of beginning, thence continue on same course North 88° 16' East 1,298 feet, thence due South 860 feet, thence North 58° West 1,530 feet along North side of right-of-way of L & A Railway, thence due North 10 feet to point of beginning, said tract containing 12.96 acres, S2NWNW, SWNW, S2S2, NWSW, NESE | 413.30 |
| 35 | NWNW, E2SWNW | 58.92 |

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | W2NW | 80.39 |
| 2 | NENE, W2NE, NW, NWSW | 318.72 |
| 3 | N2, N2SW, SWSW, NESE | 485.10 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 16 of 34

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 4 | That part lying East of the Saline Bayou | 324.14 |
| 10 | W2E2, N2NW, SESW, SESE | 320.00 |

**TOWNSHIP 13 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 18 | SWNW, NWSW, W2SWSW | 100.01 |

**TOWNSHIP 12 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 6 | N2NW, SWNW less and except 77.05 acres lying in the N2NW and the SWNW which were exchanged to Willie Glen Emmett and Barbara Louise Webb Emmett by deed dated January 11, 1994, Exhibit I, Exchange Deed, FS Tract C-174, SW, W2SE, SESE | 325.70 |
| 7 | All | 636.80 |
| 8 | SW less and except the North 35 acres of the SW lying East LA Hwy. 501. | 125.27 |
| 17 | S2NWNE, SWNE, S2NENW, W2NW, SENW, SW, SWSE | 400.67 |
| 18 | All | 637.56 |
| 19 | All | 637.72 |

Case 1:00-cv-00512-EMA Document 53-2 Filed 09/02/2008 Page 17 of 34

# SERVITUDE 2

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 12 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 20 | NENE, W2NE, W2, SE | 601.24 |
| 21 | SWSW | 40.03 |
| 26 | That part of the S2SW and the S2SE lying South of LA Hwy 1232 | 111.24 |
| 28 | W2NWNW, S2SW, W2SESE, | 119.95 |
| 29 | All | 638.92 |
| 30 | N/2 | 317.78 |
| 33 | E2NE4, SWNE, NENW, W2NW, S2 | 558.53 |
| 34 | NE, E2NW, SWNW, S2NESW, N2SESW, W2SW, N2SE | 478.92 |
| 35 | NE, W2NWNW, NESW, W2SW, S2NESE, NWSE, N2SESE | 380.02 |
| 36 | E2NE, SWNE, SENW, W2NW, N2SW, NWSE | 359.84 |

**TOTAL ACREAGE FOR SERVITUDE 2: 32,840.54**

# SERVITUDE 3

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 13 | S2 | 317.04 |
| 14 | SENE, Fractional SWNW, SENW, NESW, Fractional NWSW, E2SE, SWSE | 290.82 |
| 15 | Fractional SWNE, W2NW4, Fractional SENW, Fractional S2 | 260.20 |
| 21 | Fractional NENE | 29.18 |
| 22 | E2, NENW, S2NESW, E2SWSW, SESW, and that part of the S2NW, N2NESW, NWSW, AND W2SWSW lying East of the Monroe-Natchitoches Road. | 531.70 |
| 23 | NE, W2 | 479.55 |
| 24 | All | 634.40 |
| 25 | All | 632.80 |
| 26 | NENE, W2NWNE, N2SWNE, NENW, W2NW, N2NESENW, W2SENW, E2SE, SWSE | 345.11 |
| 27 | N2, SW, W2SE, W2SESE | 580.36 |
| 28 | E/2 | 320.00 |
| 33 | E2NE, SWNE, SE, W2 less and except 163.17 acres exchanged to the Salco Corporation by deed dated July 15, 1997, and described in Exhibit I, Exchange Deed, FS Tract C-169. | 446.83 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 19 of 34

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 5 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 34 | All | 640.00 |
| 35 | E2, E2NW, SWNW, SW | 600.00 |
| 36 | NENE, W2NE, W2, SE, | 596.02 |
| 37 | That part of irregular Section 37, otherwise known as the Emmamual Prudhomme entry within the limits of Sections 14 and 15 | 269.75 |

**TOWNSHIP 10 NORTH, RANGE 5 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | W2NE, W2 | 405.72 |
| 2 | S2NE, N2NW, S2SW, SE | 398.75 |
| 3 | NE, NENW less and except 6 acres more particularly described as follows: COMMENCING at a point 5 chains South of the Northwest corner of the NENW, run thence East 4 chains, thence South 15 chains, thence West 4 chains, thence North 15 chains to the point of beginning; NWNW, W2SENW, SESENW | 303.61 |
| 4 | N2NWNE, W2E2NW, W2NW, SW, NWSE, | 340.21 |
| 10 | NE, NENW less 12 acres in a square in the Northwest corner, and less 2.19 acres described as follows: BEGINNING at the Northeast corner of the Wyatt 12 acre tract located in the Northwest corner of the NENW; thence South 10.95 chains to start; thence South 2 chains; thence West 10.95 chains, thence North 2 chains; thence East 10.95 chains to the point of beginning; SENW, E2SW, NWSW, SWSW less 4 acres in a square in the Southeast corner; W2SE less 1 acre in a square in the Northwest corner. | 461.41 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 20 of 34

## SERVITUDE 3

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

### TOWNSHIP 10 NORTH, RANGE 5 WEST, Louisiana PM (continued)

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 11 | All less and except 2.71 acres located in the SWSE, which were quitclaimed to Couley Double Church and Cemetery Committee by deed dated November 2, 1988. | 639.49 |
| 12 | W2NE, NW, N2SW, W2SWSW, N2SESW, | 355.14 |
| 14 | N2NW | 80.05 |
| 15 | W2NE, E2NW, NWNW | 198.86 |
| 16 | NE less and except 1.62 acres described as follows: Commencing at the Northeast corner of said Section 16, thence S 35° 42' 13" W, a distance of 699.88 feet, to the Point of Beginning, Thence S 41° 45' 42" E, a distance of 230.21 feet; Thence S 19° 18' 00" W, a distance of 238.34 feet to the centerline of an existing gravel road; Thence N 47° 44' 22" W along said centerline, a distance of 329.47 feet, to the centerline of U.S. Hwy. 84; Thence N 32° 11' 08" E along said centerline, a distance of 252.75 feet; Thence S 41° 45' 42" E, a distance of 52.03 feet, to the Point of Beginning. | 158.42 |

### TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 8 | S2NE, SWNW, SW, E2SE, W2W2SE, | 398.07 |
| 9 | SENW, S2 | 358.52 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 21 of 34

# SERVITUDE 3

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 10 | SWNE, S2NW, SWSW, SE less and except 2.88 acres described as follows: Begin at the East one quarter corner of said Section 10, From said POB run: S 0° 36' 08 " W, 400.53 feet to a point in the centerline of LA Hwy 501, thence with the meanders of the center-line of said highway three lines:<br><br>N 58° 16' 28" W, 310.24 feet;<br>N 54° 23' 24" W, 211.04 feet;<br>N 50° 31' 57" W, 191.28 feet; thence<br><br>S 89° 18' 00" E, 588.70 feet to the point of beginning. | 314.52 |
| 11 | N2NE, SWNE, SENE less 2 acres described as follows: Commencing at the Southeast corner of the SENE, thence run North along East line of same 121-28/47 yards to the point of beginning; thence Due North 98-19/47 yards; thence Due West 98-19/47 yards; thence Due South 98-19/47 yards; thence Due East 98-19/47 yards to the point of beginning; E2SW, NESE, W2SE, SESE less .80 acres described as follows: Beginning at the SW corner of SESE, thence run North 3.50 chains; thence Due East 2.28 chains; thence Due South 3.50 chains; thence Due West 2.28 chains to the point of beginning. | 396.00 |
| 13 | W2W2 | 159.88 |
| 14 | NWNE, E2NW, SWNW, SW/4, SWSE less 10 acres off the East side. | 348.74 |
| 15 | W2NE, SENE, NW, NESW, SE | 477.60 |
| 16 | E2NE, SWNE, NENW, W2NW, NESE | 278.35 |
| 17 | All | 637.80 |

## SERVITUDE 3

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 18 | NE, SW | 316.18 |
| 19 | All | 631.77 |
| 20 | All | 638.64 |
| 21 | W2NE, W2, SE | 555.87 |
| 22 | N2NENE, SWNENE, W2NE, W2SENE, S/2 | 448.96 |
| 23 | NWNE, E2NW, NWNW, N2SWNW, SESWNW, SW | 349.34 |
| 24 | W2NW, SW | 239.11 |
| 25 | W2, SE | 477.27 |
| 26 | NWNE, N2SWNE, N2SENE, NENW, SENW less 5 acres off the East side, SW, W2NWSE, NWSWSE, S2SWSE, SESE | 404.33 |
| 27 | All | 639.64 |
| 28 | All | 635.24 |
| 29 | All | 637.92 |
| 30 | E2NE, N2NWNE, NWNW, NESW, S2SW, SE | 414.73 |
| 31 | E2NE, NWNE, NENW, W2NW, NWSW, SESW, E2SE, NWSE less 12 acres in a square in the SW corner, SWSE less 10 acres in a square in the Northwest corner | 453.62 |

# SERVITUDE 3

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF MAY 1, 2005

**TOWNSHIP 11 NORTH, RANGE 4 WEST, Louisiana PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 32 | All | 638.00 |
| 33 | All | 634.20 |
| 34 | All | 639.68 |
| 35 | E2NE, NWNE, W2, NESE, | 477.72 |
| 36 | All | 635.88 |

**TOWNSHIP 10 NORTH, RANGE 4 WEST, Louisiana PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | All | 645.76 |
| 2 | W2NE, E2NW | 158.18 |
| 3 | All | 649.45 |
| 5 | All | 643.40 |
| 6 | E2, E2NW, SWNW less and except 1.474 acres described as follows: Commencing at the Northwest corner of said SW, thence N 89° 55' E along the North line of said SW, a distance of 482.58 feet, to the centerline of U.S. Hwy. 84; thence S 61° 07' W along said centerline, a distance of 552.46 feet, to the West line of said SW, thence N 00° 15' E along said West line, a distance of 266.15 feet to the point of beginning; SW | 608.24 |
| 7 | All | 627.92 |

**TOTAL ACREAGE FOR SERVITUDE 3: 26,885.95**

## SERVITUDE 4

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 10 NORTH, RANGE 3 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 25 | All | 635.76 |
| 26 | E2NE | 79.95 |
| 36 | E2, SESW | 357.01 |

**TOWNSHIP 9 NORTH, RANGE 3 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | W2NE, W2, SE | 555.35 |
| 2 | S2SE | 79.67 |
| 11 | Fractional E2E2, NWNE, E2NW, SESW, SWSE | 253.34 |
| 37 | All | 566.37 |
| 12 | All | 174.00 |
| 13 | All | 638.64 |
| 14 | NE, N2SE, SESE | 280.74 |
| 22 | SENE, S2SW less 15.12 acres as described in deed between Grant Timber & Manufacturing Company of LA, Inc. and the U.S. dated January 28, 1934, and recorded in Book ZZ, Page 359 of Grant Parish; E2SE, NWSE less 11.80 acres as described in above referenced deed, SWSE | |
| 23 | SENE, E2NW, SWNW, S2 | 481.98 |

# SERVITUDE 4

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 3 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 24 | E2, E2NW, NWNW less 2.53 acres describes as follows: Begin at the Northwest corner of the section, thence run East along the North boundary line 113 yards, thence South 85 yards to the Northwest corner of the tract for a point of beginning, thence South 175 yards, thence East 70 yards, thence North 175 yards, thence West 70 yards to the point of beginning. | 637.23 |
| 25 | All | 642.00 |
| 26 | E2, NENW less 1 acre described as follows: Begin at the Northwest corner of the SENW and run due North 200 feet to to a point of beginning, run thence due east 210 feet; thence due north 210 feet, thence due West 210 feet; thence due South 210 feet to the point of beginning, W2NW, S2 | 600.88 |
| 27 | W2, SE | 481.92 |
| 34 | All | 641.20 |
| 35 | W2NE, W2, SE | 560.49 |
| 36 | NE, NENW, W2SW | 280.13 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 26 of 34

## SERVITUDE 4

### KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 10 NORTH, RANGE 2 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 29 | SWNE, W2, W2SE, SESE excepting from these lands 10.07 acres of the Rock Island Arkansas and Louisiana Railroad Company right-of-way | 469.69 |
| 31 | NENE, S2N2, NWNW, S2 | 554.58 |
| 32 | E2E2, E2W2, SWNW | 354.19 |
| 33 | SWNW less 3.31 acres of the Rock Island Arkansas and Louisiana Railroad r-o-w, W2SW | 115.98 |

**TOTAL ACREAGE FOR SERVITUDE 4:** **9,441.10**

## SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 3 | All | 634.44 |
| 4 | SENE, E2NW, S2NWNW, SWNW, NESW, S2SW, SE | 450.27 |
| 5 | N2NE less 3.78 acres in NWNE quitclaimed to Zion Baptist Church, by deed dated December 20, 1972, W2NWNW, S2NW, SW, S2SE | 407.03 |
| 6 | N2, N2SW, N2SWSW, SESWSW, SESW, SE | 614.25 |
| 7 | All | 638.24 |
| 8 | W2W2NW, NWSW | 79.38 |
| 9 | All less one acre described as follows: Commencing at a stake at the northeast corner of the NWNW, being the POB. Thence run West along the north boundary line of said section, 196.2 feet to a stake, thence South 204 feet to the north boundary line of the ROW of the L&A Railway Company, thence Southeasterly along said ROW line to the east line of the NWNW of Section 9, thence North along said east line 240 feet to the point of beginning. | 635.20 |
| 10 | NW, N2SW, W2SWSW, SE | 417.69 |
| 11 | All | 638.76 |
| 14 | NE, N2NW, E2SENW, SESW, N2SE less 2 acres in the southwest corner of the NESE as described in deed dated September 5, 1901, and recorded in CB "K", page 438 of the records of Grant Parish., W2SWSE | 400.01 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 28 of 34

**SERVITUDE 5**

**KISATCHIE NATIONAL FOREST LANDS
SUBJECT TO PETRO HUNT MINERAL SERVITUDES
WHICH ARE HELD BY DRILLING
AS OF JUNE 1, 2005**

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 15 | N2, N2S2 | 479.25 |
| 16 | All | 637.20 |
| 17 | E2E2, S2S2NESW, W2SW, SESW, SWSE | 328.10 |
| 18 | NENW, South 5/8 of NWSW, S2S2 | 224.55 |
| 19 | All | 639.96 |
| 20 | All | 636.56 |
| 21 | All | 639.12 |
| 22 | S2S2NWNE, SWNE, S2SENE, NESENE, NWNENW, S2NENW, NWNW, S2NW, S2 | 548.11 |
| 23 | NE, NENW, S2NW, S2 | 601.20 |
| 24 | SWSW | 40.09 |
| 25 | NENE, NWNW, S2N2, S2 | 560.11 |
| 26 | All | 640.24 |
| 27 | All | 637.20 |
| 28 | All | 640.32 |
| 29 | All | 637.88 |
| 30 | NE, N2NW, SWNW, NWSE, SESE | 360.22 |

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 1 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 31 | All | 641.76 |
| 32 | S2NE, E2NW, S2 | 479.67 |
| 33 | N2NE, SWNE, NENW, S2NW, SW | 400.50 |
| 34 | NENE, N2NWNE, SENWNE, NENW | 109.74 |
| 35 | N2N2, SENE | 220.00 |
| 36 | E/2, N/2 NW/4, E/2 SW/4 | 479.79 |

**TOWNSHIP 8 NORTH, RANGE 1 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 4 | E2, E2W2, NWNW, W2SW | 606.44 |
| 6 | NE, SENW, N2SW, SWSW less 2 acres in the southeast corner described as follows: Beginning in the southeast corner of said 40 acres, thence run North 20 rods, thence West 16 rods, thence South 20 rods, thence East 16 rods to the point of beginning, N2SE, SWSE | 438.30 |
| 18 | NWSW | 39.76 |

Case 5:00-cv-00303-DEW-KLH Document 228 Filed 12/07/2005 Page 30 of 34

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | All | 627.27 |
| 2 | NENE, N2NWSW, N2S2NWSW, S2S2 | 225.65 |
| 3 | N2, NESW, SE | 513.09 |
| 4 | NESE, S2SE | 117.39 |
| 5 | N2NW, SWNW, SW less 19.57 acres on the east side of the SW as shown on Exhibit 1 Map, being those lands conveyed to B. E. Melton by deed dated August 21, 1970. | 354.99 |
| 6 | E2 less 0.76 acres in SENE quitclaimed to Tyson Cemetery Committee by deed dated August 23, 1988 as described in Exhibit 2, NESW | 343.34 |
| 7 | Fractional S2S2 | 163.78 |
| 8 | E2E2, S2SW, SWSE | 280.26 |
| 37 | Part of Fractional Section 37, otherwise described as the N2S2 of Section 7 and the W2NE, NW, N2SW, NWSE of Section 8 | 496.76 |
| 9 | NWNE, S2NE, W2, SE | 595.91 |
| 10 | S2NW, S2 | 399.57 |
| 11 | N2NE, NENW, N2SENW, NWSW, S2S2, NWSE | 382.64 |
| 12 | NE, E2NW, N2SE, SESE | 361.30 |
| 13 | NENE, W2, SE | 521.46 |

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS
## SUBJECT TO PETRO HUNT MINERAL SERVITUDES
## WHICH ARE HELD BY DRILLING
## AS OF JUNE 1, 2005

**TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 14 | All | 645.24 |
| 15 | All | 637.52 |
| 16 | All | 638.00 |
| 17 | All | 638.20 |
| 18 | N2, N2S2, S2SE | 526.12 |
| 19 | W2, W2SE, SESE | 414.15 |
| 20 | All | 637.60 |
| 21 | All | 638.00 |
| 22 | All | 637.34 |
| 23 | All | 644.00 |
| 24 | All | 642.20 |
| 25 | All | 642.60 |
| 26 | All | 642.80 |
| 27 | All | 638.32 |
| 28 | N2, SW, N2SE, SWSE | 598.50 |
| 29 | All | 636.80 |
| 30 | S2NW, NESW, N2SE, SESE | 226.52 |

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

### TOWNSHIP 9 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 31 | E2NE, NWNW, S2NW, N2SW, SESW, SE | 454.35 |
| 32 | N2, N2S2, SWSE | 518.70 |
| 33 | N2, NWSW, SESE | 399.62 |
| 34 | N/2, E/2 SW/4, SE/4 | 599.30 |
| 35 | All | 641.20 |
| 36 | NWNE, S2NE, NW, S2 | 600.94 |

### TOWNSHIP 8 NORTH, RANGE 2 WEST, LOUISIANA PM

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | All | 635.75 |
| 2 | All | 645.44 |
| 3 | All | 640.40 |
| 4 | E2E2, SWNE, W2W2, SESW | 397.46 |
| 5 | E2, E2W2, SWNW, W2SW | 596.30 |
| 6 | NWNE, S2NE, E2NW, NESW, N2SE, SESE | 435.50 |
| 7 | All | 618.20 |
| 8 | N2, SW, NWSE, S2SE | 600.84 |
| 9 | N2, NESW, SWSW, SE | 557.02 |

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS SUBJECT TO PETRO HUNT MINERAL SERVITUDES WHICH ARE HELD BY DRILLING AS OF JUNE 1, 2005

**TOWNSHIP 8 NORTH, RANGE 2 WEST, LOUISIANA PM (continued)**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 10 | NE, NENW, N2NWNW, E2SENW, E2W2SENW, S2NESE, SESE | 309.28 |
| 11 | NE, N2SW, SWSW, E2SE | 361.43 |
| 12 | N2NE, SWNE, W2, W2SE, SESE | 553.80 |
| 13 | NE, E2NW, SWNW, SW, N2SE, SWSE, and that part of the SESE lying north of Fish Creek | 586.91 |
| 14 | E2NE, W2NW, SW less 10 acres in the NWSW described as follows: Beginning at the northeast corner of the said NWSW, run South along the east line thereof 50 rods, thence West 32 rods, thence North 50 rods, thence East 32 rods, to the place of beginning, SE | 473.72 |
| 16 | N2, SW, NESE | 521.46 |
| 17 | N2, SW, W2SE, SESE | 603.30 |
| 18 | NE less 1 acre being near the northwest corner of said NE, as described in deed to White Chapel Church, by deed recorded in CB "M" Page 10, S2NW, SW, N2SE | 465.28 |
| 19 | All | 612.00 |
| 20 | N/2, NE/4 SW/4, SE/4 | 515.16 |
| 29 | W/2 NE/4, NW/4, N/2 SW/4 | 317.92 |
| 30 | E/2, W/2 NW/4, N/2 SW/4, SE/4 SW/4 | 499.34 |

# SERVITUDE 5

## KISATCHIE NATIONAL FOREST LANDS
## SUBJECT TO PETRO HUNT MINERAL SERVITUDES
## WHICH ARE HELD BY DRILLING
## AS OF JUNE 1, 2005

**TOWNSHIP 8 NORTH, RANGE 3 WEST, LOUISIANA PM**

| Section | Legal Description | Approx. Acreage |
|---|---|---|
| 1 | SWNE, W2, SE | 515.55 |
| 2 | All | 632.28 |
| 11 | N2, N2SW, SESW, SE | 599.77 |
| 12 | N2, N2SE | 397.85 |
| 13 | SESE | 39.78 |
| 14 | NWNE | 40.05 |
| 24 | S2NE, S2SW, SE | 318.04 |
| 25 | NE, S2NW, SW, N2SE, SWSE, W2SESE | 536.76 |

**TOTAL ACREAGE FOR SERVITUDE 5:** **36,123.98**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PETRO-HUNT, L.L.C.,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | Case No. 00-512L<br>Judge Allegra |

DECLARATION OF DELIA K. JAQUETTE

1. My name is Delia K. Jaquette and I have been employed by the United States Forest Service for 34 years. My current position is Realty Specialist, Mineral Leasing Program Manager for the Southern Region. I have been in this position for the last 11 years.

2. As part of my duties as Regional Program Manager, I oversee the oil and gas leasing program on the lands owned and managed by the United States Forest Service, Southern Region.

3. I have reviewed the Lands and Minerals Records automated system (LR 2000) maintained by the DOI, Bureau of Land Management as the data pertain to the mineral leases at issue in Count III of Plaintiff's Complaint and also those subject to the decision in *United States v. Nebo Oil Co.*, 90 F. Supp. 73 (W.D. La. 1950), *aff'd*, 190 F.2d 1003 (5th Cir. 1951). As a result of my review of LR 2000, I have determined that:

   a. On the servitude adjudicated in *Nebo Oil* one lease was issued.

      i. Serial Number: LAES—046324; lease issued 1/27/1994; lease terminated 2/1/2000.

      The Serial Register page for this lease is attached hereto as Exhibit A.

   b. On servitude number 1.

      i. No leases were issued.

   c. On servitude number 2, the following eleven leases were issued.

i. Serial Number: LAES— 043575; lease issued 6/5/1991; lease expired 6/30/2001.

ii. Serial Number: LAES— 046312; lease issued 1/26/1994; lease terminated 2/1/2000.

iii. Serial Number: LAES— 046313; lease issued 1/27/1994; lease terminated 2/1/2000.

iv. Serial Number: LAES— 046314; lease issued 1/27/1994; lease terminated 2/1/2000.

v. Serial Number: LAES— 046315; lease issued 1/27/1994; lease cancelled 1/11/2002.

vi. Serial Number: LAES— 046318; lease issued 1/27/1994; lease expired 1/31/2004.

vii. Serial Number: LAES— 047595; lease issued 1/25/1996; lease cancelled 1/11/2002.

viii. Serial Number: LAES— 046310; lease issued 1/26/1994; lease terminated 2/1/2000.

ix. Serial Number: LAES— 047978; lease issued 8/9/1996; lease terminated 8/1/2005.

x. Serial Number: LAES— 047979; lease issued 7/17/1996; lease terminated 8/1/2003.

xi. Serial Number: LAES— 046323; lease issued 1/26/1994; lease terminated 2/1/2000.

The Serial Register pages for these leases are attached hereto as Exhibits B through L.

d. On servitude number 3.

i. No leases were issued.

e. On servitude number 4.

i. No leases were issued.

f. On servitude number 5, the following three leases were issued.

i. Serial Number: LAES— 037729; lease issued 6/1/1988; lease expired 1/1/2001.

ii. Serial Number: LAES— 047279; lease issued 7/5/1995; lease expired 7/31/2005.

iii. Serial Number: LAES—047280; lease issued 7/17/95; lease cancelled in part as to the servitude 5 lands 1/11/2002; lease expired 7/31/2005.

The Serial Register pages for these leases are attached hereto as Exhibits M through O.

4. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Delia K. Jaquette 9/2/08
Delia K. Jaquette
Realty Specialist
Mineral Leasing Program Manager

Date

# EXHIBIT A

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 03:39 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 240.560

**Serial Number** LAES-- - 046324

Serial Number: LAES-- - 046324

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046324

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0130N 0070W 024 | ALIQ | S2NE,SE; | JACKSON NO RA | NATCHITOCHES | KISATCHIE NF |

Serial Number: LAES-- - 046324

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/08/1993 | 387 | CASE ESTABLISHED | ES-141-11/93 | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 929 | NEW PRIORITY ESTABLISHED | FOR NONCOMP OFFER SB | |
| /10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| /19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/27/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/04/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $361.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $361.50;21/0000000013 | |
| 12/18/1995 | 084 | RENTAL RECEIVED BY MMS | $361.50;21/0000000010 | |
| 12/13/1996 | 084 | RENTAL RECEIVED BY MMS | $361.50;21/0000000028 | |
| 12/30/1997 | 084 | RENTAL RECEIVED BY MMS | $361.50;21/0000000035 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 03/09/2001 | 970 | CASE CLOSED | SB | |

Serial Number: LAES-- - 046324

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 & 4 |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT B

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 04:04 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 224.000

**Serial Number** LAES-- - 043575

Serial Number: LAES-- - 043575

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| GULF COAST O&G CO | PO BOX 30169 | PENSACOLA FL 32503 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 043575

| Mer Twp Rng Sec | STyp | SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|---|
| 18 0120N 0050W 005 | FF | 1 | TR C-107 EAST OF SALINE | JACKSON | NO RA | NATCHITOCHES | KISATCHIE NF |
| 18 0120N 0050W 005 | FF | 1 | TR C-107 EAST OF SALINE | JACKSON | NO RA | WINN | KISATCHIE NF |
| 18 0120N 0050W 005 | FF | 2 | BAYOU; | JACKSON | NO RA | NATCHITOCHES | |
| 18 0120N 0050W 005 | FF | 2 | BAYOU; | JACKSON | NO RA | WINN | |

Serial Number: LAES-- - 043575

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 04/09/1991 | 387 | CASE ESTABLISHED | #ES-327-4/91; | |
| 04/10/1991 | 191 | SALE HELD | | |
| 04/10/1991 | 268 | BID NOT RECEIVED | | |
| 04/11/1991 | 124 | APLN RECD | #1204; | |
| 04/11/1991 | 929 | NEW PRIORITY ESTABLISHED | FOR NONCOMP OFFER; | |
| 04/11/1991 | 943 | AVAIL OVER THE COUNTER | | |
| 5/05/1991 | 237 | LEASE ISSUED | | |
| /01/1991 | 496 | FUND CODE | 568; | |
| 07/01/1991 | 530 | RLTY RATE - 12 1/2% | | |
| 07/01/1991 | 868 | EFFECTIVE DATE | | |
| 05/17/1993 | 111 | RENTAL RECEIVED | $336.00;21/0000000013 | |
| 06/07/1994 | 111 | RENTAL RECEIVED | $336.00;21/0000000003 | |
| 05/05/1995 | 084 | RENTAL RECEIVED BY MMS | $336.00;21/0000000012 | |
| 06/22/1999 | 084 | RENTAL RECEIVED BY MMS | $448.00;21/0000000015 | |
| 06/19/2000 | 084 | RENTAL RECEIVED BY MMS | $448.00;21/102 | |
| 06/30/2001 | 234 | EXPIRED | | |
| 06/30/2001 | 763 | EXPIRES | | |
| 01/17/2002 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 043575

| Line Nr | Remarks |
|---|---|

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT C

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 03:46 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 480.300

**Serial Number** LAES-- - 046312

Serial Number: LAES-- - 046312

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046312

| Mer Twp Rng Sec | STyp | SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|---|
| 18 0130N 0050W 014 | ALIQ | | SESW,SE; | JACKSON | NO RA | WINN | |
| 18 0130N 0050W 014 | ALIQ | | S2NE,NENW,S2NW,N2SW; | JACKSON | NO RA | WINN | KISATCHIE NF |

Serial Number: LAES-- - 046312

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/04/1993 | 387 | CASE ESTABLISHED | ES-129-11/93 | |
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 10/1993 | 929 | NEW PRIORITY ESTABLISHED | | |
| 10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/26/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $721.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $721.50;21/0000000013 | |
| 12/18/1995 | 084 | RENTAL RECEIVED BY MMS | $721.50;21/0000000010 | |
| 01/07/1997 | 084 | RENTAL RECEIVED BY MMS | $721.50;21/0000000050 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 04/26/2001 | 970 | CASE CLOSED | | |
| 01/31/2004 | 763 | EXPIRES | SB | |

Serial Number: LAES-- - 046312

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 & 4 |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT D

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 03:50 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 80.060

**Serial Number** LAES-- - 046313

Serial Number: LAES-- - 046313

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046313

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0130N 0050W 015 | ALIQ | W2NW; | JACKSON NO RA | WINN | KISATCHIE NF |

Serial Number: LAES-- - 046313

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/04/1993 | 387 | CASE ESTABLISHED | ES-130-11/93 | |
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 929 | NEW PRIORITY ESTABLISHED | | |
| 11/10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/27/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $121.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $121.50;21/0000000013 | |
| 12/18/1995 | 084 | RENTAL RECEIVED BY MMS | $121.50;21/0000000010 | |
| 01/07/1997 | 084 | RENTAL RECEIVED BY MMS | $121.50;21/0000000050 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 04/26/2001 | 970 | CASE CLOSED | | |
| 01/31/2004 | 763 | EXPIRES | SB | |

Serial Number: LAES-- - 046313

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 & 4 |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT E

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 03:52 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 38.770

**Serial Number** LAES-- - 046314

Serial Number: LAES-- - 046314

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046314

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0130N 0050W 017 | FF | NENW LESS 1 AC IN SW CRN; | JACKSON NO RA | WINN | KISATCHIE NF |

Serial Number: LAES-- - 046314

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/04/1993 | 387 | CASE ESTABLISHED | ES-131-11/93 | |
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| ./10/1993 | 929 | NEW PRIORITY ESTABLISHED | FOR NONCOMP OFFER SB | |
| ./10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/27/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/04/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $58.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $58.50;21/0000000013 | |
| 12/18/1995 | 084 | RENTAL RECEIVED BY MMS | $58.50;21/0000000017 | |
| 01/07/1997 | 084 | RENTAL RECEIVED BY MMS | $58.50;21/0000000050 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 04/26/2001 | 970 | CASE CLOSED | | |
| 01/31/2004 | 763 | EXPIRES | SB | |

Serial Number: LAES-- - 046314

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 |

**NO WARRANTY IS MADE BY BLM**
**FOR USE OF THE DATA FOR**
**PURPOSES NOT INTENDED BY BLM**

# EXHIBIT F

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 03:58 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 426.740

**Serial Number** LAES-- - 046315

Serial Number: LAES-- - 046315

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| STRANG JOHN P | 35 SUTTON PLACE | NEW YORK NY 10022 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046315

| Mer Twp Rng Sec | STyp | SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|---|
| 18 0130N 0050W 018 | ALIQ | | W2NE,E2NW; | JACKSON | NO RA | WINN | KISATCHIE NF |
| 18 0130N 0050W 018 | ALIQ | | W2NE,E2NW; | JACKSON | NO RA | NATCHITOCHES | KISATCHIE NF |
| 18 0130N 0050W 018 | FF | 1 | EAST OF SALINE BAYOU; | JACKSON | NO RA | WINN | |
| 18 0130N 0050W 018 | FF | 1 | EAST OF SALINE BAYOU; | JACKSON | NO RA | NATCHITOCHES | |
| 18 0130N 0050W 018 | FF | 2 | NWNW SALINE BAYOU, S2SE; | JACKSON | NO RA | WINN | |
| 18 0130N 0050W 018 | FF | 2 | NWNW SALINE BAYOU, S2SE; | JACKSON | NO RA | NATCHITOCHES | |
| 18 0130N 0050W 018 | FF | 3 | EAST OF SALINE BAYOU; | JACKSON | NO RA | WINN | |
| 18 0130N 0050W 018 | FF | 3 | EAST OF SALINE BAYOU; | JACKSON | NO RA | NATCHITOCHES | |

Serial Number: LAES-- - 046315

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/05/1993 | 299 | PROTEST FILED | | |
| 11/08/1993 | 387 | CASE ESTABLISHED | #ES-132-11/93; | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | | |
| 01/27/1994 | 237 | LEASE ISSUED | | |
| 02/01/1994 | 496 | FUND CODE | 568; | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | | |
| 02/01/1994 | 868 | EFFECTIVE DATE | | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $640.50;11 | |
| 01/25/1995 | 111 | RENTAL RECEIVED | $640.50;21/0000000109 | |
| 01/10/1997 | 084 | RENTAL RECEIVED BY MMS | $640.50;21/0000000114 | |
| 12/23/1997 | 084 | RENTAL RECEIVED BY MMS | $640.50;21/0000000116 | |
| 01/06/2000 | 084 | RENTAL RECEIVED BY MMS | $854.00;21/122 | |
| 05/19/2000 | 673 | SUS OPS/PROD APLN FILED | | |
| 07/24/2000 | 674 | SUS OPS/PROD APLN DENIED | | |
| 09/15/2000 | 393 | DEC ISSUED | RECONSIDERATION DNIED | |
| 12/21/2000 | 084 | RENTAL RECEIVED BY MMS | $854.00;21/124 | |
| 01/11/2002 | 199 | CANCELED | | |
| 04/20/2006 | 379 | REFUND AUTHORIZED | $4985.50 | |
| 04/20/2006 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 046315

| Line Nr | Remarks |
|---|---|

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**
**CASE RECORDATION**
**(MASS) Serial Register Page**

RunDate/Time: 07/30/08 03:58 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 426.740

**Serial Number** LAES-- - 046315

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT G

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 04:00 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: AUTHORIZED**

**Total Acres** 84.750

**Serial Number** LAES-- - 046318

Serial Number: LAES-- - 046318

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| STRANG JOHN P | 35 SUTTON PLACE | NEW YORK NY 10022 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046318

| Mer Twp Rng Sec | STyp | SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|---|
| 18 0130N 0050W 027 | FF | 1 | W2SW LESS AND EXPT 5 AC | JACKSON | NO RA | WINN | KISATCHIE NF |
| 18 0130N 0050W 027 | FF | 2 | IN SE CRN, NENESE; | JACKSON | NO RA | WINN | |

Serial Number: LAES-- - 046318

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/05/1993 | 299 | PROTEST FILED | | |
| 11/08/1993 | 387 | CASE ESTABLISHED | #ES-135-11/93; | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | | |
| 01/27/1994 | 237 | LEASE ISSUED | $1.50; | |
| 02/01/1994 | 496 | FUND CODE | 568; | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | | |
| 02/01/1994 | 868 | EFFECTIVE DATE | | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $127.50;11 | |
| 01/25/1995 | 111 | RENTAL RECEIVED | $127.50;21/0000000109 | |
| 01/10/1997 | 084 | RENTAL RECEIVED BY MMS | $127.50;21/0000000114 | |
| 12/23/1997 | 084 | RENTAL RECEIVED BY MMS | $127.50;21/0000000116 | |
| 01/06/2000 | 084 | RENTAL RECEIVED BY MMS | $170.00;21/122 | |
| 05/19/2000 | 673 | SUS OPS/PROD APLN FILED | | |
| 07/24/2000 | 674 | SUS OPS/PROD APLN DENIED | | |
| 09/15/2000 | 393 | DEC ISSUED | RECONSIDERATION DNIED | |
| 12/21/2000 | 084 | RENTAL RECEIVED BY MMS | $170.00;21/124 | |
| 07/31/2002 | 188 | DEC VACATED/RESCINDED | | |
| 07/31/2002 | 365 | DEC REMANDED | | |
| 01/30/2003 | 408 | SUS OPS/PROD CONTINUES | | |
| 01/31/2004 | 763 | EXPIRES | | |

Serial Number: LAES-- - 046318

| Line Nr | Remarks |
|---|---|

**NO WARRANTY IS MADE BY BLM**
**FOR USE OF THE DATA FOR**
**PURPOSES NOT INTENDED BY BLM**

# EXHIBIT H

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 04:08 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 312022: O&G LSE COMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 330.330

**Serial Number** LAES-- - 047595

Serial Number: LAES-- - 047595

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| ASPECT RESOURCES LLC | 511 16TH STREET, SUITE 300 | DENVER CO 80202 | LESSEE | 40.000000000 |
| MB EXPLORATION LLC | 5001 LBJ FREEWAY, SUITE 370 | DALLAS TX 75244 | LESSEE | 20.000000000 |
| UMC PETROLEUM | 1201 LOUISIANA ST | HOUSTON TX 77002 | LESSEE | 40.000000000 |

Serial Number: LAES-- - 047595

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|
| 18 0120N 0050W 034 | ALIQ | SWNW,W2SW,SESW,NESE,S2SE; | JACKSON | NO RA | WINN | |
| 18 0120N 0050W 034 | ALIQ | W2SENE,NESWNE,S2NWNW; | JACKSON | NO RA | WINN | KISATCHIE NF |

Serial Number: LAES-- - 047595

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 12/06/1995 | 387 | CASE ESTABLISHED | ES-042-12/95 | |
| 12/07/1995 | 191 | SALE HELD | | |
| 12/07/1995 | 267 | BID RECEIVED | $662.00; | |
| 01/25/1996 | 237 | LEASE ISSUED | $1.50; | |
| 01/31/1996 | 974 | AUTOMATED RECORD VERIF | | JYH |
| 02/01/1996 | 496 | FUND CODE | 568; | |
| 02/01/1996 | 530 | RLTY RATE - 12 1/2% | | |
| 02/01/1996 | 868 | EFFECTIVE DATE | | |
| 01/15/1997 | 084 | RENTAL RECEIVED BY MMS | $496.50;21/0000000082 | |
| 07/11/1997 | 140 | ASGN FILED | UMC PETROLEUM CORP | |
| 08/01/1997 | 898 | ASGN EFFECTIVE | | |
| 12/22/1997 | 084 | RENTAL RECEIVED BY MMS | $496.50;21/0004005081 | |
| 08/04/1998 | 139 | ASGN APPROVED | | |
| 01/24/2000 | 084 | RENTAL RECEIVED BY MMS | $496.50;21/7076 | |
| 01/25/2001 | 084 | RENTAL RECEIVED BY MMS | $662.00;21/7092 | |
| 01/11/2002 | 199 | CANCELED | | |
| 01/11/2002 | 525 | ACRES-NONFEDERAL | | |
| 05/17/2002 | 968 | CASE ACTION COMPLETED | | |
| 04/20/2006 | 379 | REFUND AUTHORIZED | $1730;ENERGY ARROW | |
| 04/20/2006 | 379 | REFUND AUTHORIZED | $2151.50;UMC PETROL | |
| 04/20/2006 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 047595

| Line Nr | Remarks |
|---|---|
| 0001 | /A/ ASSIGNMENT OF RECORD TITLE: UMC PETROLEUM CORP. |
| 0002 | 40%; ASPECT RESOURCES LIMITED LIABILITY CO. 40%; |
| 0003 | MB EXPLORATION, L.L.C. 20%. |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT I

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/27/08 06:59 AM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 158.200

**Serial Number** LAES-- - 046310

Serial Number: LAES-- - 046310

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046310

| Mer Twp Rng Sec | STyp | SNr | Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|---|---|
| 18 0130N 0050W 007 | ALIQ | | | NESW,S2SW; | JACKSON | NO RA | NATCHITOCHES | KISATCHIE NF |
| 18 0130N 0050W 007 | ALIQ | | | NESW,S2SW; | JACKSON | NO RA | WINN | KISATCHIE NF |
| 18 0130N 0050W 007 | ALIQ | | | SWSE; | JACKSON | NO RA | NATCHITOCHES | |
| 18 0130N 0050W 007 | ALIQ | | | SWSE; | JACKSON | NO RA | WINN | |
| 18 0130N 0050W 007 | FF | 1 | | EAST OF SALINE BAYOU; | JACKSON | NO RA | NATCHITOCHES | |
| 18 0130N 0050W 007 | FF | 1 | | EAST OF SALINE BAYOU; | JACKSON | NO RA | WINN | |

Serial Number: LAES-- - 046310

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/04/1993 | 387 | CASE ESTABLISHED | ES-127-11/93 | |
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 929 | NEW PRIORITY ESTABLISHED | FOR NONCOMP SB | |
| 11/10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/26/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $238.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $238.50;21/0000000013 | |
| 12/20/1995 | 084 | RENTAL RECEIVED BY MMS | $238.50;21/0000000010 | |
| 01/07/1997 | 084 | RENTAL RECEIVED BY MMS | $238.50;21/0000000050 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 04/25/2001 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 046310

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 & 4 |
| 0002 | SUBJ TO FS STIP NO 2 |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT J

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/27/08 06:45 AM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 312022: O&G LSE COMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 158.440

**Serial Number** LAES-- - 047978

Serial Number: LAES-- - 047978

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| PALMER PETRO LLC | 401 EDWARDS ST #1400 | SHREVEPORT LA 711013143 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 047978

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0120N 0050W 028 | ALIQ | S2SW,NESE,SWSE; | JACKSON NO RA | WINN | KISATCHIE NF |

**Relinquished/Withdrawn Lands**

Serial Number: LAES-- - 047978

| | | | | | |
|---|---|---|---|---|---|
| 18 0120N 0050W 728 | ALIQ | S2SW,SWSE; | JACKSON NO RA | WINN | KISATCHIE NF |

Serial Number: LAES-- - 047978

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 06/19/1996 | 387 | CASE ESTABLISHED | ES-067-06/96; | |
| 06/20/1996 | 191 | SALE HELD | | |
| 06/20/1996 | 267 | BID RECEIVED | $954.00; | |
| 08/01/1996 | 496 | FUND CODE | 568; | |
| 08/01/1996 | 530 | RLTY RATE - 12 1/2% | | |
| 08/01/1996 | 868 | EFFECTIVE DATE | | |
| 08/09/1996 | 237 | LEASE ISSUED | | |
| 08/27/1996 | 084 | RENTAL RECEIVED BY MMS | $238.50;11/MULTIPLE | |
| 08/28/1996 | 974 | AUTOMATED RECORD VERIF | TMW; | |
| 06/18/1999 | 084 | RENTAL RECEIVED BY MMS | $238.50;21/0000000073 | |
| 07/28/2000 | 084 | RENTAL RECEIVED BY MMS | $238.50;21/78 | |
| 07/23/2001 | 084 | RENTAL RECEIVED BY MMS | $318.00;21/84 | |
| 01/11/2002 | 238 | LEASE MODIFIED-AMENDED | | |
| 01/11/2002 | 393 | DEC ISSUED | LEASE CAN. IN PART | |
| 08/01/2005 | 244 | TERMINATED | | |
| 04/18/2006 | 379 | REFUND AUTHORIZED | $1844.50; | |
| 08/29/2006 | 791 | TERMINAT'N NOTICE ISSUED | | |
| 08/29/2006 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 047978

| Line Nr | Remarks |
|---|---|
| 0001 | REMAINING ACREAGE UNDER LEASE IS 40.00 ACRES |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT K

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 07/30/08 04:09 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 312022: O&G LSE COMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 435.330

**Serial Number** LAES-- - 047979

Serial Number: LAES-- - 047979

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| PALMER PETRO LLC | 401 EDWARDS ST #1400 | SHREVEPORT LA 711013143 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 047979

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0120N 0050W 029 | ALIQ | SWNE,S2NW,S2; | JACKSON NO RA | NATCHITOCHES | KISATCHIE NF |

Serial Number: LAES-- - 047979

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 06/19/1996 | 387 | CASE ESTABLISHED | ES-068-06/96; | |
| 06/20/1996 | 191 | SALE HELD | | |
| 06/20/1996 | 267 | BID RECEIVED | $872.00; | |
| 07/17/1996 | 237 | LEASE ISSUED | | |
| [illegible]/01/1996 | 496 | FUND CODE | | |
| [illegible]1/1996 | 530 | RLTY RATE - 12 1/2% | | |
| [illegible]996 | 868 | EFFECTIVE DATE | 568; | |
| [illegible]2003 | 244 | TERMINATED | | |
| 04/18/2006 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 047979

| Line Nr | Remarks |
|---|---|

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT L

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/28/08 12:17 PM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 40.310

**Serial Number** LAES-- - 046323

Serial Number: LAES-- - 046323

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| SPEAR HOWELL R | P.O. BOX 1684 | MIDLAND TX 79702 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 046323

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | County | Mgmt Agency |
|---|---|---|---|---|---|
| 18 0130N 0070W 013 | ALIQ | SWSE; | JACKSON NO RA | NATCHITOCHES | KISATCHIE NF |

Serial Number: LAES-- - 046323

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/05/1993 | 299 | PROTEST FILED | SB | |
| 11/08/1993 | 387 | CASE ESTABLISHED | ES-140-11/93 | |
| 11/09/1993 | 191 | SALE HELD | | |
| 11/09/1993 | 268 | BID NOT RECEIVED | | |
| 11/10/1993 | 129 | DAY AFTER SALE OFFER | | |
| 11/10/1993 | 929 | NEW PRIORITY ESTABLISHED | FOR NONCOMP SB | |
| 11/10/1993 | 943 | AVAIL OVER THE COUNTER | | |
| 11/19/1993 | 888 | DRAWING HELD | | |
| 01/21/1994 | 298 | PROTEST DISMISSED | SB | |
| 01/26/1994 | 237 | LEASE ISSUED | $1.50; SB | |
| 02/01/1994 | 496 | FUND CODE | 125008.1 191 SB | |
| 02/01/1994 | 530 | RLTY RATE - 12 1/2% | SB | |
| 02/01/1994 | 868 | EFFECTIVE DATE | SB | |
| 02/03/1994 | 974 | AUTOMATED RECORD VERIF | SB | |
| 02/25/1994 | 111 | RENTAL RECEIVED | $61.50;11 | |
| 01/09/1995 | 111 | RENTAL RECEIVED | $61.50;21/0000000013 | |
| 12/18/1995 | 084 | RENTAL RECEIVED BY MMS | $61.50;21/0000000010 | |
| 12/13/1996 | 084 | RENTAL RECEIVED BY MMS | $61.50;21/0000000028 | |
| 12/30/1997 | 084 | RENTAL RECEIVED BY MMS | $61.50;21/0000000035 | |
| 02/01/2000 | 244 | TERMINATED | | |
| 03/09/2001 | 970 | CASE CLOSED | SB | |

Serial Number: LAES-- - 046323

| Line Nr | Remarks |
|---|---|
| 0001 | SUBJ TO FS LEASE NO 3 & 4 |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT M

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/04/08 12:15 PM



**01 08-07-1947;061STAT0913;30USC351-359**
**Case Type 311112: O&G LSE NONCOMP ACQ LAND**
**Commodity 459: OIL & GAS L**
**Case Disposition: AUTHORIZED**

**Total Acres** 303.260

**Serial Number** LAES-- - 037729

Serial Number: LAES-- - 037729

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| HOGAN EXPL INC | 221 WALL ST | COLUMBIA LA 71418 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 037729

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|
| 18 0090N 0020W 018 | ALIQ | S2SW; | JACKSON | NO RA | GRANT | KISATCHIE NF |
| 18 0090N 0020W 019 | ALIQ | NE,NESE; | JACKSON | NO RA | GRANT | |
| 18 0090N 0020W 020 | ALIQ | SWNW; | JACKSON | NO RA | GRANT | |

Serial Number: LAES-- - 037729

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 11/16/1987 | 124 | APLN RECD | #1513; | |
| 12/21/1987 | 910 | REPORT REQUESTED | FS | |
| 02/25/1988 | 911 | REPORT RECEIVED | FS | |
| 06/01/1988 | 237 | LEASE ISSUED | $1.00; | |
| 07/01/1988 | 496 | FUND CODE | 568; | |
| 07/01/1988 | 530 | RLTY RATE - 12 1/2% | | |
| 07/01/1988 | 868 | EFFECTIVE DATE | | |
| 06/12/1989 | 111 | RENTAL RECEIVED | $320.00;/10733 | |
| 06/23/1989 | 111 | RENTAL RECEIVED | $320.00;/10828 | |
| 10/10/1989 | 575 | APD FILED | | |
| 11/28/1989 | 576 | APD APPROVED | USA 3 | |
| 12/14/1989 | 578 | APD REJECTED | USA 3 | |
| 12/14/1989 | 650 | HELD BY PROD - ACTUAL | | |
| 12/14/1989 | 658 | MEMO OF 1ST PROD-ACTUAL | #USA 3; | |
| 01/08/1990 | 643 | PRODUCTION DETERMINATION | | |
| 03/04/1990 | 909 | BOND ACCEPTED | $10000; | |
| 05/01/1990 | 246 | LEASE COMMITTED TO CA | LAES42968; | |
| 05/01/1990 | 651 | HELD BY PROD - ALLOCATED | | |
| 05/01/1990 | 660 | MEMO OF 1ST PROD-ALLOC | | |
| 06/04/1990 | 111 | RENTAL RECEIVED | $336.00;/12787 | |
| 07/26/1990 | 102 | NOTICE SENT-PROD STATUS | | |
| 10/31/1990 | 643 | PRODUCTION DETERMINATION | | |
| 07/22/1991 | 396 | TRF OF INTEREST FILED | | |
| 09/09/1991 | 379 | REFUND AUTHORIZED | $656-DUPL 89 & 90 | |
| 10/23/1991 | 238 | LEASE MODIFIED-AMENDED | ACREAGE ADJUSTED | |
| 10/23/1991 | 379 | REFUND AUTHORIZED | $32.00; | |
| 03/13/1992 | 111 | RENTAL RECEIVED | $688.00;71 | |
| 04/07/1992 | 246 | LEASE COMMITTED TO CA | LAES45714; | |
| 02/01/1999 | 235 | EXTENDED | THRU 02/01/2001 | |
| 02/01/1999 | 522 | CA TERMINATED | LAES45714; | |
| 04/08/1999 | 393 | DEC ISSUED | LEASE EXTENDED; | |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/04/08 12:15 PM



**01 08-07-1947;061STAT0913;30USC351-359**
**Case Type 311112: O&G LSE NONCOMP ACQ LAND**
**Commodity 459: OIL & GAS L**
**Case Disposition: AUTHORIZED**

**Total Acres** 303.260
**Serial Number** LAES-- - 037729

| | | |
|---|---|---|
| 04/14/1999 | 058 | NOTICE SENT-NONPROD STAT |
| 01/01/2001 | 763 | EXPIRES |

**Line Nr** **Remarks** **Serial Number: LAES-- - 037729**

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

# EXHIBIT N

# EXHIBIT O

# DEPARTMENT OF THE INTERIOR
# BUREAU OF LAND MANAGEMENT
# CASE RECORDATION
# (MASS) Serial Register Page

RunDate/Time: 08/04/08 11:13 AM



**01 12-22-1987;101STAT1330;30USC181 ET SE**
**Case Type 311122: O&G LSE NONCOMP ACQ-1987**
**Commodity 459: OIL & GAS L**
**Case Disposition: CLOSED**

**Total Acres** 212.410

**Serial Number** LAES-- - 047280

Serial Number: LAES-- - 047280

| Name & Address | | | Int Rel | % Interest |
|---|---|---|---|---|
| JUSTISS OIL CO INC | PO BOX 2990 | JENA LA 713422990 | LESSEE | 100.000000000 |

Serial Number: LAES-- - 047280

| Mer Twp Rng Sec | STyp SNr Suff | Subdivision | District/Resource Area | | County | Mgmt Agency |
|---|---|---|---|---|---|---|
| 18 0080N 0020W 011 | ALIQ | S2SENW,N2SW,SWSW; | JACKSON | NO RA | GRANT | KISATCHIE NF |
| 18 0080N 0020W 012 | ALIQ | S2NE,NESE; | JACKSON | NO RA | GRANT | |
| 18 0080N 0020W 013 | ALIQ | NWNW; | JACKSON | NO RA | GRANT | |
| 18 0080N 0020W 013 | FF | TR C-92 IN SESE 12,41AC | JACKSON | NO RA | GRANT | |
| 18 0080N 0020W 014 | ALIQ | W2NW,S2; | JACKSON | NO RA | GRANT | |

**Relinquished/Withdrawn Lands**

Serial Number: LAES-- - 047280

| | | | | | |
|---|---|---|---|---|---|
| 18 0080N 0020W 711 | ALIQ | N2SW,SWSW; | JACKSON | NO RA | GRANT |
| 18 0080N 0020W 714 | FF | W2NW,S2 LESS THE E2NWSW; | JACKSON | NO RA | GRANT |

Serial Number: LAES-- - 047280

| Act Date | Code | Action | Action Remarks | Pending Office |
|---|---|---|---|---|
| 06/21/1995 | 387 | CASE ESTABLISHED | | |
| 06/22/1995 | 129 | DAY AFTER SALE OFFER | | |
| 06/22/1995 | 191 | SALE HELD | | |
| 06/22/1995 | 268 | BID NOT RECEIVED | | |
| 06/23/1995 | 943 | AVAIL OVER THE COUNTER | | |
| 06/30/1995 | 888 | DRAWING HELD | | |
| 07/17/1995 | 237 | LEASE ISSUED | $1.50; | |
| 08/01/1995 | 496 | FUND CODE | 568; | |
| 08/01/1995 | 530 | RLTY RATE - 12 1/2% | | |
| 08/01/1995 | 868 | EFFECTIVE DATE | | |
| 06/24/1996 | 084 | RENTAL RECEIVED BY MMS | $1072.50;21/000000105 | |
| 07/06/1999 | 084 | RENTAL RECEIVED BY MMS | $1,072.50;21/00000010 | |
| 06/26/2000 | 084 | RENTAL RECEIVED BY MMS | $1430;21/1060 | |
| 06/15/2001 | 084 | RENTAL RECEIVED BY MMS | $1430;21/1060 | |
| 01/11/2002 | 238 | LEASE MODIFIED-AMENDED | | |
| 01/11/2002 | 393 | DEC ISSUED | | |
| 07/31/2005 | 234 | EXPIRED | | |
| 04/19/2006 | 379 | REFUND AUTHORIZED | $5,773.00; | |
| 04/19/2006 | 970 | CASE CLOSED | | |

Serial Number: LAES-- - 047280

| Line Nr | Remarks |
|---|---|
| 0001 | ACREAGE CANC = 501.81; REMAINING ACREAGE - 212.41AC; |
| 0002 | ANNUAL RENTAL ADJUSTED TO $426.00; |

NO WARRANTY IS MADE BY BLM
FOR USE OF THE DATA FOR
PURPOSES NOT INTENDED BY BLM

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

JUL 28 2000

ROBERT H. SHEMWELL, CLERK
BY ______ DEPUTY

CENTRAL PINES LAND COMPANY,
TOWER MINERALS COMPANY, INC.,
JACK E. LAWTON, JR., EVELYN
GAY LAWTON DUHON, LINDA LEW
LAWTON DROST, D,S&T, INC.,
DROST & BRAME, INC.

-vs-

UNITED STATES OF AMERICA,

and

TEXACO EXPLORATION AND PRODUCTION, INC.,
SONAT EXPLORATION COMPANY, HELMERICH &
PAYNE, INC., CHESAPEAKE OPERATING, INC.

CIVIL ACTION NO. 2:96-2000

SECTION "A" (JUDGE LITTLE)

R U L I N G

Before this court is the United States of America's motion for summary judgment and the plaintiffs' motion to strike two declarations submitted by the government in support of its summary judgment motion. For the reasons that follow the plaintiffs' motion is DENIED and the United States' motion is GRANTED.

## I. Background

This case has a long, protracted history. In 1929, pursuant to a warranty mineral deed, the Gulf Lumber Company conveyed to S.H. Fullerton all oil, gas, and minerals in, on,

181

and under a 100,000 acre tract in Vernon Parish, Louisiana. The original transaction created a mineral servitude that allowed S.H. Fullerton to conduct oil, gas, and mineral exploratory and extraction operations on the land. S. H. Fullerton transferred his interest in the servitude to Fullerton Minerals Company on 7 May 1930. On 26 April 1937, Fullerton Minerals Company in turn conveyed the mineral servitude to William T. Burton by mineral deed. Through a series of later transfers, plaintiffs Central Land Company, Tower Mineral Company, Inc., Jack E. Lawton, Jr., Evelyn Gay Lawton Duhon; Linda Lew Lawton Drost, D, S, & T, Inc., and Drost & Brame, Inc. (hereinafter collectively referred to as plaintiffs)[1] acquired all the rights of Wm. T. Burton Industries through mesne conveyances.

[1] The ownership of plaintiffs in the subject servitude is as follows: Central Pines Land Company owns an undivided fifty percent of all the oil, gas, and minerals subject to the following royalties: one-half of one percent in favor of Jack E. Lawton, Jr., one-fourth of once percent in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent in favor of Linda Lew Lawton Drost. Tower Minerals Company also owns an undivided fifty percent of all of the oil, gas, and minerals subject to the following royalties: one-half of one percent in favor of Jack E. Lawton, Jr., one-fourth of once percent in favor of Evelyn Gay Lawton Duhon, one-fourth of one percent in favor of Linda Lew Lawton Drost, four and two-tenths percent in favor of D,S & T, Inc., and two and eight-tenths in favor of Drost & Brame, Inc.

The plaintiffs have delineated three parcels of land, denoted as Groups A,[2] B,[3] and C[4] to describe the property subject to the servitude. We adopt these designations in our discussion. In a series of four separate transactions between 1933 and 1938, the United States Forest Service acquired the Group A and B lands for the Kisatchie National Forest, pursuant to conventional deeds and expropriation under the Weeks Forestry Act, 16 U.S.C. § 515. By a series of letters, Memoranda of Understanding, and special use permits between 1941 and 1952, the Forest Service granted to the Army all of the Forest Service lands within Vernon Ranger District of the Kisatchie National Forest for unrestricted military training purposes. These lands, comprising approximately 36,236 acres, remained subject to the mineral servitude created by mineral deed in 1929 that existed when the United States acquired the land.

From 1950 until 1978, through a series of condemnation proceedings, the United States instituted a mineral moratorium

[2] The parties dispute the precise acreage of Group A lands. The United States asserts that Group A lands comprise approximately 31,086.01 acres. See United States' Statement of Material Facts as to Which There is No Genuine Dispute [hereinafter United States' Statement of Material Facts], Statement 4. The plaintiffs contend that Group A lands include 25,074.96 acres. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 4, at 3.

[3] According to the United States, Group B include approximately 5,106 acres. See United States' Statement of Material Facts, Statement 4. The plaintiffs assert that Group B covers 11,000 acres. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 4, at 3.

[4] This court's ruling on the prior motion for summary judgment presented to the court established that the Group C lands could not prescribe to the government. The mineral ownership of these lands are no longer at issue in this case.

that expropriated the servitude owners' rights of ingress and egress over the surface for the purpose of mineral development. The parties seem to agree that the moratorium affected all of Group B and C lands, but dispute whether ingress and egress was originally prevented over Group A lands. In 1967 in an attempt to clarify the extent of the mineral moratorium, the Army and the National Forest Service entered into a Memorandum of Understanding, that divided the land burdened by the servitude into two areas, the "Intensive Use Area" and the "Limited Use Area." The Intensive Use Area, comprising Fort Polk artillery range, was used as a military training ground and bombing range and included most of Group B lands and approximately half of Group A lands. The Army denied any access to the Intensive Use Area that was incompatible with the military's mission. The parties dispute whether the government allowed any drilling or preparatory seismic activities in the Limited Use Area, which remained under the administrative control of the Forest Service, between 1967 and 1978. <u>See</u> discussion <u>infra</u> section III[C](1).

During the moratorium, Wm. T. Burton Industries was paid a small fee by the government on a per acre basis for the portion of its servitude that was inaccessible as a result of the government's restrictions. The impediment to exploration created by the government's moratorium ended officially on 31

March 1978. See United States' Mot. for Summ. J., Ex. 48 (letter dated 31 March 1977 from John Camp, attorney for Wm. T. Burton Industries, to Michael Drost, employee for Wm. T. Burton Industries, acknowledging that Army's moratorium was to end on 31 March 1978); Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium over Fort Polk was to end on 31 March 1978). Plaintiffs assert, however, that the moratorium effectively continued after this date.

Between 1933 and 1956, Wm. T. Burton Industries drilled six wells on the lands burdened by the mineral servitude. Each of these endeavors produced a dry well. Wm. T. Burton Industries abandoned its last well located within Group A lands on 4 January 1956. In 1961, Wm. T. Burton Industries leased the mineral rights underlying the 1929 mineral servitude to Pan American Corporation. The lease agreement between the two companies noted the existence of the government's use restrictions on part of the lands subject to the lease. In 1964, Pan American drilled a well, in Section 4, Township 1 South, Range 5 West which proved to be non-productive. Pan American released the lease to Wm. T. Burton Industries on 30 June 1964.

In 1992, the United States' Bureau of Land Management began granting a series of oil and gas leases to the minerals underlying the surface to Group A and B lands. In 1995, the

plaintiffs learned that the United States was claiming ownership to the minerals underlying the Kisatchie National Forest. Plaintiffs filed the instant lawsuit to quiet title to the 1929 mineral servitude on 22 August 1996, seeking a declaration that they still own the servitude and that any leases to the minerals granted by the United States of American are null and void. Subsequently, both parties moved for summary judgment on the issue of whether the servitude lands could have prescribed to the government. On 7 April 1999, this court ruled that Louisiana Act 315 of 1940, which provides that a mineral servitude may not prescribe to the government, does not apply to the Group A and B lands because they were acquired by the United States prior to 1940. We determined that the ten-year liberative prescription period applicable to mineral servitudes would govern the Group A and B lands and reserved judgment on the question of whether the prescriptive period had been interrupted or suspended by the actions of either party. <u>See</u> 7 April 1999 Ruling, at 15-19.

On 25 April 2000, the United States filed a motion for summary judgment arguing that the plaintiffs' servitude prescribed for nonuse sometime between 1956 and 1996 and asking the court to find that plaintiffs' servitude had reverted to the ownership of the government. The plaintiffs respond that their right to explore for and capture the minerals underlying the lands owned by the United States is

extant and argue that summary judgment is inappropriate because genuine issues of material fact remain as to whether the prescriptive period was tolled by the government's moratorium on mining operations.

## II. MOTION TO STRIKE

Subsequent to the filing of the United States' motion for summary judgment, the plaintiffs' submitted a motion to strike the declarations of Gretchen Hunt ("Hunt"), the Zone Forest Geologist on the Kisatchie National Forest, and Delia Jaquette ("Jaquette"), the Leasing Program Manager and Mineral Title Specialist for the Southern Region of the United States Forest Service. In her declaration, Hunt provides a seismic map and accompanying explanatory chart detailing the location of seismic lines shot over the servitude between 1961 and 1985 by various companies. Jaquette's statement gives the exact parameters of the 1929 mineral servitude and describes what part of the servitude lay within the Limited and Intensive Use Areas. The plaintiffs object to Jaquette's declaration because it was not included in the preliminary witness list submitted by the United States on 31 July 1999 and was filed after the 21 April 2000 discovery deadline. The plaintiffs therefore insist that Jaquette's declaration is inadmissible. The plaintiffs also protest the admission of Gretchen Hunt's declaration on the basis that she is testifying as an expert

despite the fact that she never filed an expert report as required by the local discovery rules in effect in the Western District of Louisiana.

The district court has the inherent power to manage discovery in cases pending before the court. See Degen v. United States, 517 U.S. 820, 826, 116 S. Ct. 1777, 1782, 517 U.S. 820, 135 L. Ed. 2d 102; Williams v. New Orleans Public Serv., Inc. 728 F.2d 730, 732 n. 4 (5th Cir. 1984). This court therefore has discretion in determining whether to permit the United States to rely on the declarations of Hunt and Jaquette. The United States opposes the motion to strike on the grounds that both witnesses' declarations meet the standards of Rule 56(e) of the Federal Rule of Civil Procedure and therefore should be considered by this court. Rule 56(e) provides in relevant part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

Although Jaquette was not named as a witness in a timely manner, her statements are otherwise admissible under Rule 56(e) because they are made on the basis of her personal knowledge, set forth admissible evidence, and demonstrate that she is competent to testify to the matters stated in her declaration. We therefore find no reason to exclude her

declaration. Similarly, contrary to plaintiffs' contentions, Hunt's statements are not based on her opinions as an expert, but instead grounded in her own experience, gleaned from her own research or from her personal review of information given to her by her Forest Service employees, or derived from evidence submitted by plaintiffs own witnesses.[5] This is shown by the portion of her declaration in which she details the step-by-step method by which she developed a map of the survey lines that had been shot over the servitude. See Hunt Decl. ¶ 7. We do not agree, as urged by plaintiffs, that Hunt's declaration is barred by the Civil Justice Expense and Delay Reduction Plan adopted by the U.S. District Court for the Western District of Louisiana, Section III, Para 2(b), which requires that "expert witnesses shall be available for deposition during the two-week period following the discovery cutoff" unless otherwise agreed by the parties. The provision cited by plaintiffs deals with experts to be presented at trial. Hunt's declaration is being used for summary judgment purposes only.

Both Hunt's and Jaquette's declarations enlighten the court about the nature of the land subject to the servitude and enable it to make a more informed decision on the United States' motion for summary judgment. The plaintiffs fail to

[5] We offer no opinion as to whether Hunt would be qualified as an expert witness at trial.

provide us with a legal reason that prevents us from considering these declarations. We therefore DENY plaintiffs' motion to strike and proceed to determine the merits of the summary judgment motion.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the nonmovant, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). Where, as here,[6] the nonmovant bears the burden of proof at trial, the moving party may meet its burden by setting forth proof that disproves an essential element of the nonmovants' case. See Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986). "'A fact is material if it might affect the outcome of the suit under the governing substantive law.'" H.B. Zachry Co. v. Quinones, 206 F.3d 474, 480 (5th Cir. 2000)(quoting United States v. Arron, 954 F.2d 249, 251 (5th

[6] "When plaintiff's petition shows on its face that the prescriptive period has run, burden is on the plaintiff to prove an interruption or suspension of prescription." Salvex, Inc. v. Lewis, 546 So. 2d 1309, 1315 (La. Ct. App. 3d Cir. 1989).

Cir. 1992)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248; 106 S. Ct. at 2510.

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the nonmoving party to produce evidence of the existence of a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 321, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The nonmovant must go beyond the pleadings and designate specific facts showing the existence of a genuine issue of fact for trial. See Edwards v. Your Credit, Inc., 148 F.3d 427, 431 (5th Cir. 1998). "The nonmovant cannot satisfy his summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." See Wilson Indus., Inc. v. Aviva America Inc., 185 F.3d 492, 494 (5th Cir. 1999); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(en banc). In making its determination as to whether summary judgment is appropriate, the court must draw all justifiable inferences in favor of the nonmoving party. See Anderson, 477 U.S. at 255; 106 S. Ct. at 2513.

**B. Prescription of Mineral Servitudes Generally**

Many states allow for an estate in mineral rights that is separate and distinct from the estate of the surface owner. See, e.g., Central Oil Co. v. S.H. Shows, 149 So. 2d 306, 309 (Miss. 1961); Humphreys-Mexia Co. v. Gammon, 254 S.W. 296, 299 (Tex. 1923). In contrast, in Louisiana,

> [a] conveyance by a landowner to another of the oil, gas and other minerals on, in and under the land, together with rights of ingress, egress and occupancy for purposes of exploitation, is not a grant or alienation of a title to such minerals in place, but simply creates in the grantee a servitude or right of exploitation or development, prescribable in ten years for non-use, of such minerals and the right to appropriate such minerals as may be discovered and reduced to physical possession.

Frost Lumber Indus. v. Republic Prod. Co., 112 F.2d 462, 465 (5th Cir. 1940)(interpreting Louisiana law on mineral servitudes).

1. Statutory Provisions Governing Prescription of Mineral Servitudes

Under the Mineral Code, a mineral servitude is extinguished by "prescription resulting from nonuse for ten years." La. Rev. Stat. Ann. § 31:27(1)(West 2000). Likewise, the pre-Code law provided that a mineral servitude prescribes if it is not used for ten years. See Louisiana Petroleum Co. v. Broussard, 135 So. 1, 2 (La. 1931); see also Leiter Minerals, Inc. v. California Co., 132 So. 2d. 845, 931 (La. 1961)("The mineral servitude established either by sale or by

reservation is extinguished by the prescription resulting from non-user of the servitude for 10 years following its creation.").[7] Under both the Mineral Code and the law previously in effect, the prescriptive period can be interrupted when the holder of the mineral servitude engages in good faith operations with the reasonable expectation of discovering and producing minerals in paying quantities. See La. Rev. Stat. Ann. § 31:29(1)(West 2000); Mire v. Hawkins, 186 So. 2d 591, 595-96 (La. 1966); McMurrey v. Gray, 45 So. 2d 73, 77-78 (La. 1949). If interrupted, prescription starts to run anew from the last day on which mining or drilling operation are conducted. See La. Rev. Stat. Ann. § 31:30 (West 2000). When seeking to show that the prescriptive period has been interrupted, the owner of the servitude has the burden of establishing that he or someone in his name has made timely use of the servitude to prevent the accrual of prescription. See Scott v. Hunt Oil Co., 160 So. 2d 433, 435 (La. Ct. App. 2d Cir. 1964).

In addition, the prescriptive period may be suspended, or tolled, if an obstacle prevents the owner from using the

[7] The mineral servitude in this case was created in 1929 and actively drilled until 4 January 1956. The parties dispute the appropriate law to apply in this case. The Mineral Code did not take effect until 1975 after the creation of the servitude at issue in this case. The Mineral Code is to be applied retroactively unless it would "apply to divest already vested rights, or to impair the obligations of contracts." La. Rev. Stat. Ann. § 31:214 (West 2000). The plaintiffs have not argued that the application of the Mineral Code would impair pre-existing vested rights or the obligation of contracts. Accordingly, we see no reason not to apply the Mineral Code to this case. Regardless, the parties agree that the provisions of the Mineral Code relevant to this case are identical to the corresponding law in the Civil Code. As such, the parties arguments on this issue are inconsequential to the outcome of this case.

servitude. See La. Rev. Stat. Ann. § 31:59 (West 2000); see also La. Civ. Code art 792 (1870) ("If the owner of the estate to whom the servitude is due, is prevented from using it by any obstacle which he can neither prevent nor remove, the prescription of non-usage does not run against him as long as this obstacle remains.").[8] The servitude owner must actually attempt to use the servitude and be denied access before an obstacle is deemed to exist. See Perkins v. Long-Bell Petroleum Co., 81 So. 2d 389, 393-94 (La. 1955). When a servitude is extinguished by prescription, the mineral interest passes to the owner of the surface of the subject property at the time the servitude prescribes. See McDonald v. Richard, 13 So. 2d 712, 714-15 (La. 1943).

2. Case Law Interpretation of Statutory Provisions Governing Prescription

According to the plaintiffs, the government's moratorium on use of the Fort Polk artillery range created an obstacle that suspended the prescriptive period over the entire servitude between 1956 and 1996. They argue that under the maxim *contra non valentem agere nulla cirrut praescriptio*,[9] prescription is suspended if the servitude owner is

[8] Interruption and suspension are distinct concepts. When prescription is interrupted, the ten-year prescriptive period starts to run anew on the last day on which good faith operations are undertaken to secure or restore production. See La. Rev. Stat. Ann. § 31:41 (West 2000). In contrast, where the prescriptive period is merely suspended, the period that had accrued prior to the creation of the obstacle continues to run once the obstacle is removed. See id. § 31:59.

[9] "Prescription does not run against one unable to act." Cartwright v. Chrysler Corp., 232 So. 2d 285 (La. 1970).

"effectually prevented" from accessing the servitude by actions of the defendant that "hinder" or "impede" the plaintiffs' access even a portion of the servitude. The United States protests the plaintiffs' interpretation of Louisiana law and argues that according to case law precedent, the prescriptive period was not suspended in this case because at all times a section of the servitude remained available for drilling operations. We agree.

*Contra non valentem* is a judicially-created exception to the general rule of prescription.[10] The cases cited by plaintiff in support of the application of *contra non valentem* in this case do not lead to the conclusion urged in their brief. In Plaquemines Parish Comm'n Council v. Delta Dev. Co., 502 So. 2d 1034, 1054 (La. 1987), Plaquemines Parish attempted to regain title to certain mineral interests on the basis that the interests were wrongfully secured by public officials for their own personal gain. See id. at 1036. The defendants, successors to the public officials, argued that any claim by the Parish to the mineral interests had prescribed under the ten-year prescriptive period applicable to claims for breach of fiduciary duty, La. Civ. Code Ann.

[10] Contra non valentem applies in four situations: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. See Fontenot v. ABC Ins. Co., 674 So. 2d 960 (La. 1996); Taylor v. Giddens, 618 So. 2d 834 (La. 1993).

art. 3499. The court applied *contra non valentem* and determined that where the defendants' acts of concealment "effectually prevented" the plaintiffs from discovering that they had a claim against the defendants, an obstacle existed that suspended the prescriptive period. See id. at 1037.

Similarly, in Nathan v. Carter, 372 So. 2d 560 (La. 1979), the Louisiana Supreme Court applied *contra non valentem* to find an obstacle where the defendants' threats, fraud, and misrepresentation prevented plaintiff from discovering the right to pursue a cause of action for wrongful death. See id. at 563. Neither of these cases dealt with a situation where the defendants' actions created an obstacle to drilling on a mineral servitude. We consider the facts of Delta Development and Nathan too remote to those presented in the instant matter to provide any support for plaintiffs' argument that the court should find that, pursuant to *contra non valentem*, the government's restrictions on access to a portion of the servitude had the effect of preventing them from acting, thereby creating an obstacle that suspended prescription as to the entire servitude.

The concept of *contra non valentem* is not irrelevant to prescription of mineral servitudes, however. Indeed, the Louisiana Supreme Court has explained that Article 792, the predecessor to Mineral Code Section 59, is an example of *contra non valentem*. See McDonald v. Richard, 13 So. 2d 712,

715 (La. 1943). Further, in Clark v. Tensas Delta Land Co., 136 So. 1, 2 (La. 1931), the Louisiana Supreme Court considered applying *contra non valentem* to a mineral servitude, but ultimately concluded that the concept was irrelevant given that the servitude owner never made any request "to enter upon the land, and that no objection to such entry upon the land was ever expressed by the owner of the land, previous to the filing of this suit." Id. The court did not consider whether mere hindering or impeding physical access to the land is sufficient to constitute an obstacle.[11]

Despite ample opportunity, the Louisiana courts have yet to apply *contra non valentem* to enunciate the broad interpretation of an obstacle urged by plaintiffs. In the context of use of a mineral servitude, Louisiana courts have found an obstacle to user only in cases where the servitude owner has been prevented from entering the entire servitude. In Boddie v. Drewett, 87 So. 2d 516 (La. 1956), a servitude underlying a twelve acre tract of land was pooled with other tracts by the Commissioner of Conservation. The Commissioner issued a conservation order that restricted drilling on the entire twelve acre servitude, but allowed drilling on other

[11] The plaintiffs also briefly mention a Fifth Circuit case applying *contra non valentem*. See Frey v. Amoco Production Co., 943 F.2d 578 (5th Cir. 1991). That case does not apply *contra non valentem* to instances where the servitude owner is prevented from using his servitude by actions of the surface owner. Rather, the court recognized that "Louisiana courts apply the contra non valentem doctrine to suspend the period's beginning while the cause of action is not knowable by the plaintiff through the exercise of reasonable diligence." Id. at 586. Obviously, that is not the issue in the instant matter. We are unpersuaded that Frey has any relevance to this case.

portions of the unit. See id. at 518-19. The court declined to hold that good faith drilling of a dry hole on the drilling unit, but outside the subject servitude constituted user of the subject servitude. See id. at 518. Instead, the court found that there was an obstacle to user of the servitude that suspended prescription because the Commissioner's order effectively prevented all drilling operations on the twelve acre tract. See id. at 518-19.

The Louisiana Supreme Court revisited similar issues later in Mire v. Hawkins. There, part of the lands burdened by a servitude were pooled with other tracts into a drilling unit by the Department of Conservation. A portion of the servitude remained outside the drilling unit available for drilling at all times. See Mire, 186 So. 2d at 594. The court ruled that where user could be had on any part of the drilling unit, there was no obstacle that suspended prescription. See id. at 596-97. It also found that user of any portion of the unit could be considered user of any servitude incorporated into the unit even where the subject servitude was not open for drilling, thereby explicitly overruling its prior contrary determination in Boddie. See id. at 595. The court was guided by the premise that public policy did not favor unwarranted extensions of the prescriptive period, but rather supported the timely return of unused mineral servitudes to the landowner. See id. at 597.

As the plaintiffs aptly point out, the reason behind the Mire court's decision to overrule Boddie is not entirely clear given that in Boddie the servitude owner was effectively prevented from drilling on the entire servitude, whereas in Mire part of the servitude was not subject to the nondrilling order. Contrary to plaintiffs interpretation of Boddie, we do not believe that the court ruled sub silentio that a partial obstacle would result in complete suspension of prescription. Boddie is not squarely on all fours with the facts presented in the instant matter. There, the court based its decision on the fact that the servitude owner was prevented from effectively using his entire servitude. See Boddie, 87 So. 2d at 519. Here, in contrast, a portion of Group A lands remained available for drilling, even where the government denied access to certain areas of the servitude. See discussion infra section III[C]. Also Boddie must now must be read against the backdrop of the court's later decision in Mire. See Mire, 186 So. 2d at 289 ("After a further study of the opinion [in Boddie] we have concluded that it was error to say that prescription was suspended due to the existence of an obstacle."). Mire instructs that where any part of the lands burdened by a servitude are open to drilling, no obstacle exists and the prescriptive period continues to run.

Our interpretation of Mire and Boddie is supported by the decision of an intermediate state court in Hanszen v. Cocke,

246 So. 2d 200, 205 (La. Ct. App. 1st Cir. 1971). In Hanszen, pending litigation regarding the validity of a mineral lease prevented the servitude owner from drilling on a portion of his servitude. See id. at 206. The court ruled "that where any part of the servitude can be used . . . even though some part may not, as a result of an obstacle, prescription is not suspended, but to the contrary, runs against the entire servitude." Id. at 206.[12] It also noted that drilling on one portion of the land would suspend prescription for the entire servitude. See id. Unlike Mire and Boddie, Hanszen did not deal with a drilling unit, but with a single servitude. Hanszen is therefore more directly applicable to the facts presented in the instant case than the two Louisiana Supreme Court cases that focused on the ramifications to an individual servitude where the servitude land had been pooled with other tracts.

The plaintiffs also rely on Corley v. Craft, 501 So. 2d 1049, 1050-52 (La. Ct. App. 2d Cir. 1987), and Hall v. Dixon, 401 So. 2d 473, 474 (La. Ct. App. 2d Cir. 1981), for the proposition that an obstacle to user on a portion of the

[12] The plaintiffs urge that we are not compelled to follow this decision under the principle that federal courts must rule according to the law of the highest court of the state in which it encompasses. We do not agree, as suggested by plaintiffs, that Hanszen was wrongly decided. As a federal court, we are bound to determine state law as we believe the state's highest court would. See Hulin v. Fibreboard Corp., 178 F.3d 316, 328 (5th Cir. 1999). We view the Hanszen court's ruling as an accurate interpretation of Louisiana law governing suspension of prescription of a mineral servitude. We do not share the plaintiffs' concern that Hanszen is unsound because it would interfere with mineral owners' rights where only a small area is allowed for drilling. Plaintiffs have not demonstrated that only a small portion of the servitude was available for drilling when the moratorium was in effect such that we should find that the government's moratorium "effectively prevented" all access to the servitude. See infra, section III(C).

servitude effectuates suspension of the prescriptive period for the entire servitude.[13] The key distinction between those cases and the matter sub judice, which the plaintiffs fail to recognize, is that Corley and Hall dealt with instances where the servitude owner could not access any portion of the servitude. In Hall "[a]ccess [to the servitude] was only available through a locked gate" which created an obstacle that the court noted could not have been removed any legal way other than by instituting a lawsuit. Hall, 401 So. 2d at 474-76. Likewise, in Corley, the land owner had cut and excavated "the only suitable road into the tract" and obstructed the entry of the servitude owner's drilling equipment. Corley, 501 So. 2d at 1051.[14] In contrast to Hall and Corley, in the instant case, entire sections of the servitude remained open to use at all times and were in fact accessed by other companies.

Plaintiffs also argue the government's restrictions on their use constituted an obstacle under Article 777 of the Civil Code, which prohibits the owner of a tract of land

[13] Contrary to the unprofessional assertions of counsel for the plaintiffs, we find that the position of the defendant is based neither on "falsehoods" nor on a "total misunderstanding of Louisiana mineral law." In fact, the defendant's positions are well reasoned, well defended, and, in our judgment, reflective of the applicable law on the subject as discussed in the preceding text. The plaintiffs' legal and factual analysis, on the other hand, is procrustean at best.

[14] The plaintiffs cite Perkins for the proposition that anything short of "free access"to the servitude constitutes an obstacle. Plaintiffs took this quote from Perkins out of context. In fact, the court declined to find an obstacle because the surface owner "did not at any time deny to defendant [servitude owner] free access to the land for exploration purposes." Perkins, 81 So. 2d at 393. The court simply did not indicate that a hindrance to "free access" resulted in suspension of the prescriptive period. We reject the interpretation proposed by plaintiffs.

burdened by a servitude from doing anything to lessen the value of the servitude owner without his consent. See La. Civ. Code Ann. art. 777. The plaintiffs have not, however, cited any case law that supports their argument that the surface owner's act of lessening the value of the servitude results in an obstacle that suspends prescription.

The plaintiffs may not take shelter under their strained and overly broad conception of *contra non valentem*, Boddie, and the Louisiana Civil Code. After reviewing both parties' arguments concerning the proper legal standards to apply to this case, we conclude that the cases most factually similar to the instant matter, Mire and Hanszen, supra, are the appropriate guiding sources of law. These cases instruct that even if an obstacle defeats the plaintiffs use of part of their servitude, the availability of a portion of the servitude for drilling would preclude a finding that an obstacle suspended prescription for the entire servitude.[15]

**C. Suspension of the Prescriptive Period Based on Thwarted Access to the Servitude**

The ten-year prescriptive period applicable to mineral servitudes is interrupted only if the servitude owner engages

[15] We reject the plaintiffs' argument that they could not have removed the obstructions created by the government because an individual is powerless to remove an obstacle created by the United States. See Duncan Energy Co. v. United States Forest Service, 50 F.3d 584 (8th Cir. 1984). In Duncan, the Eighth Circuit discussed whether the Forest Service could regulate surface access to outstanding mineral rights. The court concluded that the Forest Service may not prevent a mineral owner from exercising his rights to use the servitude. This is not a problem in this case because, as discussed infra, here there is evidence that Wm. T. Burton Industries could have accessed a portion of the Group A lands not burdened by the moratorium. The plaintiffs do not adequately develop how Duncan has any application to the instant matter.

in good-faith drilling operations. "Preparations for the commencement of actual drilling or mining operations, such as geological or geophysical exploration, surveying, clearing of a site, and the hauling and erection of materials and structures necessary to conduct operations do not interrupt prescription." La. Rev. Stat. Ann. § 31:30; see Goldsmith v. McCoy, 182 So. 2d 519, 523 (1938); see also La. Rev. Stat. Ann. § 31:29, cmt. (incorporating Goldsmith into the Mineral Code). The only way that plaintiffs may prevail, therefore, is if they can show that they engaged in actual drilling, or that due to an obstacle created by the government, their access to the Group A and B lands was completely obstructed, such that the ten-year prescriptive period was suspended for over forty years between 1956, when Wm. T. Burton Industries abandoned its last well, and 1996, when the plaintiffs filed the instant lawsuit. See La. Rev. Stat. Ann. § 31:59; Hanszen, 246 So. 2d 106. Obviously, if the government prevented even preparatory drilling actions on the servitude, we would have to find that an obstruction prevented user of the servitude. See, e.g. Corley, 501 So. 2d at 1052.

1. **Activities between 1956-1978**

The United States argues that the plaintiffs have failed to raise genuine issues of material fact to refute their assertion that no obstacle suspended prescription between 1956 and 1966. There is evidence that Wm. T. Burton Industries'

lessee, Pan American, drilled a well, in Section 4, Township 1 South, Range 5 West, an area that fell within the Fort Polk artillery range in 1964. See United States' Statement of Material Facts as to Which There is No Genuine Dispute, Statement 21d [hereinafter United States' Statement of Material Facts], Ex. 20; Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 21d, at 33.[16] Although Pan American's well was dry, even drilling of a dry well is sufficient user to interrupt prescription. See La. Rev. Stat. Ann. § 31:29, cmt.; Barnwell v. Carter, 220 So.2d 741, 745 (La. App. 1st Cir. 1969). A lessee's user of the servitude inures to the servitude owner. See Dupree v. Oil, Gas & Other Minerals, 731 So. 2d 1067, 1070 (La. Ct. App. 2d Cir. 1999). The user of the servitude by Pan American therefore would have interrupted prescription over the 1929 mineral servitude. The prescriptive period would have began to run anew 20 March 1964, the date that Pan American plugged its well. See La. Rev. Stat. Ann. § 31:29.[17]

As stated previously, the parties generally agree that as of 1967, a moratorium on mineral operations was in effect in the Intensive Use Area that covered most of Group B lands and

[16] Plaintiffs' Answers to United States First Set of Interrogatories indicates that this well was spudded on 30 September 1963. See United States' Mot. for Summ. J., Ex. 59.

[17] Pan American ultimately did release its lease to Wm. T. Burton Industries because it was having trouble accessing the artillery range. See Pls.' Resp. to United States' Statement of Material Facts, Ex. 10c. This does not supplant the fact that Pan American's activities show that at least part of the servitude was available for drilling.

about forty to fifty percent of Group A lands. There is ample evidence in the record demonstrating that Wm. T. Burton Industries and several other companies were prevented from accessing the artillery range during the moratorium. For instance, the plaintiffs reference two letters sent by the Army to Senator Allen Ellender dated 16 September 1968 and 8 January 1969 indicating that no access would be allowed to the Fort Polk artillery range. See Pls.' Resp. to United States' Statement of Material Facts, Exs. 10r, 10t. In 1969, Major General John C. Dalrymple sent a letter to Senator Allen Ellender informing him that "authorization for seismographic operations under the entire [artillery] range area [at Fort Polk] is incompatible with the training mission" of the Army. See id., Ex. 10w. The plaintiffs also provide a letter dated 29 May 1968 from Wm. T. Burton Industries to the Army regarding the pending expiration of the government's lease to the land. In this letter, John Camp, the attorney for Wm. T. Burton Industries, explained that the government had denied entry permits to the artillery range to its lessee, Pan American, but suggested that several companies would be interested in mineral exploration should access be permitted. See id., Ex. 8c ("Pan American reported that it was unable to obtain entry permits onto the adjacent Fort Polk artillery range for the purpose of conducting mineral exploration activities thereon.").

The moratorium continued during the 1970s. Plaintiffs have submitted correspondence sent by the Army to Representative Speedy O. Long in 1970 informing him that Chevron Oil would not be able to obtain a lease to Fort Polk both because the United States did not own the mineral rights, and because the government had imposed a moratorium on minerals underlying the Fort Polk artillery range. See id., Ex. 10y. Wm. T. Burton Industries again expressed an interest in drilling on Fort Polk in a meeting with the Army on 27 November 1973. See id., Ex. 10dd (Disposition Form Re: Trip Report to Negotiate Settlement of Annual Payment for Moratorium in Minerals, Fort Polk, La.). According to Camp, the Army continually indicated to Wm. T. Burton Industries that "there ain't going to be no drilling on this reservation." Camp Dep. at 91.[18] Teledyne Exploration Company, acting on behalf of Atlantic Richfield Oil Company, likewise was denied access to the artillery range through a letter from the Army for similar reasons in February 1973. See id.; Ex. 10cc.

The plaintiffs' submissions demonstrate that Wm. T. Burton Industries and other companies did indeed express an interest in drilling on Fort Polk throughout the 1960s and 1970s, but were repeatedly denied access by the government due

[18] The vague nature of Camp's statements are outweighed by the overwhelming evidence that the government did allow entry onto portions of the servitude throughout the 1970s. So overwhelming in fact and in law that no reasonable trier of fact could find otherwise. See discussion infra.

to military operations in the area that would potentially prove dangerous to companies engaging in geophysical exploration. See also Exs. 10ee-mm (detailing extent of government's moratorium).[19] Regardless, the plaintiffs' evidence deals only with the area subject to the moratorium and not the portion of the servitude that lies outside of the area restricted by the Army. Even when the moratorium was in place, the plaintiffs admit that about forty-percent of the total acreage of the servitude was outside the Intensive Use Area and not covered by the government's moratorium. See United States' Statement of Material Facts, Ex. 13; Pls.' Resp. to United States' Statement of Material Facts, Statement 8h, at 10.[20] Again, if portions of the servitude remained open to drilling, the government's moratorium would not be considered an obstruction that would have suspended prescription. See Hanszen, 246 So. 2d at 206.

The plaintiffs have not presented any proof that Wm. T. Burton Industries' was denied access to the portion of Group A lands that remained outside the artillery range and exempt from the government's moratorium. They also do not explain why they did not attempt to access the servitude when other

[19] Plaintiffs provide extensive documentary evidence regarding the Army's continuing moratorium on the Fort Polk artillery range, only a small portion of which are referenced here. We find it unnecessary to detail every piece of evidence given that Fort Polk did not comprise the full area of the servitude and that other parts of the servitude were available for drilling activity.

[20] Plaintiffs then contradict themselves in baldly asserting that the entirety of Group A and B lands were subject to intensive use by the military, but provide no summary judgment evidence to support this proposition. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 23, at 41.

Case 2:96-cv-02000-FAL-JDK Document 181 Filed 07/28/2000 Page 28 of 34

companies clearly were granted permission to do so by the United States. There is considerable evidence that indicates that Wm. T. Burton Industries should have been on notice that they were able to enter portions of its servitude during the 1960s and 1970s. The plaintiffs' argument that the prescriptive period was suspended by the creation of an obstacle by the government during the early 1960s is undermined by the fact that Wm. T. Burton Industries' own lessee, Pan American, was able to access a portion of the servitude to engage in drilling so as to interrupt prescription in 1964. Moreover, it is apparent that numerous seismic surveys were shot over the 1929 servitude between 1966 to 1984. According to the seismic line map compiled by Gretchen Hunt of the Forest Service, lines were shot over the servitude by CGG and Chevron in 1970, by Arco from 1971-73, and by Shell in 1976. See Hunt Decl., Attachments (relying, in part, on information obtained by plaintiffs' land man Val Miller).

If companies were able to access the Limited Use Area during the 1970s, the court is inclined to conclude that Wm. T. Burton Industries also could have entered the land. In its reply to the government's motion for summary judgment, the plaintiffs state that they were "prevented from crossing the lands subject to the condemnation proceedings to reach those lands which were not." They fail to provide any summary

judgment evidence to support this statement. Further, although the plaintiffs dispute the accuracy of the information provided by the government, they fail to present summary judgment evidence to directly refute the evidence that lines were shot by CGG, Chevron, Arco, and Hess during the 1970s. The information that the Army allowed access for geophysical operations during this period vitiates plaintiffs' arguments that the government denied access to the servitude during the 1970s so as to create an obstacle to plaintiffs' use of the land. Again, the availability of even part of the servitude for drilling would have caused the servitude to lapse for nonuse. See Mire, 186 So. 2d at 595-97; Hanszen, 246 So. 2d at 206. Although the evidence of access detailed above defeats a finding that an obstacle existed, it is not sufficient to show that the prescriptive period was interrupted. Even if the companies that conducted seismic surveys were acting at the behest of Wm. T. Burton Industries, as the plaintiffs imply,[21] since no drilling actually occurred, prescription would not have been interrupted. See La. Rev. Stat. Ann. § 31:30.

---

[21] [U]se of a mineral servitude must be by the owner of the servitude, his representative or employee, or some other person acting in his behalf." La. Rev. Stat. Ann. § 31:42 (West 2000); see also id. cmts. (explaining the comparable law under the pre-existing Civil Code). "A person is acting on behalf of a servitude owner only when there is a legal relationship between him and the servitude owner, such as co-ownership or agency, or when there is clear and convincing evidence that he intended to act for the servitude owner. . . ." La. Rev. Stat. Ann. § 31:43.

2. **Activities Between 1978 and 1996**

Assuming, arguendo, that the servitude did not prescribe due to nonuse prior to 1978, it is evident that the servitude still would have lapsed sometime between 1978 and 1996. The impediment to exploration of the Fort Polk artillery range was lifted as of 31 March 1978. See United States' Mot. for Summ. J., Ex. 48 (letter dated 31 March 1977 from John Camp to Michael Drost acknowledging that Army's moratorium was to end on 31 March 1978); Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium over Fort Polk was to end on 31 March 1978). The plaintiffs urge, however, that the government continued effectively to deny access to the servitude through a de facto moratorium subsequent to 1978. As mentioned previously, mere preparatory activities such as geophysical exploration and surveying, do not interrupt prescription. See La. Rev. Stat. Ann. § 31:30. It is undisputed that Wm. T. Burton Industries did not engage in actual drilling between 1978 and 1996. See Pls.' Resp. to United States' Statement of Material Facts, Resp. to Statement 36, at 58. Therefore, the only way the plaintiffs can avoid summary judgment is if they can show that the United States continued to block access to the lands burdened by the 1929 servitude between 1978 and 1996.

There were several occurrences that should have put Wm. T. Burton Industries on notice that they could have used their servitude subsequent to 1978. As an initial matter, Wm. T. Burton Industries should have been put on notice that entry would be permitted by the fact that the government stopped paying Wm. T. Burton Industries to refrain from using the artillery range for drilling activity in 1978. See United States' Statement of Material Facts, Statement 27; United States' Mot. for Summ. J., Ex. 55 (letter from Major General William B. Steele to Commander, US Army FORSCOM dated 6 June 1977 explaining that moratorium payments were to end on 31 March 1978); Pls.' Resp. to United States' Statement of Material Facts, Statement 27, at 43. Moreover, it is apparent that various companies were able to access portions of the servitude to conduct seismographic surveys after 1978. For instance, with a permit from Wm. T. Burton Industries, Shell Oil secured the right to enter a portion of the lands burdened by the servitude in 1980. See id., Exs. 20, 21. Certainly, the existence of a permit between Wm. T. Burton Industries and Shell shows that Wm. T. Burton Industries had knowledge that the government was allowing access to a portion of the servitude. Further, Delta Exploration and Petty Ray Geosource, on behalf of Chevron Oil, each ran seismic surveys with permission of the Forestry Service and the Army in 1981. See id., Pls.' Resp. to Statements 42d, 42f, at 66-68; United

States' Mot. for Summ J., Exs. 73. 74. The United States also allowed Hunt Exploration to access the servitude in 1980, although there is no indication that Hunt actually undertook exploratory actions. See United States' Mot. for Summ. J., Ex. 69.

In addition, Hunt's chart detailing seismic surveys shot over the servitude shows that seventeen seismic lines were shot by various companies including Seitel Data Ltd., Shell, Stratex, Chevron, Amoco/Delta, and Petty-Ray Geophysical between 1980 and 1984. See Hunt Decl., Attachments; United States' Mot. for Summ. J., Ex. 90.[22] Certainly, if some companies were able to conduct seismic surveys over Group A and B lands during the 1980s, plaintiffs cannot now argue that an obstruction blocked its access to the servitude. Finally, there is absolutely no evidence in the record that Wm. T. Burton Industries or any other company sought access to the servitude between 1984 and 1996. Even if the servitude did not prescribe prior to 1984, this twelve year period of inactivity alone would have resulted in the servitude reverting to the United States as surface owner.

Plaintiffs argue that the government's restrictions made it impractical to use their servitude. Even if the government's moratorium may have made it more difficult and

[22] Again, even if these companies were acting as agents of Wm. T. Burton Industries when they shot the surveys, mere geophysical operations are not sufficient to interrupt prescription. See La. Rev. Stat. Ann. § 31:30.

less productive to engage in drilling operations on the Group A lands, pursuant to Louisiana law, the availability of even a portion of the land for drilling would not have suspended prescription. See Mire, 186 So. 2d at 595-597; Hanszen, 246 So. 2d at 206. The plaintiffs do not present any pertinent summary judgment evidence to refute the government's argument that no obstacle existed that prevented the plaintiffs' predecessor Wm. T. Burton Industries from accessing portions of the servitude between 1978 and 1996.[23]

## IV. Conclusion

For the reasons set forth above, we DENY plaintiffs' motion to strike the declarations of Hunt and Jaquette. Interpreting the evidence in the light most favorable to the plaintiffs, as we are bound to do in a motion for summary judgment, we conclude that no issues of material fact remain for trial. Although numerous factual disputes remain between the parties, summary judgment is not precluded if there are mere factual discrepancies. Rather, there must be a genuine issue of material fact remaining for trial. See Anderson, 477 U.S. at 249-50, 106 S. Ct. at 2509-10. We find no remaining issues of fact that would affect the outcome of this case.

[23] The plaintiffs point out that the government leased the minerals to other companies beginning in 1992. See Pls.' Resp. to United States' Statement of Material Facts, Ex. 16. The surface owner's leasing of the minerals underlying his land to someone other than the servitude owner does not in and of itself constitute an obstacle. See Gayoso Co. v. Arkansas Natural Gas Corp., 146 So. 677, 679-80 (La. 1933); see also Gailey v. McFarlain, 193 So. 570, 578-79 (La. 1940)(prior recorded mineral lease on land upon which mineral servitude is subsequently created does not constitute an obstacle).

Plaintiffs have failed to refute the government's argument that there were at least ten years of nonuse of the servitude between 1964 and 1996 with competent summary judgment evidence. Ten years of nonuse effectuates a reversion of the mineral servitude to the surface owners. See La. Rev. Stat. Ann. § 31:27 (Mineral Code concept of prescription); La. Civ. Code Ann. art. 753 (prescription under the Civil Code). The servitude therefore reverted to the ownership of the United States sometime prior to 1996. This finding comports with the public policy of this state, which "favors the timely return of outstanding minerals to the owner of the land." Mire, 186 So. 2d at 597. The government's motion for summary judgment is GRANTED and the plaintiffs' complaint is DISMISSED WITH PREJUDICE.

Alexandria, Louisiana

28 July 2000

COPY SENT:
DATE: 7-28-00
BY: mel
TO: Gray
Beard
Minaldi
Lalonde
Thompson
Broadwell
Smith
Baudier
Means
Hebert
Kletz
Roush
Laizer

F. A. LITTLE, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT