# In The United States Court of Federal Claims

No.  00-512L

(Filed:  November 6, 2009)

_____

| | |
|---|---|
| PETRO-HUNT, L.L.C., | * Takings and contract case; Motion to |
| | * dismiss under RCFC 12(b); Servitudes – |
| Plaintiff, | * prescription under Louisiana law; Mineral |
| | * leases; Statute of limitations – 28 U.S.C. |
| v. | * § 2501; Permanent takings claim – accrual |
| | * suspension rule; Permanent takings claim |
| THE UNITED STATES, | * untimely; Temporary takings; Temporary |
| | * physical takings claim accrual point; |
| Defendant. | * Temporary takings claim allegedly |
| | * occasioned by certain mineral leases made |
| | * by the United States on property owned by |
| | * plaintiff held timely; Contract claims held |
| | * untimely; Temporary takings – mineral |
| | * servitudes are compensable property |
| | * interest; Nature of mineral lease under |
| | * Louisiana law; Reformation. |

_____

**OPINION**

_____

*Joseph Ralph White,* White Law Firm, New Orleans, LA, for plaintiff.

*James D. Gette*, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John C. Cruden*, for defendant.

**ALLEGRA, Judge:**

     Scylla and Charybdis were the treacherous sea monsters of Greek mythology, who lurked on the opposing sides of the Straits of Messina between Sicily and Calabria.  According to lore, these nightmarish creatures were strategically placed so as to pose an inescapable threat to passing ships – sail too close to the peninsula and Scylla would seize and devour your crew with her six serpentine heads; compensate, by navigating closer to the island of Sicily, and face the loss of your entire ship in the maelstroms belched from Charybdis' gaping mouth.  On the advice

of Circe, Odysseus chose to sail closer to Scylla – costing him six of his men, but leaving his ship intact to sail another day.

Some might say that, in Federal takings law, these fictional leviathans have been replaced by the doctrines of ripeness and limitations, both of which must successfully be navigated by claimants seeking to bring their cases before this court.  File too early and risk having your case dismissed as premature; delay too long, however, and face the loss of your entire suit, as time-barred.  *See Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1037-38 (Fed. Cir. 1997).  In some situations, litigants may find themselves between a rock and a hard place (a veiled reference, as it turns out, to the twin monsters of old).

Pending before the court in this takings and contract case is defendant's motion to dismiss under RCFC 12(b), in which defendant's principal claim – as the foregoing intimates – is that various counts are time-barred under the applicable six-year statute of limitations.  For the reasons that follow, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion.

## I.    BACKGROUND

While this case has a long and complicated history, the court need summarize here only those facts necessary to provide context.

Unlike other states, Louisiana does not recognize the existence of separate mineral estates.  Instead, mineral rights take the form of a mineral servitude, the holder of which has the right to enter the property and extract the minerals.  *See* La. Rev. Stat. § 31:21.  Louisiana law has long provided that such servitudes are extinguished by "prescription resulting from nonuse for ten years."  La. Rev. Stat. § 31:27; *see also Central Pines Land Co. v. United States*, 274 F.3d 881, 884 (5th Cir. 2001), *cert. denied*, 537 U.S. 822 (2002).  The period of prescription on mineral servitudes begins to run on the date a servitude is created, and is interrupted only by "good faith operations for the discovery and production of minerals."  La. Rev. Stat. § 31:20.  This rule may not be abrogated by contract.  *See Leiter Minerals, Inc. v. California Co.*, 132 So. 2d 845, 853 (La. 1961).

In 1932, five Louisiana lumber companies agreed to pool the mineral rights on their respective lands.  They created a joint venture called the "Good Pine Oil Company" (Good Pine), to which they conveyed the rights to explore and develop their property for the production of oil, gas and sulphur.  Between November 12, 1932, and May 3, 1934, two of the five companies, Bodcaw Lumber and Grant Timber, made six conveyances of mineral rights, involving 180,000 acres of land, to Good Pine.  As the affected parcels were noncontiguous, the transfers created multiple mineral servitudes under Louisiana law – ninety-six in all.  Each of the deeds conveying mineral rights to Good Pine contained a clause explicitly providing that the ten-year period of prescription applied.

In the 1930s, the United States sought to buy land in Louisiana to consolidate into a national forest authorized by the Weeks Act of 1911, 36 Stat. 961, ch. 186, *as amended by* the Clarke-McNary Act of 1924, 43 Stat. 653, ch. 348.  Although the Weeks Act allowed owners selling property to the United States to reserve their rights to minerals, *see* 36 Stat. 962, owners of large tracts of land in Louisiana were unwilling to sell their property to the United States, cognizant of several court decisions that had held that the reservation of mineral rights in Louisiana created only a "right in the nature of a servitude" which was subject to the prescription rule outlined above.  After Bodcaw Lumber and Grant Timber rejected an offer to sell their surface estates to the United States, the Forest Service of the United States Department of Agriculture (the Forest Service) supplied the companies with an opinion by the Assistant Solicitor of the Department of Agriculture declaring that the prescription provisions of the Louisiana Civil Code would not apply to land sold to the United States under the Weeks Act.  Allegedly in reliance on this opinion, Bodcaw Lumber and Grant Timber agreed to sell the surface estates of various tracts of timber land to the United States.

From November 1934 through January 1937, Bodcaw Lumber and Grant Timber conveyed to the United States the surface rights to approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes.  The eleven instruments of transfer all expressly excluded from the transactions the mineral servitudes that had previously been conveyed to Good Pine.  At the time of these sales, the officers and directors of Bodcaw and Grant believed that the mineral rights underlying this land were valuable.  It is alleged that they would not have sold the timber lands to the United States at the price agreed had they thought the prescriptive provisions of Louisiana law applied.

In the years that followed, the United States' efforts to acquire land in Louisiana continued to be met by resistance from landowners fearful of losing their mineral reservations through prescription.  In 1940, the Louisiana Legislature passed Act 315 (the 1940 Act) to eliminate the rule of prescription for mineral rights on lands held by the United States:

> [W]hen land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America . . . and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible.

La. Rev. Stat. § 9:5806 (Supp. 1973) (repealed 1975); *see also* La. Rev. Stat. § 31:149 (2004) (codifying a similar rule).  The purpose of the 1940 Act was to facilitate the Forest Service's purchase of large tracts of lands for national forests and parks, as well as military installations. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 599 & n.16 (1973) (citing *Leiter Minerals, Inc.*, 132 So. 2d at 851)*.*  Sometime after this statute was passed, Nebo Oil Company (Nebo Oil) acquired all of the mineral rights formerly held by Good Pine.

Despite its prior representations, the United States, in 1948, filed a declaratory judgment action against Nebo Oil to quiet title to the minerals on a particular servitude claimed by the company as successor in interest to Good Pine. The complaint referred to a specific parcel, approximately 800 acres in size, lying in portions of section 19 (Township 13 North, Range 6 West) and section 24 (Township 13, Range 7 West) in Natchitoches Parish. This parcel was one of several acquired by the United States through a February 11, 1936, deed from Bodcaw Lumber, which covered 24,943.93 acres. Nebo Oil claimed a mineral servitude on the 800-acre parcel as a result of the 1932 conveyance of mineral rights from Bodcaw to Good Pine. In its complaint, the United States averred that: (i) no drilling operations had been conducted on the 800-acre parcel during the ten-year period beginning on November 12, 1932; (ii) the mineral servitude on the parcel had, therefore, prescribed for nonuse; and (iii) Nebo Oil intended to drill a well on the land and had advised the government that the company would resist interference. The United States sought declaratory relief and an order permanently enjoining Nebo Oil from entering the 800-acre parcel for mineral production.

The United States District Court for the Western District of Louisiana concluded, *inter alia*, that the mineral rights underlying the tract in question were imprescriptible by virtue of the 1940 Act. *United States v. Nebo Oil Co., Inc.*, 90 F. Supp. 73, 83-84 (W.D. La. 1950). It rejected defendant's claim that the Louisiana statute was unconstitutional, as interfering with the United States' rights to the minerals. Via the transaction, it noted, the United States "had no vested property right in such minerals, either present or future," but rather had only the "vaguest expectancy of acquiring them at some future time" based on a contingency that could be changed by local law. *Id.* at 84.

On appeal, the United States Court of Appeals for the Fifth Circuit affirmed. *United States v. Nebo Oil Co., Inc.*, 190 F.2d 1003 (5th Cir. 1950). That court first noted that it was bound by rulings of the Supreme Court of Louisiana, which in considering the impact of the 1940 Act on another 1936 sale made by Bodcaw Lumber to the United States, had "held that Act 315 of 1940 was applicable because of the general rule [in Louisiana] that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation." *Id.* at 1008 (citing *Whitney Nat. Bank of New Orleans v. Little Creek Oil Co., Inc.*, 33 So. 2d 693 (La. 1947)). After carefully reviewing other relevant precedents, the court reaffirmed the district court's holding that the statute was constitutional, concluding –

> Act 315 of 1940 provides that when lands are conveyed to the United States subject to a prior sale or reservation of oil, gas, or other minerals still in force and effect, the rights so reserved or previously sold shall be imprescribable. It does not state or imply that the reserved rights shall be increased or varied but only that they shall not be lost by prescription. The consideration of $1.75 per acre paid by the United States did not cover the value of any mineral rights. Indeed, since the minerals underlying the lands had previously been sold to Good Pine Oil without limit for time of their enjoyment, Bodcaw did not own any minerals which it could sell to the United States. Neither could it reserve nor sell the expectation of a servitude lapsed for nonuser. All that Bodcaw had which it could sell to the United States was the timber land itself. That was the obligation of the contract

and it remains unimpaired.  By virtue of its ownership of the land appellant could merely hope that the outstanding servitude might lapse but this hope or expectancy was born of a statute of prescription based on the then existing public policy of the State as declared by its legislature.  It was not a part of the obligation of the contract.  It was wholly given by law and the power that gave it could increase, diminish, or otherwise alter, or wholly take it away without violating the Federal Constitution.

*Nebo Oil*, 190 F.2d at 1010 (citations omitted).

So stood the law for twenty years.  Subsequent to the Fifth Circuit's decision, Nebo Oil placed affidavits in the land records of Grant, Winn and Natchitoches parishes in Louisiana wherein it claimed title, *inter alia*, to all the mineral rights conveyed to Good Pine through the conveyance instruments described above.  During this same period, the land records of the Forest Service reflected that the minerals underlying the land in question were held by others in perpetuity.

In 1969, the United States filed suit in the United States District Court for the Western District of Louisiana seeking to quiet title to two parcels of land which it had acquired pursuant to the Migratory Bird Conservation Act, 45 Stat. 1222, 16 U.S.C. § 715, *et seq.*, as part of the Lacassine Wildlife Refuge.  The two transfer documents reserved to Little Lake Misere the rights to minerals for a period of ten years (and as long as any production begun during this period continued), and recited that, after this period, "complete fee title to said lands shall thereby become vested in the United States."  Although no production occurred during the period indicated, Little Lake Misere argued that it retained the right to the minerals under the 1940 Act.  The district court and, in turn, the Fifth Circuit agreed, relying on the earlier *Nebo Oil* decision.  *See United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5ᵗʰ Cir. 1971).  But, the Supreme Court granted certiorari and reversed.  *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580 (1973).

The Court did not reject the *Nebo Oil* decision.  Rather, invoking the choice-of-law doctrine in *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943), it held that the Fifth Circuit had erred in applying Louisiana state law.  It reasoned that because the land acquisition agreement was "explicitly authorized" by the Migratory Bird Conservation Act and thus "ar[ose] from and [bore] heavily upon a federal regulatory program," federal law governed.  412 U.S. at 593-94.  The court determined that applying the 1940 Act would deprive the United States of its "bargained-for-contractual interests" by abrogating "a consummated land transaction under a contract which specifically defined conditions for prolonging the vendor's mineral reservation." *Id.* at 597.  It held instead that the appropriate rule of decision should be supplied by either federal common law or "residual" state law, neither of which would give effect to the 1940 Act "as plainly hostile to the interests of the United States" and both of which instead would give effect to the contract terms.  *Id.* at 597, 604.  Notably, the Court observed, albeit in *obiter dicta*, that without a contractual term setting out the conditions under which the United States would obtain the mineral rights, "it might be said that the Government acknowledged and intended to be bound by unforeseeable changes in state law."  *Id.* at 602-03.

After the decision in *Little Lake Misere*, the United States began granting mineral leases allowing the exploitation of minerals in the servitudes in question. At first, this activity was sporadic. While the parties disagree as to the exact timing of these leases (and, indeed, even as to number thereof), it appears that the wide majority of them were granted beginning in 1991, with more than forty-five leases made from that year up to the beginning of this lawsuit. Each of the leases was for a period of ten years.

Issues regarding the application of the 1940 Act rose yet again in the late 1990s. At that time, Central Pines Land Co. filed a declaratory judgment action against the United States and several oil companies that had entered into lease agreements with the United States for the exploration and production of oil and gas in the area of various servitudes. On April 7, 1999, the district court ruled that the 1940 Act was inapplicable to a 1929 servitude created before the 1940 passage of the Act, but applied to servitudes that arose in 1941 through 1981, rendering the latter servitudes imprescriptible. On July 28, 2000, the same court ruled that, based on inactivity, the 1929 servitude, in fact, had prescribed.

In affirming these rulings, the Fifth Circuit first decided whether *Little Lake Misere* required application of federal common law to the case. *Central Pines Land Co.*, 274 F.3d at 888. Noting that the Supreme Court's ruling had hinged, in part, on the interpretation of a particular land acquisition agreement, the Fifth Circuit observed that the United States' right to the minerals associated with the 1929 servitude was "arguably weaker" because it did not arise from the transfer agreement, but rather from the Louisiana prescription rule. *Id*. at 888. The court, nonetheless, concluded that the analysis in *Little Lake Misere* applied and that the operative rule of decision was federal common law. Holding that it need not decide whether "*Nebo Oil* [was] . . . implicitly overruled by *Little Lake,*" *id*. at 890, the court concluded that "there is a conflicting federal interest – that in obtaining the mineral rights via the default rule of prescription in place before Act 315," *id*. at 891, requiring the court to "balanc[e] . . . [the] state and federal interests to determine whether the state rule should apply." *Id*. It held that the *Little Lake Misere* had struck this balance in favor of applying a federal rule of decision where there was "retroactive application of Act 315," but that the considerations cited by the Supreme Court did not compel the same conclusion where a prospective application of the same statutes was involved. In the latter instance, the Fifth Circuit found, "Act 315 provides the background rule that the United States bargained under." *Id*. at 892-93. Finally, the court viewed its prior decisions, including *Nebo Oil*,[1] as precluding it from reconsidering whether the 1940 Act unconstitutionally discriminated against the United States. *Id*. at 893-94.

_____

[1] The Fifth Circuit did not cite *Nebo Oil*. Rather, it indicated that it could not reconsider these constitutional points based upon its decision in *United States v. Little Lake Misere Land Co.*, 453 F.2d 360 (5th Cir. 1971), noting the Supreme Court, in reversing that opinion, had reserved any ruling regarding the constitutionality of the 1940 Act. *Central Pines*, 274 F.3d at 893. That said, the Fifth Circuit's ruling in *Little Lake Misere* was squarely based on its prior ruling in *Nebo Oil*. *See Little Lake Misere*, 453 F.2d at 362.

On February 18, 2000, after the first of the district court's rulings in *Central Pines,* but before the second, Petro-Hunt, along with the other co-owners of the mineral estate, brought a quiet title action against the United States in the United States District Court for the Western District of Louisiana – a lawsuit apparently triggered by the United States' continuing and burgeoning leasing activity.  On August 24, 2000, Petro-Hunt filed suit in this court.  On November 2, 2000, this court granted the parties' joint motion to stay this action pending a final decision in the quiet title action.  Meanwhile, in the district court, Petro-Hunt and the other plaintiffs filed a motion for summary judgment asserting that the combined effect of the decision in *Nebo Oil* and the doctrine of *res judicata* precluded the United States from arguing that the servitudes in question had prescribed.  On December 18, 2001, the district court granted this motion, holding that the preclusive effect of *Nebo Oil* barred the United States from asserting the prescription defense not only to the 800-acre servitude directly addressed in *Nebo Oil*, but also to all 24,942.93 acres of land that were acquired in the transaction involving the 800-acre servitude **and** as to the remainder of approximately 180,000 acres of land acquired by the United States in ten additional transactions.  *Petro-Hunt, L.L.C. v. United States*, 179 F. Supp. 2d 669, 681-82 (W.D. La. 2001).  In this regard, the district court concluded that "the entire 180,000 acres was similarly situated to the 800 acres at issue in *Nebo Oil*."  *Id*. at 682.

On appeal, the Fifth Circuit reversed.  *Petro Hunt, LLC v. United States*, 365 F.3d 385 (5th Cir.), *cert. denied*, 543 U.S. 1034 (2004).  It held that neither *res judicata* nor collateral estoppel precluded the United States from relitigating the applicability of the 1940 Act to ninety-five of the ninety-six Good Pine servitudes.  Rather, the court found, the United States was prohibited only from relitigating the title to the single servitude burdening the 800-acre parcel of land directly at issue in *Nebo Oil*.  The court held that "res judicata is no bar to the United States' defense in this action because its claim with respect to each servitude depends on a unique set of operative facts."  *Id*. at 397.  The court then concluded that collateral estoppel did not apply to the rulings in *Nebo Oil* because the relevant question – involving the choice of law – had not been litigated in the earlier Fifth Circuit case.  *Id*. at 398.  Even if that issue had been raised, the court found, changes in the controlling legal principles effectuated by the decisions in *Little Lake Misere* and *Central Pines* would permit the United States to relitigate the issue.  *Id*. at 399.  Based upon the rulings in the latter two cases, the Fifth Circuit concluded that it was "prohibited from borrowing Act 315 as the federal rule of decision because it is hostile to the federal interests at stake."  *Id*.  The court remanded the case to the district court to determine which of the ninety-five servitudes that were not at issue in *Nebo Oil* had prescribed.  *Id*.  After the Supreme Court denied a petition for certiorari, it ultimately was determined that the United States owned ninety servitudes and plaintiff remained the owner of six (the servitude at issue in *Nebo Oil* and five others).

On June 25, 2008, plaintiff filed its first amended complaint in this court, in which it asserted seven counts.  In the first six of these, plaintiff averred that the United States had effectuated:  (i) a permanent taking of ninety servitudes; (ii) a temporary taking of ninety-one servitudes by issuing mineral leases to third parties; (iii) a temporary taking of servitudes over which the United States had asserted ownership during the quiet title action; (iv) breaches of the

original land conveyance contracts which plaintiff may pursue as the successor-in-interest to Good Pine; (v) breaches of the original land conveyance contracts which plaintiff may pursue as a third-party beneficiary; and (vi) breaches of the covenant of good faith and fair dealing associated with the original land conveyance contracts. A seventh count sought reformation of the original land conveyance contracts. On September 2, 2008, defendant moved to dismiss the amended complaint for lack of jurisdiction, primarily arguing that the claims were time-barred. It also argued that various counts in the complaint failed to state a claim. Following the completion of briefing on that motion, the court conducted oral argument on the motion on April 9, 2009. The court ordered supplemental briefing, which was completed on July 31, 2009.

## II.    DISCUSSION

Defendant raises a host of objections to plaintiff's amended complaint. As the court previously indicated to the parties, the court will resolve only those objections properly raised in the context of RCFC 12, *to wit*, issues involving jurisdiction and whether various counts of plaintiff's complaint fail to state a claim. It will not consider, at this time, defendant's alternative motion for summary judgment, which relies on evidence that goes well beyond the specific allegations in the complaint. The arguments made in this alternative motion are, in the court's view, premature and must await the completion of discovery.

### A.    Lack of Jurisdiction – Statute of Limitations

In considering a motion challenging jurisdiction, the court construes factual allegations in the complaint most favorably to the plaintiff, resolving ambiguities in its favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The court may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists. *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991). RCFC 12(c) provides that if "matters outside the pleadings are presented to and not excluded by the court, the motion shall treated as one for summary judgment." But, this provision "does not apply to a motion made under Rule 12(b)(1) to dismiss for lack of jurisdiction over the subject matter," under which the court undoubtedly may "address matters outside the pleadings." *Reed Island-MLC, Inc. v. United States*, 67 Fed. Cl. 27, 32 (2005) (citing *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1383 (Fed. Cir. 2002)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), grants this court jurisdiction to render judgment on any claim against the United States founded, *inter alia*, on the Constitution or a contract. *See United States v. Testan*, 424 U.S. 392, 397-98 (1976). A claimant must bring a claim under the this provision "within six years after such claim first accrues." 28 U.S.C. § 2501; *see also Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005). This is a jurisdictional limit that cannot be waived. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130 (2008). It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), *cert. denied*, 540 U.S. 1177 (2004) (quoting *Nager Elec. Co. v. United States*, 368 F.2d

847, 851 (Ct. Cl. 1966)); *see also Samish*, 419 F.3d at 1369.  Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely.  *See Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998); *Entines v. United States*, 39 Fed. Cl. 673, 678 (1997), *cert. denied*, 526 U.S. 1117 (1999); *see also John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); *Reynolds v. Army and Air Force Exchange Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988).[2]

In the 1930s, defendant persuaded the prior owners of the property in question to sell their surface rights by supplying them with an opinion that held that the prescriptive provisions of Louisiana law did not apply to these lands.  Consistent with that view, the documents transferring those surface rights reserved the associated mineral interests.  In 1940, the Louisiana legislature passed a law stating that the prescriptive provisions did not apply to land acquired by the United States.  In its 1950 *Nebo Oil* decision, the Fifth Circuit, relying upon prior decisions of the Louisiana Supreme Court, held that this statute applied to one of the servitudes at issue in this case.  Subsequent to this ruling, Louisiana State and Interior Department records reflected that the minerals underlying the land in question were not owned by the United States.  A 1973 decision of the Supreme Court raised doubts regarding the impact of the 1940 Act, but did so in a case involving a contract in which the United States had bargained for and seemingly obtained the mineral interests in question.  A 2001 ruling of the Fifth Circuit distinguished the 1973 precedent on this and other bases, and held that *Nebo Oil* was still good law.  In a lawsuit filed shortly before this suit was initiated, a district court, in 2001, held that the *res judicata* impact of the *Nebo Oil* decisions precluded defendant from asserting interests in any of the servitudes involved in this case.  That ruling was reversed by the Fifth Circuit in 2004, ultimately leading to a finding, on remand, that the United States owned ninety of the ninety-six servitudes involved here.

Despite the recentness of the latest of these developments, defendant claims that most of the counts in plaintiff's lawsuit are barred by the statute of limitations – contending, in its original motion, that the claims accrued "long before" the 2004 court rulings on the servitudes.  Defendant's choice of the pliant phrase "long before" apparently was not inadvertent, for, in briefing the pending motion, it has taken various views as to when the claims here accrued for limitations purposes.  At points, it has argued that the claims accrued in the 1940s – when the minerals allegedly first came into the possession of the United States under the Louisiana law of prescription.  Alternatively, it has asserted that the claims accrued in 1973 when the Supreme Court issued its opinion in *Little Lake Misere*.  And, at still other instances, it has asseverated that the claims accrued during the late 1980s and early 1990s, when defendant began to grant

---

[2]  *See also Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1197 (9th Cir. 2008) ("Although ordinarily the defendant bears the burden of proving an affirmative statute of limitations defense, here the statute of limitations is jurisdictional, and, '[w]hen subject matter jurisdiction is challenged under Federal Rule of Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.'" (quoting *Tosco Corp. v. Comtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001)).

mineral leases relating to the properties.  Yet, while itself advocating alternating accrual dates that span nearly a half a century, defendant audaciously managed, in its final brief, to accuse plaintiff of "throwing . . . alternative arguments at the wall, [in hopes] one will stick" – a classic example of the pot calling the kettle black, if there ever was one.  As it turns out, both parties present arguments that are a bit viscid.  To sort through them – and to determine which adhere to the fabric of the law – the court will consider plaintiff's permanent takings, temporary takings and contract claims *seriatim*.

## 1.      Permanent Takings

The Fifth Amendment provides that private property shall not "be taken for public use without just compensation."  U.S. Const. Amend. V.  A claim alleging a Fifth Amendment taking "'accrues when that taking action occurs.'"  *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Alliance of Descendants of Tex. Land Grants v. United States*, 37 F.3d 1478, 1481 (Fed. Cir. 1994)).  Apart from a condemnation, such a taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property.  *United States v. Causby*, 328 U.S. 256, 261-62  (1946); *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945); *see also Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000).  A permanent takings claim arises when: (i) all the events which fix the government's liability have occurred; and (ii) the plaintiff knew or should have known of the existence of these events.  *See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir.), *cert. denied*, 2009 WL 22404042 (U.S. Oct. 5, 2009); *Alliance of Descendants of Tex. Land Grants*, 37 F.3d at 1481.  As plaintiff points out, each prong of this analysis has bred its own set of corollaries which, in turn, may control when a given takings claim arises.

One such corollary – focusing on when the government's liability is fixed – stems from the interlocking nature of this court's Tucker Act jurisdiction with that of the district courts under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*., and other statutes.  It holds that if a necessary element to a claim must be established in a different forum, the claim will not accrue for section 2501 until that element is finally established in the other proceeding.  A prime example of this rule at work may be found in *Samish*, 419 F.3d at 1369.  There, the Samish claimed that they were entitled to damages for benefits lost when the Bureau of Indian Affairs (BIA) terminated their status as a Federally-recognized tribe.  The Federal Circuit observed that an essential element of this claim was a finding that the Samish were entitled to be treated as a Federally-recognized tribe, but noted that "[o]nly a district court, acting on challenge under the APA, ha[d] the authority to review the . . . executive's recognition determination" in this regard.  *Id*.  It held that the plaintiff's claim did not accrue until the Samish "obtained a final ruling by a district court under the APA" that they were entitled to be treated as a Federally-recognized tribe.  *Id*. at 1369.  Other cases have likewise concluded that where a ruling by another tribunal is a precondition to the maintenance of a claim, the claim cannot accrue until that ruling is obtained.[3]

---

[3]  *See also, e.g., Heck v. Humphrey*, 512 U.S. 477, 489–90 (1994) (claim for wrongful conviction did not accrue until the conviction or sentence has been invalidated); *Midgett v.*

This line of cases takes it lead from *Nager Elec. Co.,* 368 F.2d at 859, where the Court of Claims held that a claim "cannot logically mature for limitation purposes . . . before the plaintiff has a proper cause of action to allege in court – a claim which is proof against a motion to dismiss – and the time period does not run until the claim ripens in that sense."

Is this a case like *Samish*?  Plaintiff certainly thinks so.  It contends that it had to complete its quiet title action in the district court before it could pursue its permanent takings claims here.  Unlike in *Samish*, however, there was no legal requirement that plaintiff obtain a ruling from the district court to establish an element of its permanent takings claim.  To be sure, it is axiomatic that to maintain a takings claim, a claimant must show that it had a property interest that was impacted by government action.  *See, e.g., Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005); *Am. Pelagic Fishing Co. L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004), *cert. denied*, 545 U.S. 1139 (2005).  And, in several discrete subject areas (*e.g.*, unpatented mining claims), Congress has vested in the district courts the sole authority to determine the validity of certain types of property interests.  *See Freese v. United States*, 221 Ct. Cl. 963, 963 (1979); *see also Aulston v. United States*, 823 F.2d 510, 514 (Fed. Cir. 1987) (this court "does not acquire authority to review an agency action otherwise reviewable only in district court merely because plaintiff's effort to obtain review is couched in terms of a taking claim").  Yet, as numerous cases attest, questions regarding the existence or loss of most property interests, including those of real property, may be – and often are – litigated in this court in resolving a takings claim.[4]  And this occurs even where reference to state law is

*United States*, 603 F.2d 835, 839 (Ct. Cl. 1979) (claim for death gratuity did not accrue until Virginia decree of death); *Fort Mojave Indian Tribe v. United States*, 23 Cl. Ct. 417, 429 (1991) (claim for breach of trust in the loss of water rights did not accrue until Supreme Court confirmed that rights had been lost); *see also Peak v. United States*, 353 U.S. 43, 45 (1957) (claim accrues for limitation purposes when the claimant "might have successfully maintained her suit").

[4]  *See, e.g.*, *Acceptance Ins. Cos., Inc. v. United States*, 2009 WL 3127774, at *7 (Fed. Cir. Oct. 1, 2009); *see also Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995), *cert. denied*, 519 U.S. 810 (1996) ("In analyzing a takings claim, a court must first determine what was taken.").  In *Dwen v. United States*, 62 Fed. Cl. 76, 81 (2004), this court noted that while it plainly lacks jurisdiction under the Quiet Title Act, 28 U.S.C. § 2409a, to declare titles, that does not prevent the court from determining property rights in the context of resolving takings claims.  In this regard, the court noted –

After the passage of the QTA, however, the government frequently argued that the court was divested of jurisdiction to adjudicate takings claims where resolution of a title dispute was subsumed in the determination.  That argument, however, has been firmly laid to rest.  It is now well-established that the court has jurisdiction to make independent factual determinations of a claimant's specific property interest as a matter of course in adjudicating takings claims.  *Mannatt v. United States*, 48 Fed. Cl. 148, 152 (2000); *Chevy Chase Land Co. of Montgomery County v.*

required – indeed, the latter is usually the case.[5]  Accordingly, nothing prevented this court from determining, in the context of a takings claim, plaintiff's rights to the servitudes at issue here.  As such, this is not an instance in which the accrual of a claim here had to await a ruling by another tribunal.

While the *Samish*-line of cases deals with situations where a claim has not yet accrued, another salvific corollary invoked by plaintiff – the so-called "accrual suspension rule" – applies where  "an accrual date has been ascertained, but plaintiff does not know of his claim." *Japanese War Notes Claimants Ass'n v. United States*, 373 F.2d 356, 358-59 (Ct. Cl.), *cert. denied*, 389 U.S. 971 (1967); *Benchmark Resources Corp. v. United States*, 64 Fed. Cl. 526, 532 (2005).

Under the accrual suspension rule, "the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." *Martinez*, 333 F.3d at 1319; *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008).  This concept derives directly from the meaning of the term "accrues," as used in section 2501, and, therefore, is viewed as a matter of statutory interpretation, rather than a form of equitable tolling.  *Martinez*, 333 F.3d at 1319; *L-3 Comms. Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 463 (2007).[6]  To achieve such a suspension, the plaintiff "must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." *Id*. (quoting *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir.), *cert. denied*, 474 U.S. 826 (1985)); *see also Young*, 529 F.3d at 1384.  While some cases talk in terms of requiring "active" or "intentional" concealment, *see, e.g.*, *Rosales v. United States*, 2009 WL 3286594, at * 7 (Fed, Cl. Oct. 7, 2009); *Central Pines Land*, 61 Fed. Cl. at 533, others seem to proceed from the notion that the *mens rea* underlying the concealment is largely irrelevant, so long as the nondisclosure

---

*United States*, 37 Fed. Cl. 545, 564 (1997); *Oak Forest*, 23 Cl. Ct. at 96; *Yaist*, 228 Ct. Cl. at 285-86, 656 F.2d 616.

*Dwen*, 62 Fed. Cl. at 81; *see also Bourgeois v. United States*, 545 F.2d 727, 729 n.1 (Ct. Cl. 1976) (stating that in a suit seeking compensation, the court is not denied jurisdiction simply because there is a quiet title issue involved in determining compensation); *Oak Forest, Inc. v. United States*, 23 Cl. Ct. 90, 96 (1991) ("[T]he mere fact that title must be determined as part of [a takings claim] does not oust the court of jurisdiction, assuming it otherwise exists.").

[5]  *See Am. Pelagic Fishing Co.*, 379 F.3d at 1376; *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002), *cert. denied*, 537 U.S. 1112 (2003) (determining property interests by considering "'background principles' derived from an independent source, such as state . . . law"); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029-30 (1992).

[6]  This is important, of course, as there can be no equitable tolling of the statute of limitations in section 2501, which is jurisdictional.  *See John R. Sand & Gravel Co.*, 552 U.S. at 133-34, 137-39.

prevented the claimant from knowing that its claim had arisen. *See Bleak v. United States*, 214 Ct. Cl. 812, 813 (1977) ("we need not delve deeply into the technical rules that surround this technical point of law to be reminded that the underlying precept is that the limitations cannot begin to run until the claimant has reason to know he holds a ripe claim"); *Japanese War Notes Claimants*, 373 F.2d at 359; *see also L.S.S. Leasing Corp. v. United States*, 695 F.2d 1359, 1366 (Fed. Cir. 1982).[7] These and other cases also teach that a claim is "inherently unknowable" when there is nothing to alert one to the wrong at the time it occurs. *See Japanese War Notes Claimants*, 373 F.2d at 358-59; *Texas Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009); *see also Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007) (cause of action is "inherently unknowable" if "it was incapable of detection by the plaintiff through the exercise of reasonable diligence").

        Mindful that the "accrual suspension" rule is to be "strictly and narrowly applied," *Martinez*, 333 F.3d at 1319, courts have concluded that a misunderstanding of the meaning of the law or one's legal rights does not trigger this rule *See Catawba Indian Tribe of S.C.*, 982 F.2d 1564, 1572 (Fed. Cir.), *cert. denied*, 509 U.S. 904 (1993) (declining to apply the rule where "all the relevant facts were known. It was the meaning of the law that was misunderstood."); *Black v. United States*, 84 Fed. Cl. 439, 448 (2008); *see also United States v. Kubrick*, 444 U.S. 111, 122 (1979). Yet, several cases involving this rule and the related discovery rule[8] intimate that the suspension rule may apply where a claimant, through the exercise of reasonable diligence, could not have known that its legal rights had been modified or abridged in a way giving rise to a claim. Cases of this sort typically involve situations in which the change in circumstance arises out of a decision that overrules or alters prior precedent, with the claim deemed to have been tolled until the modifying decision was made. In *Neely v. United States*, 546 F.2d 1059, 1068 (3d Cir. 1976), for example, the Third Circuit held that the Tucker Act's statute of limitations was not triggered until the Supreme Court had overruled several prior opinions, thereby giving rise to the claims at issue. Finding that the alterations in the claimants' rights worked by the Supreme Court's opinion were "inherently unknowable," the court commented that "[t]o require

---

        [7] The rule has been applied in cases where defendant has deliberately or fraudulently concealed its acts from plaintiff. *See, e.g., Barrett v. United States*, 689 F.2d 324, 327-328 (2d Cir. 1982); *L-3 Communs.*, 79 Fed. Cl. at 464; *see also Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). In other instances, however, the same result has obtained where critical facts simply have not been disclosed. *Spevack v. United States*, 390 F.2d 977, 981 (Ct. Cl. 1968) (suspending accrual of patent infringement claim where defendant performed patented process secretly, pursuant to applicable security regulations); *Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973) (suspending accrual of claim for breach of fiduciary duties where defendant was not in the practice of paying out income or accounting to plaintiffs on a regular basis).

        [8] *See Kubrick*, 444 U.S. at 120-22; *Urie v. Thompson*, 337 U.S. 163, 169 (1949) (statute of limitations not triggered where facts were "unknown and inherently unknowable"); *see also Ramirez-Carlo*, 496 F.3d at 47 (applying this rule to a case under the Federal Tort Claims Act).

clairvoyance in predicting new jurisprudential furrows plowed by the Supreme Court, under these circumstances, would be to impose an unconscionable prerequisite to asserting a timely claim." *Id.*[9]  Cases such as *Neely* are readily distinguishable from those in which the facts are known, but the legal implications are not.  *Red Chevrolet Impala Sedan*, 457 F.2d at 1358 ("This is not . . . a case in which a plaintiff is ignorant of his rights, but rather a case of a plaintiff without a right.").

But, again, is this a case like *Neely*?  Plaintiff asserts that prior to the 2004 ruling of the Fifth Circuit, its permanent takings claim was not legally apparent.  It argues that until this decision, it had every reason to believe that the Louisiana law of prescription did not apply to its servitudes.  Its predecessors, of course, had been assured of that by the Department of Agriculture in inducing them to sell their surface rights, and the transfer documents reflected this view.  As further evidence that prescription did not apply, plaintiff cites not only the 1950 ruling of the Fifth Circuit in *Nebo Oil*, but the 2000 ruling of that same court in *Central Pines,* and even the 2001 ruling of the Louisiana district court in the quiet title action related to this case.  And while defendant asserts that the 1973 decision in *Little Lake Misere* should have alerted plaintiff that the law had changed to its detriment, plaintiff notes that: (i) the decision was factually distinguishable; (ii) the Fifth Circuit, in *Central Pines,* held that *Nebo Oil* was still good law; and (iii) there was good reason to believe that even if *Nebo Oil* had been overruled, the *res judicata* impact of that ruling remained and still protected all of its servitudes – a belief validated by the Louisiana district court as late as 2001.  Based on this, plaintiff contends that its permanent takings claims were inherently unknowable until the Fifth Circuit reversed the district court's ruling that the *res judicata* impact of *Nebo Oil* applied to all ninety-six servitudes.  It was not until that point, plaintiff contends, that it knew or should have known that it had a permanent takings claim.

Were these all the relevant facts, plaintiff's suspension claim, in the court's view, would be compelling.  There is little doubt that the accrual suspension rule applied here to some extent.  Otherwise, the permanent takings claim here would have accrued when the servitudes in question prescribed, which for some of the properties, and perhaps almost all, occurred in the 1940s – it was at that time that the property interests here were obtained by the United States.  The question, rather, is how long that suspension lasted – did it extend, critically, all the way until August 28, 1994, so as to be within six years of the filing of the original lawsuit here?  Almost certainly, that suspension was in effect when the Louisiana legislature passed the 1941 Act (recall that statute was retroactive) and, later, when the Fifth Circuit decided *Nebo Oil*.  And while defendant claims otherwise, it would appear that plaintiff has the better of the case in asserting that the suspension remained in effect even after the Supreme Court's decision in *Little Lake*

---

[9]  *See also Wollman v. Gross*, 637 F.2d 544, 547 (8th Cir. 1980), *cert. denied*, 454 U.S. 893 (1981) (rule applies where "new law applied retroactively has created a new basis for a claim"); *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353, 1358 (5th Cir. 1972) (same); *cf. Venture Coal Sales Co. v. United States*, 57 Fed. Cl. 52, 54 (2003), *aff'd*, 370 F.3d 1102 (Fed. Cir.), *cert. denied*, 593 U.S. 1020 (2004) (recognizing concept, but finding it inapplicable).

*Misere*, particularly because the latter case left unaffected plaintiff's ability to invoke *res judicata* as to the earlier *Nebo Oil* opinion.[10]   But, these events bring us only to 1973 or thereabouts – and not all the way to August of 1994.  Alas for plaintiff, it appears that the suspension ceased – that plaintiff knew or should have known it had a permanent takings claim – and the statute of limitations was triggered in 1991 (or, at the latest, in 1993).

In the 1970s and 1980s, the United States entered into a few mineral leases relating to the servitudes in question.  Perhaps, those isolated leases should have aroused suspicions.  Perhaps not.  Then, in 1991, when defendant sought to enter into several new leases, one of plaintiff's predecessors-in-interest, Hunt Petroleum Corporation, formally protested, claiming in a March 18, 1991, letter that it owned the relevant servitudes and requesting that the Bureau of Land Management (BLM) withdraw the parcels.[11]   Four days later, on March 22, 1991, the Forest Service advised the BLM that while two of the parcels involved had not prescribed, the remainder had prescribed making the Federal government the legal owner thereof.  This letter, on which Hunt Petroleum was copied, cited a 1986 opinion by the Office of General Counsel of the Department of Agriculture and indicated that the United States had taken ownership of servitudes on parcels that were acquired prior to 1940 and on which no wells had been drilled.  On November 2, 1993, Hunt Petroleum again protested to the BLM the inclusion of certain lands in a competitive lease sale.  On December 10, 1993, the BLM notified Hunt Petroleum and Placid Oil Company that the protest had been denied, citing an April 19, 1993, title report as indicating that the minerals in question "were in fact prescribed to the United States."

---

[10]   In *Central Pines Land Co. v. United States*, 61 Fed. Cl. 527 (2004), a takings case that was stayed pending the resolution of the *Central Pines* quiet title action discussed above, this court concluded that the plaintiff's claims were time-barred because they were filed more than six years after the servitudes in question had prescribed under Louisiana law.  *Id.* at 535.  It rejected the plaintiff's contention that its claim was unknowable because it believed, based on *Nebo Oil*, that mineral servitudes on federally-owned lands were imprescriptible under Louisiana law.  In so concluding, the court found that the plaintiff had no basis to rely upon *Nebo Oil* after the 1973 decision in *Little Lake Misere*.  *Id*.  For reasons unexplained, however, the court failed to take cognizance of the fact that the Fifth Circuit, in its own *Central Pines Land* case, had concluded that *Nebo Oil* was still good law following the Supreme Court's decision.  Moreover, there is no indication in the opinion that Central Pines, like the plaintiff here, could argue that the *res judicata* effect of *Nebo Oil* survived *Little Lake Misere* – an argument, of course, that was accepted by the district court in the quiet title action involving the servitudes at issue.  Accordingly, *Central Pines* casts little light on the proper result here.

[11]   For reasons unexplained, it seems that defendant first made this point in its supplemental brief – late enough that the court would be disinclined to consider this point were it not related to jurisdiction.  Even then, while claiming that Hunt Petroleum was a "predecessor" to plaintiff, defendant failed to cite any evidence in support of that claim.  However, the record contains an affidavit filed by plaintiff in the Louisiana quiet title action in which it admits that Hunt Petroleum was an "ancestor in title."

These documents in themselves should have indicated to plaintiff's predecessor-in-interest that a permanent takings claim should be pursued – and with that task taking on added urgency in January of 1994 (again more than six years prior to the filing suit), when the Forest Service engaged in a series of additional leases. Moreover, the documents discussed above reference title reports that plaintiff does not deny were publicly available, which reports would have further revealed the extent of (and rationale underlying) defendant's prescription claims. *See Catawba*, 982 F.2d at 1570-72 (party is charged with knowledge of information that is available from public records); *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720-21 (Fed. Cir. 1984) (same). Accordingly, it appears that by 1991 and, certainly, no later than in 1993, plaintiff was "'on inquiry as to its possible injury,' and the statute of limitations began to run." *Ingrum*, 560 F.3d at 1315 (quoting *Coastal Petroleum*, 228 Ct. Cl 864, 867 (1981)); *see also Welcker*, 752 F.2d at 1580 ("Once plaintiff is on inquiry that it has a potential claim, the statute can start to run."). Certainly, by this time, the nature and extent of its claim was no longer either concealed or inherently unknowable.

Because plaintiff filed suit more than six years after that critical juncture, the court must conclude that its permanent takings claim was time-barred.[12]

## 2.    Temporary Takings

Landowners, of course, must be justly compensated for both permanent and temporary takings. *See First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, California*, 482 U.S. 304, 318 (1987) ("'[T]emporary' takings . . . are not different in kind from permanent takings, for which the Constitution clearly requires compensation."). As a general matter, "'the distinction between 'permanent' and 'temporary' takings refers to the nature of the intrusion and not its temporal duration."' *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 896 (Fed. Cir. 1998) (quoting *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993)); *see also Reed Island*, 67 Fed. Cl. at 33.

---

[12]   Plaintiff also argues that its takings claims are timely under the "continuing claims" doctrine, asserting that the government's issuance of leases are wrongful acts that took place over a period of time, culminating in defendant's assertion of ownership in the 2001 quiet title action. The continuing claims doctrine applies where a plaintiff's claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997). The doctrine allows "later arising claims even if the statute of limitations has lapsed for earlier events." *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); *see also Tamerlane, Ltd. v. United States*, 550 F.3d 1135, 1145 (Fed. Cir. 2008). In the court's view, however, the leasing activity in question is appropriately viewed more as a temporary taking and should be analyzed as such. Plaintiff has made several other glancing arguments regarding claim accrual that the court has considered and also rejects.

In the case *sub judice*, the temporary takings claims are predicated upon a series of mineral leases entered into between the United States and third parties, involving the servitudes at issue. Each of these leases had a term of ten years. The parties have filed competing affidavits cataloguing the leases they believe are at issue.[13] Those affidavits differ in terms of the number of leases made and when those leases were created. Plaintiff asserts that there were sixty-eight "intrusive" leases – twenty-one on the servitudes that were held in the quiet title action not to have prescribed to the United States and forty-seven on the servitudes that were held to have prescribed. Defendant admits to having issued fifteen mineral leases on the servitudes that did not prescribe, but does not provide any information as to the leases entered into with respect to the servitudes that prescribed. All the leases listed by defendant and all but two of those listed by plaintiff were entered into after August 24, 1984, and thus all ended within six years of the filing of this lawsuit.[14] Fifty-six of the leases cited by plaintiff apparently were initiated during that same six-year limitations period.

The decisional law suggests that the timing of the accrual of a temporary takings claim may depend upon the nature of the takings involved. Several cases indicate that a temporary regulatory takings claim accrues when the "process that began it has ended" because, among other things, the property owner "would not know the extent of [its] damages until the Government completes the 'temporary' taking." *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir. 1994); *see also Hornback v. United States*, 56 Fed. Cl. 359, 364 (2003).[15] In *Reed Island*, the court suggested that this rule also applies to temporary physical takings, operating much like the doctrine applicable to suits upon repudiation of a contract – that is, a plaintiff may file a claim on a temporary takings theory once the taking begins or wait and determine the duration of the taking before filing suit. *Reed Island*, 67 Fed. Cl. at 36 (discussing *Franconia Assocs. v. United States*, 536 U.S. 129, 144 (2002)). Other decisions, however, take a different view. Thus, for example, in *Kemp v. United States*, 65 Fed. Cl. 818 (2005), the plaintiff claimed that the National Park Service had allowed the public to use her land without her permission, resulting in a physical takings. Rejecting the argument that this claim accrued only when the temporary takings had ended, this court instead held that where a temporary physical takings is

---

[13] Again, as these affidavits involve jurisdictional facts, the court may consider them even though they present matter not found within the four corners of the amended complaint.

[14] Plaintiff's affidavit recites one lease entered into on August 1, 1983, on Servitude No. 2, and another entered into on February 1, 1973.

[15] In *Creppel*, the Federal Circuit determined that the alleged temporary taking occurred in 1976 when an Army Corps of Engineers' officer issued an order modifying a flood control levee project in Jefferson Parish, Louisiana. 41 F.3d at 629-30, 632. The Federal Circuit further concluded that the temporary taking ended, and thus the temporary takings cause of action accrued, in August 1984, when the federal district court ordered the original flood control levee project to proceed. *Id*. at 632. Because plaintiff did not file suit until 1991, the Federal Circuit found that plaintiffs' temporary takings claim was barred by the statute of limitations.

involved, "the statute of limitations begins to run when the United States comes into physical possession of the plaintiff's land." *Id.* at 822 (citing *Dow*, 357 U.S. at 21); *see also Roth v. United States*, 73 Fed. Cl. 144, 149 (2006). *Kemp* and similar cases hold that "[w]hether a physical taking is permanent or temporary is irrelevant to the application of the statute of limitations because the accrual date is the same for both." *Kemp*, 65 Fed. Cl. at 822 (citing *Caldwell v. United States*, 391 F.3d 1226, 1235 (Fed. Cir. 2004), *cert. denied*, 546 U.S. 826 (2005)).

Plaintiff asserts that the leases made by the United States effectuated physical takings. The court agrees that because these leases authorized the physical occupation of property, they should be analyzed as potentially giving rise to physical, not regulatory takings. *See Lucas*, 505 U.S. at 1017; *Pettro v. United States*, 47 Fed. Cl. 136, 144-46 (2000); *see also Tahoe-Sierra Preservation Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002). As such, the accrual rule applicable to temporary regulatory takings is not controlling here. For fifty-six of the leases cited by plaintiff, of course, it matters not whether the accrual rule applicable to temporary physical takings is triggered by the initial deprivation of access or the end of the takings, because these leases were entered into during the six-year period preceding the filing of the original complaint herein. Whether a special accrual rule applies to temporary physical takings, however, does make a difference as to the twelve leases cited by plaintiff that were entered into before the six-year limitations period began, but which terminated thereafter. Accordingly, the court is compelled to decide for itself when a temporary physical takings accrues.

While a close issue, there are several reasons why temporary and permanent physical takings claims seemingly ought to be treated the same for accrual purposes. In both instances, the "taking occurs when the owner is deprived of the use of the property." *Caldwell*, 391 F.3d at 1235. That rationale does not apply to regulatory takings, which arise only where, in the oft-quoted words of Justice Holmes, a "regulation goes too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 383, 415 (1922); *see also Lucas*, 505 U.S. at 1019 n.8; *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992). To decide whether the latter is true, courts must either determine that the regulation has denied the owner "all economically beneficial or productive use of land," *Lucas*, 505 U.S. at 1015, or, barring such a finding, employ the three-factored test outlined in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The latter test famously considers "[t]he economic impact of the regulation on the claimant" and "the extent to which the regulation has interfered with distinct investment-backed expectations." *Penn Central*, 438 U.S. at 124; *see also Brace v. United States*, 72 Fed. Cl. 337, 346 (2006), *aff'd*, 250 Fed. Appx. 359 (2007), *cert. denied*, 128 S. Ct. 1658 (2008).

It is in the context of these factors, with their heavy emphasis on the degree of diminution of the value of the property, that courts have found it appropriate to await the end of a temporary takings before treating a claim as accrued. The delay allows the property owner to assess fully the economic impact of the regulation in question. Thus, after reviewing the three-pronged *Penn Central* test, the Federal Circuit in *Creppel* reasoned –

[T]he Constitution recognizes a distinction between a temporary and a permanent taking.  Simply declaring a regulation that takes property invalid does not grant a constitutionally sufficient remedy.  Thus, property owners cannot sue for a temporary taking until the regulatory process that began it has ended.  This is because they would not know the extent of their damages until the Government completes the 'temporary' taking.  Only then may property owners seek compensation.

41 F.3d at 632 (citations omitted).  On this basis, the court held that the plaintiff's temporary takings claim accrued when a district court overturned an agency order halting the plaintiff's land reclamation project, because the court order "restored some potential expectation of completion of the Project and thus some measure of the property's value."  *Id.* at 364.  But, none of the considerations outlined in *Creppel,* or in other temporary regulatory takings cases, for that matter, resonates when the question is whether a physical takings has occurred.  In the latter instance, any deprivation in the use or enjoyment of property triggers a takings, regardless of its impact on value.  *See Tahoe-Sierra*, 535 U.S. at 322; *Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1292 (Fed. Cir. 2008) ("in the physical taking jurisprudence any impairment is sufficient").  The effect is immediate and there is no reason, as in a temporary regulatory takings, to await the completion of the harm.

Moreover, with all due respect to contrary decisions, any analogy between the accrual rules for temporary physical takings and the repudiation of contracts is superficial and strained.  In *Franconia*, the Supreme Court held that the enactment of the Emergency Low Income Housing Preservation Act (ELIHPA) effectuated a repudiation of prior loan contracts entered into by the Farmers' Home Administration, not an immediate breach.  536 U.S. at 143.  In this regard, the Court found that ELIHPA "conveyed an announcement by the Government that it would not perform as represented in the promissory notes if and when, at some point in the future, petitioners attempted to prepay their mortgages."  *Id.*  Relying upon the Restatement (Second) of Contracts § 250 and other contract treatises, the court noted that the time of accrual varied, depending upon "'whether the injured party chooses to treat the . . . repudiation as a present breach."  *Id.* at 144.  If that were true, the accrual date of the contract claim would be the date on which the injured party made the election; if no such election were made, that date would be the time fixed for performance.  *Id.*[16]  In either instance, then, the statute of limitations was triggered

_____

[16]  In this regard, the Supreme Court explained –

In sum, once it is understood that ELIHPA is most sensibly characterized as a repudiation, the decisions below lose force.  To recapitulate, "[t]he time of accrual . . . depends on whether the injured party chooses to treat the . . . repudiation as a present breach."  1 C. Corman, Limitation of Actions § 7.2.1, p. 488 (1991).  If that party "[e]lects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from [the] time of performance to the date of such election."  *Id.*, at 488-489.  But if the injured party

by an actual breach of contract. These common law contract principles hold no sway in the law of physical takings, in which the injured party does not have the election of deciding when the takings occurs. Accordingly, *Franconia* provides no extendable rationale for delaying the accrual of a temporary physical takings to when the takings ceases.

Finally, it should not be overlooked that, in drawing major distinctions between permanent and temporary physical takings, the accrual rule espoused by plaintiff (and the decisions discussed above) has the potential to bail out some claims, but sink others. The decisional law suggests that the "distinction between 'temporary' and 'permanent' prohibitions is tenuous." *Tahoe-Sierra*, 535 U.S. at 346-47 (Rehnquist, C.J., dissenting); *see also Lucas*, 505 U.S. at 1017; *First English*, 482 U.S. at 318. Accordingly, any attempt to distinguish between these types of takings in determining when a claim accrues risks having a claimant make the wrong choice, that is, to await the filing of its suit thinking that it has temporary takings, only to find out later – indeed, when it is too late – that the takings instead was of the permanent variety. Even though prudential considerations should play little or no role in deciding what is the appropriate accrual point here, the court hesitates to adopt an accrual rule that would require claimants to make distinctions that the law itself has found difficult to make consistently. The straits leading to this court's jurisdictional harbor are perilous enough without introducing yet another potentially-obscured obstacle.

To sum up, the court concludes, as this court did in *Kemp*, that the accrual date is the same for both permanent or temporary physical takings. As such, plaintiff's claims with respect to the twelve leases that were entered into more than six years before the initiation of this lawsuit are untimely and, to that extent, must be dismissed. The remainder of the plaintiff's temporary takings claims that are at issue are predicated upon leases that were executed within the six-year limitations period and thus meet the requirements of section 2501.[17]

### 3.    Breach of Contract

A breach of contract claim accrues "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Oceanic S.S. Co. v.*

---

instead opts to await performance, "the cause of action accrues, and the statute of limitations commences to run, from the time fixed for performance rather than from the earlier date of repudiation." *Id.*, at 488.

536 U.S. at 144; *see also Indiana Mich. Power Co. v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) ("For an aggrieved party to recover damages for an anticipatory repudiation, it must elect to treat the repudiation as a total breach."); *Arakaki v. United States*, 62 Fed. Cl. 244, 254 (2004).

[17]   Should discovery produce new facts regarding the mineral leases, either party may revisit this ruling in an appropriate motion for summary judgment.

*United States*, 165 Ct. Cl. 217, 225 (1964).  Nevertheless, the accrual suspension rule also may apply to breaches of contract, delaying the accrual of such claims.  *Texas Nat. Bank*, 86 Fed. Cl. at 413-14; *see also L-3 Comms.*, 79 Fed. Cl. at 463-64.

Preliminarily, defendant contends that because plaintiff's contract claim was not filed until it amended its complaint in 2008, that claim is well out of time.  RCFC 15(c)(1)(B), however, provides that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."  The Federal Circuit has instructed that "'the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.'"  *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1369 (Fed. Cir. 2004) (quoting *Snoqualmie Tribe v. United States*, 372 F.2d 951, 961 (Ct. Cl. 1967)).  Applying this standard, the court has reviewed plaintiff's original complaint.  It lists the contracts under which the United States acquired the "surface (but not the minerals) of the lands subject to" its servitudes and avers that in *Nebo Oil*, "the court found specifically that the United States did not intend to buy, nor did it pay for, minerals or mineral servitudes at the time it acquired the surface of this same property."  The latter statement is, in essence, the predicate for plaintiff's breach of contract claim and, in the court's view, provided defendant with adequate notice that a breach of contract claim might arise out of the transactions listed.

That plaintiff's contract claim arose from the same transaction that gave rise to its takings claim, however, leaves plaintiff with the same statute of limitations problem encountered above. In short, while it would appear that the accrual of plaintiff's breach claim was suspended for many years, every indication is that plaintiff was constructively on notice of that claim (through its predecessor) at the same time it became aware of its takings claims.  That was in 1991, or, at the latest, 1993, and thus more than six years prior to the filing of this lawsuit.  Accordingly, plaintiff's breach of contract claims must also be dismissed as time-barred under section 2501.[18]

---

[18]  Defendant further argues that plaintiff's contract claim is barred by the doctrine of laches.  Laches is an inexcusable delay that results in prejudice to the defendant.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002); *Kansas v. Colorado*, 514 U.S. 673, 687 (1995); *Galliher v. Cadwell*, 145 U.S. 368, 373 (1892) ("[L]aches is not . . . a mere matter of time.").  Here, the flurry of activity that followed the filing of the original complaint cuts against defendant's position that plaintiff's delay in pursuing its contract claim was unreasonable or inexcusable.  Moreover, defendant has made no showing of real prejudice, except to claim, without any details, that the delay in filing the amended complaint has caused "witnesses' memories . . . [to have] faded" (since the contracts here were entered into in the 1930s, one must wonder whether the witnesses themselves, and not just their memories, have faded).  Laches thus does not provide an additional basis for striking plaintiff's contract claims.

B.      **Failure to State a Claim**

In its motion to dismiss, defendant also contends that a variety of counts in plaintiff's amended complaint fail to state a claim upon which relief may be granted and thus must be dismissed under RCFC 12(b)(6).  To survive such a motion, the complaint must have sufficient "facial plausibility" to "allow[ ] the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Colida v. Nokia, Inc.*, 2009 WL 3172724, at *1 (Fed. Cir. Oct. 6, 2009).  Thus, the plaintiff's factual allegations must "raise a right to relief above the speculative level" and cross "the line from conceivable to plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Nevertheless, the Federal Circuit has recently reiterated that "[i]n ruling on a 12(b)(6) motion to dismiss, the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff."  *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1326 (Fed. Cir. 2009).

The court will consider defendant's merits arguments only insofar as it has concluded that it has jurisdiction over the enumerated claims.  In other words, it will not address arguments regarding the counts that will be dismissed as untimely.

1.      **Temporary Takings**

Defendant asserts that plaintiff's temporary takings claims should be dismissed with respect to the ninety prescribed servitudes that were determined to have prescribed in the quiet title action.  It contends that the judgment of the United States District Court for the Western District of Louisiana collaterally estops plaintiff from contending that it has a compensable property interest in the prescribed servitudes, requiring its temporary takings claims as to those servitudes to be dismissed.

It is, of course, "axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation."  *Bair v. United States*, 515 F.3d 1323, 1327 (Fed. Cir.), *cert. denied*, 129 S. Ct. 763 (2008) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1077 (2002)); *see also Maritrans v. United States*, 342 F.3d 1344, 1351 (Fed. Cir. 2003).  Accordingly, there is little doubt that to support their temporary takings claims, plaintiff must show that, at the time of the leases in question, it owned the relevant servitudes.  Likewise, it is beyond peradventure that the district court's judgment here is entitled to preclusive effect.  "[O]nce an issue is actually and necessarily determined by a court of competent jurisdiction," the Supreme Court has instructed, "that determination is conclusive in subsequent suits based on a different cause of action involving a party to a prior litigation."  *Montana v. United States*, 440 U.S. 147, 153 (1979); *see also In re Cyngnus Telecomm. Tech., LLC, Patent Litigation*, 536 F.3d 1343, 1349 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1906 (2009).  By its terms, however, this rule applies only where "the point or question presented for determination in the subsequent action is the same as that litigated and determined in the original action" – in other words, the adjudication of an issue in the first case is not conclusive of a

distinct issue arising in the second. *United States v. Moser*, 266 U.S. 236, 241 (1924); *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001); *Underwood Livestock, Inc. v. United States*, 2009 WL 3286686, at *12 (Fed. Cl. Oct. 7, 2009); *see also Petro-Hunt, LLC*, 365 F.3d at 398-99. Any doubts in this regard are resolved against the party invoking the doctrine. *See Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).

Here, the district court effectively resolved which of the servitudes in question prescribed. There is no indication in the record, however, that it found ***when*** the prescriptions occurred. Indeed, the judgment rendered by that court on December 7, 2005, focused not on the properties that had prescribed, but instead concluded that plaintiff had retained interests on five servitudes and that any leases issued by the United States with respect to those servitudes were "cancelled and set aside as null and void." Unlike in the quiet title action, timing here is critical: we know plaintiff originally had a compensable property interest in the servitudes – the question is whether it still had that interest at the time that the leases in question were granted. If the prescription of a given servitude occurred after the lease thereon was let, then defendant conceivably could still be liable for any temporary takings associated with the leasing – at least for any period of overlap. Resolution of when the servitudes prescribed cannot be made based upon the facts disclosed in plaintiff's amended complaint and, therefore, must await resolution following discovery in this case.[19]

Finally, in arguing that plaintiff's temporary takings claims should be dismissed, defendant essentially asserts that the leases in question could not have effectuated a takings because, under the Louisiana law regarding mineral servitudes, plaintiff could not preclude defendant from making those leases. Defendant bases this remarkable claim on La. Rev. Stat. § 31:121, which states that "[a] mineral lessee may takes leases from persons claiming the leased land or mineral rights or interests therein adversely to his lessor." A comment in the Louisiana Code describes this provision, as follows:

> The rule stated in Article 121 is consistent with the rule of Article 120 that the mineral lessor's warranty is that of a seller. Early jurisprudence took a common-sense view of the mineral lease, holding that the rule that a lessee may not contest

---

[19] A careful reader might perceive tension between this conclusion and the conclusion that plaintiff's permanent takings claim accrued in 1991, or at the latest 1993, and thus is untimely. In the court's view, however, that plaintiff's temporary takings claim may proceed, while its permanent takings claim does not, results from the different burdens plaintiff had in terms of responding to defendant's motion to dismiss. As to the jurisdictional prongs of that motion, plaintiff was obliged to show that its claims were timely – and its failure to demonstrate factually that any of the servitudes prescribed within six years of the filing of its complaint meant that its permanent takings claim was untimely. But, plaintiff is not obliged to demonstrate now when the servitudes in question prescribed for purposes of the claims made by defendant with respect to the merits. Rather, it may rely on its complaint which, in the court's view, demonstrates that it has a plausible claim.

his lessor's title is inapplicable to mineral leases. . .  However, following the decision in *Gulf Refining Co. v. Glassell*, 186 La. 190, 171 So. 846 (1936), which held a mineral lease to be like a predial lease and denied lessees the right to bring real actions, the United States Court of Appeals refused to follow the early decisions on this point and held that a lessee cannot deny his lessor's title.  *Sabine Lumber Co. v. Broderick*, 88 F.2d 588 (5th Cir. 1937).  The problem posed by this jurisprudence has usually been met by the inclusion in mineral leases of a clause permitting the lessee to take leases from adverse claimants.  Article 121 therefore lays to rest a question existing in the jurisprudence and adopts what has become customary practice in the industry.

Comment to La. Rev. Stat. § 31:121.  Summarizing this history, a Louisiana Court of Appeals has observed that this provision "was incorporated into the Mineral Code to enable a mineral lessee to protect its rights to explore for and produce minerals."  *Am. Lung Ass'n v. State of La.*, 645 So. 2d 1219, 1222 (La. Ct. App. 1994), *writ denied*, 650 So. 2d 1182 (La. 1995).

One obvious shortcoming in defendant's claim is that section 121, by its terms, is inapplicable here, as there is no indication – certainly nothing in the amended complaint – that defendant's lessees were previously leasing the same servitudes from plaintiff.  Defendant, however, persists in suggesting that the existence of this provision indicates that a lessor in Louisiana is not liable to the rightful property owner for any damages occasioned by a mineral lease.  But, can it be that Louisiana law holds blameless one who, without authorization, leases someone else's property?  In fact, as the above commentary reveals, the provision cited by defendant is intended to protect *lessees* who wish to pursue drilling and extraction on contested lands, not to protect *lessors* who are found to have leased servitudes they did not own.  One seeking confirmation of this need consider not only the many cases arising under Louisiana law in which the rightful owners of property have successfully pursued false lessors,[20] but also La. Rev. Stat. § 31:120, which explicitly gives the lessee the right to sue a lessor who does not have title to the interest leased  for damages and other revenues that the lessee is obliged to pay to the true owner.[21]  Moreover, while defendant deduces from section 121 that the "mere issuance of a

---

[20]  *See, e.g.*, *Nelson v. Young*, 234 So. 2d 54 (La. 1970) (landowner who leased mineral interests owned by others liable to owners of mineral reservation for accounting and payment of amounts owed under leases); *State v. Jefferson Island Salt Mining Co.*, 163 So. 145 (La. 1935), *cert. denied*, 297 U.S. 716 (1936) (dispute between mineral owner and salt mining company); *Newman v. Livingston Parish Police Jury*, 603 So. 2d 250 (La. Ct. App. 1992) (dispute between competing claimants as to entitlement to mineral lease royalties); *Win Oil Co. v. UPG, Inc.*, 509 So. 2d 1023, 1026 (La. Ct. App. 1987) (dispute between competing claimants as to entitlement to oil royalties).

[21]  Article 120 provides that "[a] mineral lessor impliedly warrants title to the interest leased unless such warranty is expressly excluded or limited. The liability of the lessor for breach of warranty is limited to recovery of money paid or other property or its value given to the lessor

lease" does not affect the true owner's use or enjoyment of the property, so as to effectuate a takings, this is far from clear as a factual matter.  This is particularly so if one assumes that the leases meant what they said in indicating that the lessees were paying royalties to the United States (and not plaintiff) for the exclusive right (presumably, as against plaintiff) to drill for, mine, extract and remove all of the oil and gas on a given servitude (owned by plaintiff).  At the least, this court is unwilling to adopt defendant's hollow characterizations of the leases in question based upon a statute that, on its face, is wholly inapplicable here.[22]

At this nascent stage of the proceedings, this court need go no further – contrary to defendant's intimations, plaintiff need not plead every single fact concerning every single lease in order to meet the "plausibility" standard of *Twombly*.  The Supreme Court in the latter case (and, even more so in its recent decision in *Iqbal*) made clear that it intended neither to defenestrate the notice pleading rules that have reigned under *Conley v. Gibson*, 355 U.S. 41, 45 (1957), nor, correspondingly, to collapse discovery, summary judgment and trial into the pleading stages of a case.  *See Twombly*, 550 U.S. at 555 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Iqbal*, 129 S. Ct. at 1949-50 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Accordingly, this court finds that, to the extent plaintiff's temporary takings claims are timely, they state a valid claim.[23]

---

for execution or maintenance of the lease and any royalties delivered on production from the lease."  Commentary to this provision indicates that Article 2506 of the Louisiana Civil Code authorizes the lessee to recover from the false lessor "the fruits or revenues when he is obliged to return them to the true owner."  Comment to La. Rev. Stat. § 31:120.

[22]  In arguing to the contrary, defendant relies upon *American Lung Ass'n*.  In that case, a Louisiana intermediate appellate court was faced with a situation in which La. Rev. Stat. § 31:120 plainly applied, namely, one in which the lessee of the rightful property owner also entered into what the court termed a "protective" lease with a competing claimant.  645 So. 2d at 1222.  The court concluded that the rightful owner could not sue the non-owner for damages, suggesting that instead the owner should pursue its own lessee for any amounts owed.  In so concluding, the court not only emphasized that its ruling applied to the "protective" leases governed by the statute, but also suggested that its holding was based on the fact that the rightful lessor had not expressly prohibited its lessor from entering into such protective leases, as apparently the lessor could have done under state law.  *Id.* at 1222-23.  (Here, of course, plaintiff had no opportunity to prevent anyone from entering into leases with the United States.)  In the court's view, the rationale of this case lends no weight to defendant's argument that the leases here could not effectuate a takings.

[23]  Nor will the court resolve, at this early juncture, whether defendant did or did not issue leases with respect to certain of the servitudes still owned by plaintiff.  In making factual claims

### 2.      Reformation

In its complaint, plaintiff seeks to reform the contracts entered into between its predecessor-in-interest and the United States.  While this court lacks general equitable powers, it may "exercise equitable powers as an incident to [its] general jurisdiction . . . by reforming a contract and enforcing it as reformed in an action of law."  *Carney v. United States*, 462 F.2d 1142, 1145 (Ct. Cl. 1972); *see also Lion Raisins, Inc. v. United States*, 51 Fed. Cl. 238, 244 (2001).  Plaintiff may prevail on its reformation claim only if that reformation is a precursor to a monetary judgment.  *See United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173-74 (1906); *see also Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 1274 n.1 (Ct. Cl. 1972) ("Where the relief is monetary, we can call upon such equitable concepts as rescission and reformation to reach the right result.").  Plaintiff asserts that its claim for reformation is incidental to a claim for money damages, but does not explain how this is so, other than to suggest that the reformation claim buttresses its other contract claims.  Of course, if that is the case, then plaintiff's reformation claim must rise or fall with those other contract claims and, indeed, must be dismissed because those other claims have been determined to be untimely.  *See Bank of Guam*, 578 F.3d at 1331 (claim for declaratory relief properly dismissed where all other contract claims were dismissed).  But, even if plaintiff's reformation claim is viewed as giving rise to a damage claim separate and distinct from its other contract claims, it is hard to envision how any such other contract claim does not fall prey to the same timeliness limitations – again, the facts indicate that plaintiff (or its predecessor) should have known by 1991, or no later than 1993, that the United States no longer viewed the Louisiana law of prescription as inapplicable.

Accordingly, for a variety of reasons, plaintiff's reformation claim must also be dismissed.

## III.      CONCLUSION

This court will not gild the lily.  Like Odysseus's Ithacan vessel of old, plaintiff's complaint survives for another day (albeit with a complement of fewer claims).

Based on the foregoing, the court **GRANTS**, in part, and **DENIES**, in part, defendant's motion to dismiss.  Specifically, the Clerk shall dismiss from the complaint Count I (permanent taking of the ninety-six servitudes); counts IV, V and VI (dealing with contract claims); and count VII (reformation).  In addition, count II shall be dismissed to the extent that it presents temporary takings claims as to particular leases that are not timely.  On or before November 30,

---

with respect to these and other issues, defendant relies upon detailed declarations (and associated charts) from two expert witnesses, seemingly swatting aside the evidentiary limitations associated with a motion to dismiss.  To the extent those declarations assert facts that are non-jurisdictional, this court hereby excludes that matter and will not convert defendant's motion into what the court views as a premature motion for summary judgment.  *See* RCFC 56(d).

2009, the parties shall file a joint status report setting forth a proposed discovery plan for this case.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge